IN THE UNITED STATES COURT OF FEDERAL CLAIMS
_____

No. 15-953 T

(Judge Eric G. Bruggink)

CITIGROUP INC.,

                                        Plaintiff,

            v.

THE UNITED STATES,

                                        Defendant

_____

PLAINTIFF'S MEMORANDUM OF
CONTENTIONS OF FACT AND LAW
_____

Jean A. Pawlow
Attorney of Record
Latham & Watkins LLP
555 11th St. NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-3331
Fax: (202) 637-2201
jean.pawlow@lw.com

Counsel of Record for Plaintiff
Citigroup Inc. & Subsidiaries, including
Citibank, N.A. as successor in interest to
Glendale Federal Bank, FSB

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND ................................................................................3

    A.   Glendale's Acquisition of Broward ...........................................................3
    B.   Assets Acquired in the Merger ...................................................................7
        1.   FSLIC Assistance Items.....................................................................7
            a.   The RAP Right...........................................................................7
            b.   The Branching Right..................................................................8
            c.   Other Items of FSLIC Assistance .............................................9
        2.   Other Assets .....................................................................................10
            a.   Tangible Assets ........................................................................10
            b.   Tax Benefits.............................................................................10
            c.   Other Intangible Assets of Broward ..........................................11
    C.   The Government's Breach ........................................................................11
    D.   Tax Consequences of the Breach .............................................................13

III.    TRIAL SUMMARY .............................................................................................14

    A.   Background Regarding the Merger............................................................16
        1.   Mr. Richard Fink Will Describe the Merger From Glendale's
            Perspective and Explain Why the RAP Right Was Valuable ...................16
        2.   Glendale Employees Described the Importance of the RAP Right
            From Glendale's Perspective ...............................................................18
        3.   Dr. David Croft Described the Importance of the RAP Right From
            FHLBB'S Perspective..........................................................................20
        4.   Mr. Martin Lowy Will Describe the Accounting and Regulatory
            Environment Existing at the Time of the Merger ...................................21
        5.   Mr. Lowy and Mr. Mark Oken Will Rebut the Anticipated
            Testimony of Mr. Hargett. ..................................................................23
    B.   Valuation of the Intangible Assets ...........................................................26
        1.   The Value of the RAP Right................................................................27
            a.   Dr. Froot Correctly Valued the RAP Right as Insurance..............27
            b.   Dr. Froot Will Rebut Mr. Kimball's RAP Right Valuation..........31
            c.   Dr. McDonald Correctly Valued the RAP Right as a
                Guarantee. ..............................................................................32
            d.   Plaintiff Will Prove the Major Flaws and Technical Errors
                in Mr. Kimball's Purported Valuation of the RAP Right. ............40
                 i.   Mr. Plastino Will Describe the Flaws and Errors in
                     Mr. Kimball's RAP Right Valuation. ................................42
                 ii.  Mr. Harms Will Proffer His Expert Report Valuing
                     the RAP Right to Preserve His Testimony ........................44

i

2. Dr. Mann Correctly Valued the Branching Right and the Tax Benefit...........................................................................................44
    a. The Value of the Branching Right ................................45
    b. The Value of the Tax Benefit.......................................46
3. Mr. Harms Correctly Valued the Other Items of FSLIC Assistance .........48
    a. The Interest Rate Protection Agreement.......................48
    b. The Indemnification Provision .....................................49
    c. The FHLB Advance Refinancing Provision .................50
4. Mr. Plastino Correctly Identified and Valued Broward's Intangible Assets. .........................................................................................51
5. Mr. Plastino Will Also Opine on the Overall Valuation of the Assets at Issue. ............................................................................54
6. Mr. Carroll Will Describe the Tax Consequences of the Merger and Related Litigation...........................................................................56
    a. Mr. Carroll Will Testify that Any Amounts Attributed to the Florida Operations Should Offset the Gain on the Sale of the Florida Business...................................................57
    b. Mr. Carroll Will Testify that Glendale Did Not Obtain a Tax Benefit From the Transaction Costs From the 1993 Recapitalization...................................................................60
    c. Mr. Carroll Will Testify that Glendale Recognized Cancellation of Indebtedness Income as a Result of the Breach and Subsequent Restructuring. ...........................61

IV. CONCLUSION...................................................................................61

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Citigroup, Inc. v. United States*,
  140 Fed. Cl. 283 (2018) ................................................................................... *passim*

*Freeman v. Comm'r*,
  33 T.C. 323 (1959).............................................................................................3

*Glendale Federal Bank, FSB v. United States*,
  239 F.3d 1374 (Fed. Cir. 2001), *aff'g* 43 Fed. Cl. 390 (1999) ..........................12, 13

*Glendale Federal Bank, FSB v. United States*,
  43 Fed. Cl. 390 (1999), *aff'd*, 239 F.3d 1374 (Fed. Cir. 2001)......................*passim*

*Glendale Federal Bank, FSB v. United States*,
  54 Fed. Cl. 8 (2002), *aff'd*, 378 F.3d 1308 (Fed. Cir. 2004)...............................4, 13

*Hillsboro Nat. Banks v. Comm'r*,
  460 U.S. 370 (1983).............................................................................................3

*Statesman Savs. Holding Corp. v. United States*,
  26 Cl. Ct. 904 (1992), *aff'd, United States v. Winstar*, 518 U.S. 839 (1996) .......................3, 6

*United States v. Winstar Corp.*,
  518 U.S. 839 (1996), *aff'g, Winstar Corp. v. United Sates*, 64 F.3d 1531 (Fed. Cir. 1995) ................................................................................ *passim*

*Wash. Mut., Inc. v. United States*,
  130 Fed. Cl. 653 (2017), *aff'd*, 891 F.3d 1016 (Fed. Cir. 2018).........................2, 45

*Wash. Mut., Inc. v. United States*,
  996 F. Supp. 2d 1095 (W.D. Wash. 2014), *aff'd*, 856 F.3d 711 (9th Cir. 2017) ...............2, 46

*Winstar Corp. v. United States*,
  64 F.3d 1531 (Fed. Cir. 1995), *aff'd,* 518 U.S. 839 (1996) ......................................3

### STATUTES

26 U.S. Code
  § 1012(a) ...........................................................................................................2
  § 165(a) ...........................................................................................................2, 59
  § 197...............................................................................................................15
  § 368(a)(l)(G)..................................................................................................6, 11

  § 61(a)(12) .......................................................................................................61

Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989)......................................................................................................................11

## REGULATIONS

12 C.F.R.
    § 561.13........................................................................................................................................7
    § 563.13(a)...................................................................................................................................7
    § 563.13(b)...................................................................................................................................7

46 Fed. Reg. 19, 221 (Mar. 30, 1981)...............................................................................................8

Treas. Reg. §1.165-1(b) ..................................................................................................................59

Treas. Reg. § 1.165-1(d)(2)(i).........................................................................................................1

## OTHER AUTHORITIES

APB 16: Business Combinations (August 1970).............................................................................20

FHLBB Memorandum No. SP-24 (December 29, 1981) .................................................................20

Goodman, Gordon E., "*Risk Tutorial: Financial Reporting - How to Value Guarantees*," (Global Association of Risk Professionals, January/February 2008) ...........................................40, 42

Hull, John, *Options, Futures, and Other Derivatives*, (Pearson 9th ed. 2015) ...................................................................................................................36

Lowy, Martin, *High Rollers: Inside the S&L Debacle* (Praeger 1991) .........................................22

McDonald, Robert L., *Derivatives Markets*, (Pearson, 2013) ......................................................36

Staff Accounting Bulletin No. 42, 17 CFR Part 211 (Dec. 23, 1981) ...........................................24

Statement of Financial Accounting Concepts No. 3, Financial Accounting Standards Board (December 1980) ....................................................................................................................25

Statement of Financial Accounting Standards No. 72, Financial Accounting Standards Board (published in proposed form September 30, 1982) (February 1983)......................................26

## I.      **INTRODUCTION**

This is a federal tax refund suit seeking recovery of taxes paid by Citigroup Inc. & Subsidiaries, including Citibank, N.A. as successor in interest to Glendale Federal Bank, FSB ("Glendale").[1]  The transaction that gave rise to Glendale's refund claim took place in November 1981, when Glendale acquired the failing Florida thrift First Federal Savings and Loan of Broward ("Broward") through a federally subsidized and approved supervisory merger (the "Merger") during the savings and loan crisis.[2]  As an incentive to enter into the Merger, Glendale received certain items of assistance from its regulators, the Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB").

Plaintiff seeks a refund of income taxes attributable to:

(1)      A $798 million deduction for certain intangible assets that it lost when Congress changed the treatment of so-called "supervisory goodwill" in 1989 and Glendale was forced to sell its Florida operations in 1994; and

(2)      Taxes it paid on $73 million of the $381 million judgment obtained as a result of litigation for the Government's breach of contract.

Plaintiff seeks a refund for the 2005 tax year, the year in which its litigation against the Government finally ended.[3]

---

[1] For convenience, Plaintiff Citigroup, Inc. generally will be referred to throughout as Glendale.

[2] For background on the 1970s and 1980s savings and loan crisis, Plaintiff respectfully references the Court's description contained within its 2018 opinion denying Plaintiff's motion for summary judgment.  *See* Court Opinion, ECF No. 53 at 2; *Citigroup, Inc. v. United States*, 140 Fed. Cl. 283 (2018) (hereinafter "*Citigroup*" or the Court's "2018 Opinion").

[3] When a taxpayer pursues a claim for reimbursement for a loss, Treas. Reg. § 1.165-1(d)(2)(i), defers the year of deduction until the claim is resolved.  Code references are to the Internal Revenue Code of 1986, and Treas. Reg. references are to the Treasury Regulations promulgated thereunder as in effect for the year at issue, unless otherwise noted.

*First*, Code section 165(a) provides that a taxpayer may deduct "any loss sustained during the taxable year and not compensated for by insurance or otherwise."  The amount of that loss is determined by the taxpayer's basis in the lost property.  In general, the basis of property is the "cost" of such property under Code section 1012(a), and any liability assumed is treated as a part of the property's "cost."

The Parties agree with this Court, the Ninth Circuit, and the Federal Circuit that the purchase price for the intangible assets described herein is "the excess of liabilities over assets." *See Citigroup*, 140 Fed. Cl. at 290.  As explained below, Glendale assumed $798 million in "excess liabilities" as part of the Merger.  Once a taxpayer establishes that it has basis in an asset (or a group of assets) that basis does not "disappear."  Instead, basis is "recovered" either through periodic depreciation deductions, upon the sale, abandonment, or other disposition of the asset, or when the asset becomes worthless.  Despite filing multiple claims for refund, the Internal Revenue Service never allowed Plaintiff to recover *any* of its $798 million basis.

Through expert testimony and the evidentiary record, and applying the framework provided by the *Washington Mutual* line of cases and this Court's 2018 Opinion, Plaintiff will establish to a reasonable degree of certainty the fair market values of all of the intangible assets, including the items of federal assistance, that Glendale received in the Merger.[4]  Plaintiff will then allocate its cost basis to each intangible asset based on its relative fair market value at the time of the Merger.  This will enable the Court to determine that Plaintiff is entitled to:  (a) the loss

---

[4] The *Washington Mutual* cases include tax refund litigation commenced in the Western District of Washington as well as this Court.  *See Wash. Mut., Inc. v. United States*, 130 Fed. Cl. 653 (2017), *aff'd*, 891 F.3d 1016 (Fed. Cir. 2018); *Wash. Mut., Inc. v. United States*, 996 F. Supp. 2d. 1095 (W.D. Wash. 2014), *aff'd*, 856 F.3d 711 (9th Cir. 2017).

attributable to those lost assets; and (b) an offset to the ***$200 million gain*** it reported on the sale of its Florida operations.

*Second*, this Court has already noted that as a general matter "a damages award which only compensates for lost capital is not usually taxable because such an award is not a realization of income." *Citigroup,* 140 Fed. Cl. at 292 (citing *Freeman v. Comm'r*, 33 T.C. 323, 327 (1959). As this Court also explained, however, the tax benefit rule "will not allow the exclusion of an item from income if it represents a recovery for a loss that has already been deducted from income in a prior year." *Id.* at 293 (citing *Hillsboro Nat. Banks v. Comm'r*, 460 U.S. 370, 383 (1983)). Accordingly, the Court held that if "some or all of the amounts deducted as expenses" correspond with the $381 million damages award, the tax benefit rule will apply. *Id.* As discussed below, the evidence will show that the tax benefit rule does not apply to approximately $73 million of the damages comprised of: (1) $24,235,000 in transaction costs from a 1993 recapitalization, which did not yield a deduction or credit on Glendale's tax returns and should not be subject to tax upon their recovery; and (2) $48,713,003 of cancellation of indebtedness ("COD") income incurred as a result of the 1993 capitalization that Glendale reported on its 1993 tax return.[5]

## II.   FACTUAL BACKGROUND[6]

### A.   Glendale's Acquisition of Broward

Broward was a Florida thrift organized as a mutual association. In September 1981, it was insolvent, with liabilities exceeding its assets by over $700 million. To fully liquidate Broward,

---

[5] Plaintiff respectively reserves all its appeal rights, including the right to argue that no portion of the $381 million damage award is taxable because it is excluded from gross taxable income pursuant to Code section 597.

[6] The majority of the facts should not be at issue, having specifically been determined in the Court's 2018 Opinion and in prior litigation. *See Statesman Savs. Holding Corp. v. United States*, 26 Cl. Ct. 904 (1992), *aff'd*, *Winstar Corp. v. United States*, 64 F.3d 1531 (Fed. Cir. 1995), *aff'd*, *United States v. Winstar Corp.*, 518 U.S. 839 (1996). This so-called "*Winstar* litigation" determined the

the FSLIC would have needed about $1.8 billion.  Only about $1 billion, however, could have been recouped from the sale of Broward's assets.  At the time, Glendale was a California thrift that was organized as a mutual institution.  It was both profitable and well capitalized, with a net worth of approximately $277 million, but it too faced risks associated with the interest rate environment at the time.

In September 1981, Broward approached Glendale about a possible merger.  Besides originating the merger discussions, Broward participated in meetings with Glendale and the regulators and played an active role in the merger negotiation process.  The regulators and Glendale also entered into negotiations over Glendale's possible acquisition of Broward.  The FHLBB found that Broward's financial condition was deteriorating and projected that Broward's regulatory capital would fall to zero by June 1982.  It was estimated that, at the time of the Merger, the market value of the liabilities of Broward exceeded the market value of its assets by $734 million.[7]  The assumption of Broward's liabilities would have rendered Glendale immediately insolvent by approximately $460 million.  From Glendale's first negotiations with government regulators over the Merger, it was understood by both sides that the transaction would be feasible if and only if the government dealt with Broward's large tangible capital deficit in some way, otherwise, Glendale would have been subject to regulatory noncompliance and penalties from the moment of

_____

nature of the contract between Glendale and the government and the fact of the government's liability to Glendale.  As discussed in more detail below, the Court of Federal Claims subsequently awarded Glendale damages in the amount of $380,787,000.  *See Glendale Federal Bank, FSB v. United States*, 54 Fed. Cl. 8 (2002), *aff'd*, 378 F.3d 1308 (Fed. Cir. 2004).

[7] The total goodwill amount of $734,666,000 was adjusted upward to $798,291,000 to reflect the market value of the excess liabilities on the date that the merger was approved.  This included the market value of the net loss as of September 30, 1981, as calculated through November 19, 1981, as well as additional losses between September 30, 1981, and November 19, 1981.  *See Glendale Federal Bank, FSB v. United States*, 43 Fed. Cl. 390, 405 n.7 (1999).  The final goodwill amount was $798,291,000.  *See Complaint,* ECF No. 1 *and Answer,* ECF. No 10 ¶ 42.

the Merger.  *See United States v. Winstar Corp.*, 518 U.S. 839, 863 (1996).  The preferred means of doing so was through the purchase method of accounting, and recognizing the excess liabilities as goodwill.

After preliminary negotiations with the regulators, Glendale submitted a merger proposal to the FHLBB, which had to approve all mergers involving savings and loan associations.  In the proposal Glendale requested approval from the FHLBB to use the purchase method of accounting, and to record supervisory goodwill arising from the transaction as an asset for regulatory capital purposes with an amortization period of 40 years.  On November 12, 1981, Glendale entered into an Agreement of Merger with Broward, which was conditioned upon a Supervisory Action Agreement ("SAA") between Glendale and the FSLIC.  In essence, the acquisition of Broward by Glendale was "a tripartite agreement with the United States in that it required an agreement between the Glendale and Broward and an agreement between the United States and Glendale."  *Citigroup*, 140 Fed. Cl. at 285.

On November 19, 1981, Glendale entered into the SAA with the FSLIC pursuant to which Glendale agreed to assume, through a merger, the government's financial liability.  Among the assistance items provided by the FSLIC to Glendale as a part of this transaction were:  (1) interest rate protection; (2) indemnification for damages arising out of litigation against Glendale as a result of the Merger, damages suffered as a result of the FHLBB or FSLIC's actions to effectuate the Merger, and any amounts paid to satisfy any unknown liability of Broward; and (3) a promise of FHLBB to use best efforts to restructure existing FHLBB loans to Broward.  In addition, Glendale received the "RAP Right" and "Branching Right," the two most important and valuable

assistance items, which are discussed in further detail below.[8]   The merger was a tax-free reorganization under Code section 368(a)(l)(G).

The SAA between Glendale and the FSLIC incorporated by reference "any resolutions or letters issued contemporaneously herewith by the FHLBB or the FSLIC" and the merger agreement between Glendale and Broward.  This Court previously held that these incorporated documents included the November 19, 1981, FHLBB Resolution No. 81-710, which approved the Merger, as well as several other documents.  *Statesman*, 26 Cl. Ct. at 910.

FHLBB resolution No. 81-710 required Glendale to furnish an opinion from its independent accountant justifying under Generally Accepted Accounting Principles ("GAAP") the use of the purchase method of accounting for its merger with Broward, recognizing any goodwill or discount of assets from the merger to be recorded on Glendale's books, and substantiating the reasonableness of amounts attributed to goodwill and the discount of assets including the resulting amortization periods and methods.  The opinion letter of Glendale's independent accountants, Peat Marwick, Mitchell & Co. ("Peat Marwick"), dated November 10, 1981, supplemented by letter dated March 15, 1982, specified two components of goodwill from the Merger:  $18 million of goodwill associated with the savings deposit base to be amortized on a straight line basis over 12 years and $716,666,000 of goodwill of indefinite life to be amortized on a straight line basis over 40 years.   Peat Marwick's opinion letter substantiated the reasonableness of the amounts attributable to goodwill and the opinion letter was satisfactory to the FHLBB.  The government subsequently approved of the terms set forth in the letter.  *See Statesman*, 26 Cl. Ct. at 911.

---

[8] "'RAP' refers to the FHLBB's new set of regulatory accounting principles that it promulgated to supersede GAAP for purposes of compliance with capital reserve requirements in supervisory mergers."  *Citigroup*, 140 Fed. Cl. at 286 n.3 (citing *Winstar*, 518 U.S. at 846).

### B.      Assets Acquired in the Merger

#### 1.      FSLIC Assistance Items

##### a.      The RAP Right

Under GAAP, there are circumstances in which a business combination may be dealt with by the purchase method of accounting, the relevant aspect of which is to permit the acquiring entity to designate the excess of the purchase price over the fair value of all identifiable assets acquired as an intangible asset called goodwill. *See Winstar*, 518 U.S. at 848-49. At the time of the Merger, however, it was not clear under GAAP whether the purchase method of accounting was applicable to the acquisition of failing thrifts. *Id.* at 854; *see also Citigroup*, 140 Fed. Cl. at 286 n.3 (citing *Winstar*). Moreover, the relevant thrift regulations did not explicitly state that intangible goodwill assets created by the purchase method of accounting could be counted toward regulatory capital. *Winstar*, 518 U.S. at 854.[9] Thus, Glendale wanted to settle regulatory treatment of the transaction as a condition of the Merger. Indeed, without the government's promise as to the use of the purchase method of accounting and 40-year amortization for the bulk of the goodwill that would be generated as a result, Glendale's responsible directors and officers would have never approved the Broward merger. The assumption of Broward's liabilities would have incapacitated Glendale and made it impossible to operate. *See Id.* at 863; *Glendale Fed. Bank*, 43 Fed. Cl. at 393. As this Court stated previously: "the supervisory goodwill and the long amortization was designed to fill the capital hole, permit Glendale to maintain its ability to leverage its existing capital, give the

---

[9] Glendale was subject to the regulatory "reserve" and "net worth" requirements under C.F.R. § 563.13(a) and (b). Both regulatory requirements used the definition of "net worth" in C.F.R. § 561.13. The regulatory definition of "net worth" did not state that intangible goodwill assets created from purchase accounting would count towards regulatory "net worth."

thrift the ability to generate income to replace the amortizing goodwill and, ultimately, make the whole enterprise profitable." *Id.* at 394.

Therefore, it was prudent for Glendale and the regulators to reach an agreement on the regulatory accounting treatment to be accorded supervisory goodwill as a condition of the Merger. This Court explained:

> The Supreme Court held that the totality of these documents amounted to a ***valuable guarantee*** by the United States that Glendale would be allowed to treat the supervisory goodwill as an asset for regulatory capital compliance purposes. Included in that promise was a 40-year time period for keeping the goodwill on Glendale's books. Together these promises are known as the "RAP right."

*Citigroup,* 140 Fed. Cl. at 286 (emphasis added).

Relying on *Washington Mutual*, this Court also elaborated on the nature of the RAP Right:

> [T]he nature of the RAP right was a ***regulatory guarantee*** that the purchase[r] be allowed to continue to account for that asset as it had and to amortize it for 40 years should the financial regulations change in the future. This was, in essence, an ***insurance*** against loss if the law changed.

*Id.* at 290 emphasis added)(citing *Wash. Mut*., 891 F.3d at 1025).

### b.    The Branching Right

Attached to the SAA was a letter from the FHLBB promising that any future applications of Glendale to establish or maintain branches in Florida would be treated as if Glendale's home office was in Florida. *Citigroup*, 140 Fed. Cl. at 286. At the time of Glendale's acquisition of Broward, FHLBB regulations generally prohibited thrifts from opening and/or operating branches outside of the state in which they had their home office. Statement of Policy Amendment Regarding Supervisory Mergers and Acquisitions, 46 Fed. Reg. 19221 (Mar. 30, 1981); *Wash. Mut.*, 636 F.3d at 1213. This Branching Right thus represented an approval by regulators given to an out-of-state thrift to operate acquired branches in a specific new state not previously part of the

buyer's operations, as well as to be able to expand in that state, subject to the FHLBB's approval. Glendale's acquisition of Broward specifically included these elements.

FHLBB Resolution No. 81-710 specifically approved Glendale's operation of the branches acquired from Broward as offices of Glendale and approved Glendale's designation of the branches acquired from Broward as "First Federal Savings and Loan of Broward County, a division of Glendale Federal Savings and Loan Association." In addition, Exhibit C to the SAA specified that, because Glendale had established a branch office in Florida through a supervisory merger with Broward, future applications by Glendale to establish new branches or acquired branches in Florida would be treated by the FHLBB as if Glendale had a home office in Florida.

### c.    Other Items of FSLIC Assistance

As discussed below, Glendale also received other items of FSLIC Assistance in the supervisory merger.

Interest Rate Protection Agreement

According to Section 5 of the SAA, if interest rates rose above threshold levels, the FSLIC would make payments to Glendale; if interest rates fell below threshold levels, Glendale would make payments to the FSLIC. The purpose of the agreement was to protect Glendale and FSLIC from adverse changes in interest rates. In Glendale's case, increasing interest rates following the acquisitions would adversely affect the earnings and financial condition of the thrift. For FSLIC, a reduction in interest rates would mean that the assistance granted to Glendale was an unnecessary cost. Following the Merger, interest rates did in fact decline, with Glendale ultimately paying the FSLIC $18,400,000 under the agreement.

The Indemnification Provision

In Section 6 of the SAA, the FSLIC agreed to indemnify Glendale against damages associated with litigation arising from the Broward acquisition or from amounts paid in respect of

9

any unknown liabilities of Broward existing at the acquisition date.   The purpose of the Indemnification Provision was to provide risk mitigation benefits to Glendale.  Glendale did not make any claims for payment from FSLIC under the Indemnification Provision.

The Federal Home Loan Bank ("FHLB") Advance Refinancing Provision

Section 8 of the SAA includes a provision allowing Glendale to extend, restructure, or refinance outstanding advances from the FHLB to Broward during a 90-day period following the transaction.   The purpose of this provision was to provide Glendale the opportunity to realize interest savings on FHLB advances having interest rates above prevailing market rates at the valuation date.  There is no indication that Glendale elected to extend, restructure, or refinance the outstanding FHLB advances payable by Broward during the 90 days following the transaction.

2.   Other Assets

a.   Tangible Assets

There is no dispute about the value of the tangible assets Glendale acquired in the Merger. The tangible assets listed on Broward's balance sheet, marked to market at the time of the Merger by Peat Marwick, totaled $1.824 billion.  They included:  (1) cash of $25,956,000; (2) certificate of deposit, bankers' acceptances and short term bank obligations of $55,024,000; (3) U.S. government and other securities of $89,350,000; (4) loans receivable of $1,528,577,000; (5) real estate held for sale or development of $18,803,000; (6) interest receivable and other assets of $27,876,000; (7) investment in capital stock of FHLB of $21,196,000; (8) Federal Savings and Loan Insurance Corporation secondary reserve of $1,193,000; and (9) premises and equipment of $56,435,000.

b.   Tax Benefits

When Glendale acquired Broward, the book value of Broward's loan portfolio was $2,325 million.  The acquisition purchase accounting applied a $796 million discount to the book value

of Broward's mortgage loan portfolio, based on an estimated $1,529 million loan market value. Because the acquisition was a tax-free reorganization pursuant to Code section 368(a)(l)(G), the loan discount was not reflected in Glendale's tax basis for the acquired loans.  Instead, Broward's tax basis for the loans was carried over and became Glendale's tax basis.

Because of the difference between tax and financial accounting rules for bad debt deductions, Broward's tax basis for the acquired loans was $49 million lower than the book value shown on its March 31, 1981, financial statements.  Therefore, if Glendale were to sell the loans it acquired from Broward, it had the potential to recognize tax losses of as much as $747 million (based on a tax basis of $2,276 million and a market value of $1,529 million).  The potential tax losses could be used to shield income from taxation.

### c.      Other Intangible Assets of Broward

As discussed in more detail below, Plaintiff will show that intangible assets owned by Broward had a fair market value of approximately $28.3 million at the time of the Merger.

| Intangible Asset | Description | Value |
|---|---|---|
| Core Deposits Intangible ("CDI") | CDI assets represent the value a financial institution obtains from its retail deposit base – typically the largest intangible asset acquired in an unassisted bank merger. | $18.0 million |
| Assembled Workforce Intangible | This intangible asset represents the value of a financial institution's investments in recruiting and training its employees. | $3.9 million |
| Outlook Development Corporation ("Outlook") | This intangible consists of the going concern value of Broward's real estate development subsidiary. | $6.1 million |
| Florida Real Estate Appraisers ("FREA") | This intangible consists of the going concern value of Broward's real estate appraisal subsidiary. | $0.3 million |
| | | **$28.3 million** |

### C.      The Government's Breach

In 1989, the Government passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA") in an effort to

solve the  savings and loan crisis and patch up what legislators viewed as the excesses and errors of the regulators' attempts to meet the crisis.  This ended the favorable treatment of allowing supervisory goodwill to be counted as regulatory capital, requiring thrifts to maintain core capital in an amount not less than three percent of the savings association's total assets and defined core capital to exclude unidentifiable intangible assets such as supervisory goodwill.   Although FIRREA provided a transition rule permitting thrifts to count supervisory goodwill toward half the core capital requirement for a time, this allowance was phased out by 1995. *See Winstar*, 518 U.S. at 856-57.

Glendale thus found itself out of regulatory compliance.  In an effort to return to compliance, beginning in 1993 Glendale took several remedial actions including recapitalization and raising money from new investors, shrinking its balance sheet, and selling portions of its business, including, in 1994, the entire Florida Division, which included Broward.  *See Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1378 (Fed. Cir. 2001).  Glendale survived the effort but incurred significant transactional costs in the process.  Years of litigation ensued.  After a trial that lasted more than 150 days and generated more than 20,000 pages of trial transcript, this Court awarded Plaintiff $909,948,000 in restitution and non-overlapping damages with respect to the Government's failure to live up to its end of the bargain.  *Glendale Fed. Bank,* 43 Fed. Cl. at 392.  The initial $909,948,000 damages award was comprised of the following:

- $509,921,000 in restitution damages, determined as:  (1) the amount by which Broward's liabilities exceeded its assets on the date of the merger (***$798.291 million***); less (2) the value of the benefits Glendale received from the contract ($288.37 million)).

- $18,400,000 in restitution damages, which was the amount that Glendale paid to the Government under the interest rate provision of the contract.

12

- $380,787,000 in non-overlapping (post-breach) reliance damages ("wounded bank damages").

On appeal, however, the Federal Circuit vacated the award of restitution damages. *Glendale Fed. Bank,* 239 F.3d 1374.   On remand, this Court reinstated the award of reliance damages in the amount of $380,787,000, consisting of $335.4 million in "wounded bank" damages, $11.48 million for increased deposit insurance premiums, $4.675 million in increased assessments by the Office of Thrift Supervision ("OTS"), and $29.232 million from other post-breach costs and custodial fees paid to FHLBB.  These damages are discussed in more detail below.

With respect to cutting Plaintiff's damages award by nearly 60%, this Court was clear about its position:

> Plaintiff will get significantly less than half of the amount that this court feels is the fair amount by which it has been damaged.  ***This is not justice***.  However, it is not the job of a court to legislate on what the law should say.  Rather, the judge must remain true to his oath by following the law.

*Glendale Federal Bank, FSB v. United States*, 54 Fed. Cl. 8, 10 (2002) (J. Smith) (emphasis added), *aff'd*, 378 F.3d 1308 (Fed. Cir. 2004).  Thus the dispute over damages concluded without Plaintiff being fully compensated for the government's breach, and Plaintiff has never recovered any of the $798 million still at issue.

### D.      Tax Consequences of the Breach

In 2005, sixteen years after the Government breached its contract with Plaintiff, the Government paid Plaintiff $381,538,696 in non-overlapping reliance damages, and Plaintiff reported this amount as taxable income on its timely filed 2005 federal income tax return.  After Congress enacted FIRREA, Plaintiff repeatedly filed with the Internal Revenue Service ("IRS") claims for deductions relating to the loss of supervisory goodwill, the Branching Right, and "regulatory intangibles" for tax years 1994-1997 and 2000-2002.  The IRS denied each of

Plaintiff's claims, in part, on the ground that claims could not be made until Glendale's *Winstar* litigation had concluded.

In December 2014, Plaintiff filed a timely refund claim with the IRS for the 2005 taxable year, claiming a deduction for the uncompensated loss of supervisory goodwill in the amount of $798,291,000.  A few days later, Plaintiff amended the refund claim to include the erroneous inclusion of the $381,538,696 damages payment as income.  Thus Plaintiff claimed a total reduction in 2005 taxable income in the amount of $1,179,829,696.  On May 18, 2015, the IRS denied Plaintiff's claim for refund in its entirety.  This refund suit was commenced on September 1, 2015.

On June 27, 2018, in response to the arguments made by the Government in this litigation, the Taxpayer timely filed an amended return for the tax year ending December 31, 2005, with the IRS.  In this claim for refund, the Taxpayer continued to reiterate the arguments made in its original claim for refund and in its motion for summary judgment contending that it was entitled to a deduction of $798 million.  Because the Government contended that the $798 million purchase price must be allocated to the various separate intangible assets received in the Merger, however, the Taxpayer also claimed:

> [I]f for any reason any of the above items [Branching Right, RAP Right, etc.] (or any other intangible asset similarly alleged to have been received as part of the transaction) is required to be severed from supervisory goodwill and separately valued for purposes of determining tax basis, then the taxpayer hereby expressly asserts that each and all such items were abandoned or worthless by the conclusion of the taxpayer's breach of contract litigation against the United States government in 2005, at which point the taxpayer was permitted to claim a deduction under IRC § 165 for the total amount of cost basis allocated to them (i.e., the entire tax basis).

## III.   **TRIAL SUMMARY**

With respect to the first issue, Plaintiff has never been compensated for the loss incurred when certain intangible assets it acquired in the Merger became worthless as a result of the breach

of contract by the United States.[10]  Plaintiff will first offer testimony and evidence to explain *why* these intangible assets were valuable.  In particular, the RAP Right was valuable because:  (1) in November 1981 the accounting and regulatory treatment for the Merger was not clear; and (2) the assumption of Broward's liabilities would have rendered Glendale immediately insolvent by approximately $460 million but for its right to count goodwill as regulatory capital.[11]  *See Winstar*, 518 U.S. at 863.  The Supreme Court explained:

> Although one can imagine cases in which the potential gain might induce a party to assume a substantial risk that the gain might be wiped out by a change in the law, it would have been irrational in this case for Glendale to stake its very existence upon continuation of current policies without seeking to embody those policies in some sort of contractual commitment.  This conclusion is obvious from both the dollar amounts at stake and the regulators' proven propensity to make changes in the relevant requirements.

*Id.*

Plaintiff will then offer testimony and evidence to demonstrate the values (and range of values) of the various intangible assets.  Specifically, Plaintiff will offer testimony and evidence to demonstrate that the fair market value of the liabilities Glendale expected to assume was equal to the aggregate fair market value of the assets it received, including intangible assets, making the deal economically rational, as follows:

---

[10] Prior to the enactment of Code section 197 on August 10, 1993, taxpayers could not take a depreciation deduction for goodwill assets.  Taxpayers could elect to apply Code section 197 to purchases occurring on or after July 25, 1991.  Because the Merger occurred in 1981, Glendale could amortize the supervisory goodwill for financial statement (book) purposes, but could not take a deduction for tax purposes.

[11] In stark contrast to the acquisitions at issue in *Washington Mutual*, the loss of the RAP Right would have been catastrophic to Glendale.  Glendale reported goodwill of $740 million and equity of $235 million on its June 30, 1982 Thrift Financial Report.  Home Savings reported goodwill of $530 million and equity of $680 million on its June 30, 1982 Thrift Financial Report.  Had Glendale's right to count the goodwill from the Merger as an asset for regulatory capital purposes been taken away, it would have had a ***negative*** regulatory net worth of over $505 million.  Had the same right been taken away from Home Savings, it still would have had a ***positive*** regulatory net worth of over $150 million.  This is why the RAP Right was so valuable to Glendale.

| Assets Received from FSLIC and FHLBB | |
|---|---|
| RAP Right | 513,000 |
| Interest Rate Protection | 12,700 |
| Indemnification Provision | 4,400 |
| FHLB Advance Refinancing Provision | 4,600 |
| Florida Branching Rights | 124,158 |
| **Subtotal** | **658,858** |

| Other Assets | |
|---|---|
| Tax Benefits | 47,500 |

| Assets Received from Broward (other than tangible assets) | |
|---|---|
| Core Deposit Intangible Asset | 18,000 |
| Assembled Workforce Intangible Asset | 3,904 |
| Outlook Development Corporation | 6,103 |
| Florida Real Estate Appraisers | 301 |
| **Subtotal** | **28,308** |

| | |
|---|---|
| **Total Value of Intangible Assets Acquired by Glendale** | **734,666** |
| **Total Value of Supervisory Goodwill** | **734,666** |

With respect to the second issue, Plaintiff will offer testimony and evidence that it did not receive any tax benefit for approximately $73 million of the $381 million damage award.

## A.    Background Regarding the Merger

In order to put the valuations proffered by Plaintiff's experts in context, Plaintiff will present testimony and documentary evidence about the Merger.

### 1.    Mr. Richard Fink Will Describe the Merger From Glendale's Perspective and Explain Why the RAP Right Was Valuable

Plaintiff will present testimony from Mr. Richard Fink as well as documentary evidence at trial. Mr. Fink was the former General Counsel at Glendale. He received a business degree and a law degree from Stanford University. Before joining Glendale in 1992, he had practiced as a corporate lawyer in large law firms for two decades. While at private practice, most of his clients were banks and thrift organizations. Mr. Fink specialized in mergers and acquisitions of thrift organizations, and financing, corporate governance, and corporate structuring activities. At the

16

time of the transaction he was working for the law firm of McKenna, Conner & Cuneo in Los Angeles, serving as one of Glendale's outside counsel on the Merger.

Mr. Fink will testify about the state of the thrift industry at the time of the Merger, the merger negotiations between Glendale and Broward, negotiations between Glendale and the Federal regulators, as well as the actions Glendale took in response to FIRREA. Mr. Fink will describe the interest rate environment that led to the thrift industry's financial crisis and the actions Federal regulators took to ease pressure on the thrift industry. In addition, he will discuss the general differences between the merger of mutual thrifts and the merger of stock thrifts, and in particular, the typical accounting method used in each (pooling-of-interest accounting and purchase method of accounting, respectively). He will also point out the general differences between regulatory accounting principles (created by the FHLBB) and GAAP.

In addition, Mr. Fink will testify about the merger negotiations, including the crucial importance of certain provisions included in the supervisory action agreement. As will be explained by Mr. Fink, there was great uncertainty in the method of accounting to be applied to the Glendale-Broward Merger because it was if not the first, among the first, merger of two mutual thrifts to propose the use of purchase accounting. In 1981, Glendale was required to comply with regulatory accounting principles. Therefore, as Mr. Fink will testify, Glendale specifically and repeatedly requested from the regulators that, "Glendale's method of accounting for the transaction as a purchase, including periods for amortization of goodwill and discount on loans, to be approved."

Mr. Fink will explain that had the FHLBB not granted such approval, , it would have been uneconomic for Glendale to enter into the Merger. Throughout the negotiations and drafting process of the supervisory action agreement, Glendale insisted that the use of purchase method of

accounting, including the ability to treat the supervisory goodwill as an asset for regulatory capital and amortize over 40 years, be a precondition to the Merger.

Finally, Mr. Fink will testify briefly about the actions Glendale took in response to the enactment of FIRREA.  Mr. Fink will explain that Glendale had little ability to raise capital post-FIRREA and, as a result, had to recapitalize and reduce its assets to remain in capital compliance.  One of its actions was to divest itself of the entire Florida operation in 1994.

### 2.     Glendale Employees Described the Importance of the RAP Right From Glendale's Perspective

On December 3, 2021, Plaintiff filed a motion for leave to enter deposition and trial testimony transcripts from six witnesses identified therein as substantive evidence for use at trial.  Mr. David Hansen is one of the witnesses.  Mr. Hansen was the Chief Financial Officer of Glendale at the time of the Merger.  He provided deposition testimony on January 6, 1997, and trial testimony on October 28, 1997, before this court in the corresponding damages trial.  He further provided deposition testimony on May 24, 2017, in connection with the instant litigation.  Mr. Hansen is unable to testify because of infirmity.  The parties are in agreement as to the unavailability of Mr. Hansen and the introduction of his prior testimony.

Mr. Hansen graduated from the University of Michigan in 1958 with a bachelor's degree in business administration.  After graduation he worked for the public accounting firm Arthur Anderson and Company as an auditor, for Union Commerce Bank as its controller, and for Fidelity Union Bank as its chief financial officer.  In June 1981 he joined Glendale as its Chief Financial Officer.

Mr. Hansen previously described the Merger background, Glendale and Broward's negotiations, and Glendale and the regulators' negotiations including in particular, the proper accounting treatment as a precondition of the Merger.  For example, in his January 6, 1997,

deposition, Mr. Hansen described the centrality of the RAP Right to the transaction: "We were talking about the 40-year amortization—we made it very clear—in both of those meetings that, one, if the goodwill would be deducted from capital, there would obviously be no deal because that would throw the association into a negative capital position. And also, that they agreed to the specifics of the accounting and the period of amortization of goodwill." Hansen Dep. 76:11-18 (Jan. 6, 1997). In addition, he testified that there was no discussion of a shorter period of amortization. *Id.* He further testified that "[t]he government agreed to [the inclusion of goodwill as an asset on the balance sheet and not deducting it from capital]. That was the key to the whole transaction." *Id.* at 77:3-4. Moreover, Mr. Hansen testified regarding the comparative value of entry into Florida and the accounting profits that 40-year amortization would yield. Although getting into Florida was the initial impetus for Glendale's interest in Broward, with a significantly shorter amortization period for the goodwill, the deal would not have taken place unless the long amortization period were replaced by some other significant financial benefit, such as $300 million dollars from FSLIC.

Similarly, Mr. Raymond Edwards, the Chairman of Glendale at the time of the Merger, Mr. Gordon Klett, the President and Chief Operating Officer of Glendale at the time of the Merger, and Mr. Norman Coulson, the Senior Vice President of Glendale at the time of the Merger, testified about the importance of the RAP Right. For example, Mr. Edwards explained, "[t]he goodwill from the beginning was a problem. If it was not to be counted, then that was the whole basis of our merger. And to lose any part of it was bad . . . not being able to count on the goodwill was detrimental and devastating to us." Edwards Dep. 168:4-11(Jan. 7, 1997) . In addition, when asked about the significance of the 40-year amortization period, Mr. Edwards testified "[w]e had to have time to write off the portfolios and to be able to absorb the seven hundred and some millions

of dollars of the goodwill.  The longer, the better." *Id.* at 86:10-17.  Mr. Coulson testified similarly, Coulson Dep. 31:2-5 (Jan. 13, 1997)  "[t]he longer the better") and also noted that Glendale would not have entered into the Merger if they "knew the rules were going to be changed." *Id.* at 150:6-151:5.

Mr. Klett's testimony will also demonstrate the importance of supervisory goodwill and the use of purchase accounting during the parties' negotiations.  For example, he explained "this transaction would not have gone forward without the benefits of purchase accounting so that we could have spread these goodwill costs over a long period of time."  Klett Dep. 40:4-18 (Jan. 15, 1997) .  He testified that they had to "have the goodwill allowances in order not to completely devastate the reserve position of [Glendale]." *Id.* at 40:23-25.

### 3. Dr. David Croft Described the Importance of the RAP Right From FHLBB'S Perspective

Plaintiff also requested entry of trial testimony from Dr. David James Croft.  Dr. Croft was the Director of the Office of Examination and Supervision for the FHLBB at the time of the Merger.  He provided trial testimony from February 25-26, 1997, and on March 28, 1997, in Glendale's damages trial.

Dr. Croft graduated from Stanford University with a degree in Mathematics.  He received an MBA and a PhD in operations research and statistics from Northwestern University.  He worked as a financial analyst for the Boeing Company, taught business classes at the University of Utah, and subsequently joined the FHLBB.  Dr. Croft is the principal drafter of SP-24, FHLBB Memorandum No. SP-24 (December 29, 1981).  Finding APB Opinion 16 inadequate, SP-24 created its own, more flexible version of GAAP that would permit the decision as to pooling or purchase to be made on a case-by-case basis.  As the Director of the Office of Examination and Supervision, Dr. Croft oversaw the examination of all federally insured thrifts in the United States.

Dr. Croft's prior testimony was based on his personal involvement in the Merger and his extensive experience in the thrift industry, which he gained by virtue of various positions he had held as well as his position at the FHLBB.

Dr. Croft's prior testimony described the thrift industry and economic conditions at the time of the Merger and the actions the regulators took to address the thrift industry crisis, including the FSLIC assisted mergers.  It will show the discussions among the regulators about the appropriate accounting methods to be accorded to the supervisory mergers.  Furthermore, it will show that the accounting treatment at the time of the Merger was uncertain and that the particular accounting methodology that was used in the Merger had to be approved by the FHLBB.  For example, he testified that "[the Office of Examination and Supervision] often reviewed the proposed accounting on anything that came before the board that was out of the ordinary. Typically in a merger that involved goodwill accounting, one of the provisions of the resolution by the board was that the independent public accountant for the resulting institution would certify to the board that the accounting that the board had approved had, in fact, taken place."  Croft Tr. 244:1-8 (Feb. 25, 1997). .

In addition, his testimony will show that the regulators did not have sufficient resources to close all insolvent institutions and were motivated to invite healthier thrifts to combine with failing thrifts.  For example, he testified that "[w]e didn't have the resources to go out and arrange all of these potential mergers on our own, and to the extent we could have them initiated by the stronger institutions, that would make our job easier."  *Id.*, 221:4-7.

### 4.    Mr. Martin Lowy Will Describe the Accounting and Regulatory Environment Existing at the Time of the Merger

Plaintiff will present expert testimony from Mr. Martin Lowy as well as documentary evidence at trial.  Mr. Lowy authored *High Rollers: Inside the S&L Debacle*, a 1991 historical

overview of the 1980s savings and loan crisis that was cited as a technical reference multiple times by the U.S. Supreme Court in *Winstar*.[12]

Mr. Lowy received an undergraduate degree in history from Amherst College and a Bachelor of Law degree from Yale Law School, where he was managing Editor of the Yale Law Journal. He practiced law from 1966 to 1986, specializing in financial regulation, representing banks, mutual funds, the Federal Deposit Insurance Corporation ("FDIC"), and the New York State Superintendent of Banks, and advising other types of entities on financial regulation issues. He served as Chair of the American Bar Association Savings Bank Committee from about 1975-77 and 1980-83 and was a member or Chair of numerous committees of the Association of the Bar of the City of New York, most of which related to banks or thrift institutions. Although he is not a certified public accountant, Mr. Lowy has expertise in the application of GAAP to financial institutions, especially at the time of the Merger.

Mr. Lowy will testify about the uncertainty Glendale faced regarding the use of purchase accounting in a FSLIC supervised merger and the selection of a 40-year amortization period for the supervisory goodwill resulting therefrom. Glendale's merger with Broward was the first transaction (or among the first) where a mutual thrift acquiring a failing mutual thrift was permitted to count the resulting goodwill as an asset for RAP Reporting purposes.[13] Prior to the Merger, no

---

[12] For example, the Supreme Court in *Winstar* cited Mr. Lowy's book to support the following conclusion: "Although the Glendale transaction in this case occurred before the promulgation of SFAS 72 in 1983, the proper amortization period for goodwill under GAAP was uncertain prior to that time. According to one observer, 'when the accounting profession designed the purchase accounting rules in the early 1970s, they didn't anticipate the case of insolvent thrift institutions .... The rules for that situation were simply unclear until September 1982,' when the SFAS 72 rules were first aired." *Winstar*, 518 U.S. 855 at 856 n.10 (citing M. Lowy, *High Rollers: Inside the S&L Debacle,* 39-40 (Praeger 1991).

[13] Defendant's expert Mr. Hargett claims that over a month before the Glendale Transaction "[U]nited Postal Savings Association in Missouri acquired Lafayette Federal Savings of St. Louis in a combination of two mutuals and used purchase accounting. Goodwill was recorded in this

reasonable thrift would expect that the excess liabilities assumed in the acquisition of a failed thrift would be counted as capital for regulatory purposes.  As the Supreme Court noted in *Winstar*:

> Indeed, the rationale for recognizing goodwill stands on its head in a supervisory merger: ordinarily, goodwill is recognized as valuable because a rational purchaser would not pay more than assets are worth; here, however, the purchase is rational only because of the accounting treatment for the shortfall.  See Black, [Ending Our Forebearers' Forbearances:  FIRREA and Supervisory Goodwill, 2 Stan. L. & Policy Rev. 102,  104 [(1990)] ("GAAP's treatment of goodwill ... assumes that buyers do not overpay when they purchase an S&L").  In the end, of course, such reasoning circumvented the whole purpose of the reserve requirements, which was to protect depositors and the deposit insurance fund. … To those with the basic foresight to appreciate all this, then, it was not obvious that regulators would accept purchase accounting in determining compliance with regulatory criteria, and it was clearly prudent to get agreement on the matter.

518 U.S. at 854-55.

### 5. Mr. Lowy and Mr. Mark Oken Will Rebut the Anticipated Testimony of Mr. Hargett

The government's expert, Mr. Hargett, testified in the *Washington Mutual* cases.  It is anticipated that Mr. Hargett will testify that "RAP followed GAAP."  *See, e.g.,* Hargett Report at 10.  Mr. Hargett therefore contends that Glendale had no choice but to account for the transaction as it did, implying that the RAP Right was not valuable.  Mr. Hargett uses this catchy phrase to elide over, yet surreptitiously opine on, the following important issues in this case:

(1)     Whether it was ***clear*** under GAAP that the purchase method of accounting was applicable to the acquisition of failing thrifts.  As discussed above, the Supreme Court has ruled that ***it was not***;

---

FSLIC-assisted purchase transaction.  The $100 million of goodwill that was recorded was amortized over forty years."  Hargett Report at 43.  Mr. Hargett fails to mention, however, that United Postal Savings Association reported $0 of Goodwill & Other Intangibles on its December 31, 1981 and June 30, 1982 Thrift Financial Reports.  United Postal Savings Association first reported goodwill in its December 31, 1982 Thrift Financial Report, a year after Glendale first reported its goodwill from the Glendale-Broward Transaction.

(2)    Whether it was *clear* that intangible goodwill assets created by the purchase method of accounting could be counted toward regulatory capital.  As discussed above, the Supreme Court has ruled that *it was not*, and Plaintiff's Motion in Limine explained why Mr. Hargett should not be permitted to testify about this legal issue; and

(3)    Whether in fact Glendale's accounting for the Merger *complied with GAAP*.

Because the Supreme Court has already answered the first two questions, Plaintiff does not believe this Court is required to answer the third question in order to resolve the tax issues in this matter.  Nonetheless, if the Court were to consider this issue, Plaintiff believes the testimony of Mr. Mark Oken and Mr. Lowy will be of assistance to the Court.

Mr. Oken was the former Chief Financial Officer of Bank of America.  In that role, he had responsibility for Finance, Supply Chain Management, Corporate Treasury, Corporate Investments, Corporate Workplace, and Investor Relations.  Also during his tenure with Bank of America as a senior financial executive, Mr. Oken had significant involvement in all of Bank of America's acquisition activities.  Prior to his career with Bank of America, Mr. Oken was a Partner with Price Waterhouse.

Mr. Oken served as a Professional Accounting Fellow at the Securities and Exchange Commission ("SEC").  On December 23, 1981, shortly after the Glendale-Broward Merger, the SEC issued Staff Accounting Bulletin No. 42, 17 CFR Part 211 (Dec. 23, 1981), ("SAB 42") setting for the staff's views pertaining to the application of GAAP to business combinations accounted for by the purchase method of accounting involving financial institutions.

Mr. Oken was involved in drafting SAB No. 42 and answering questions about it.  Mr. Oken will testify regarding the concerns that the SEC staff had about the accounting for goodwill in these circumstances.  Specifically, Mr. Oken will testifying that using the purchase method of

accounting, amortizing the goodwill on a straight-line basis over 40 years, and accreting the loan discount over a much shorter period created phantom income and, when used to disguise the true financial condition of a failing thrift, was ***not*** in accordance with GAAP.

Similarly, Mr. Lowy will also testify that creating what the Supreme Court in the *Winstar* case called "paper profits"[14] was not in accordance with GAAP at the time of the Merger. One of the fundamental principles of GAAP is (and was in 1981) the "matching principle." "The matching principle states that each expense item related to revenue earned must be recorded in the same accounting period as the revenue it helped to earn. If this is not done, the financial statements will not measure the results of operations fairly."[15] Intentionally mismatching the periods when expenses and revenues occurred would violate this principle. Glendale sought, and was granted, permission to amortize the supervisory goodwill over a period of 40 years while accreting the loan discount over a 23 year period. The "income" generated by the loan discount accretion would greatly exceed the "expense" booked in relation to the supervisory goodwill amortization in the years immediately following the Merger, generating "paper profits." Mr. Hargett has estimated that the benefit of these "paper profits" was expected to be about $199 million over the first five post-acquisition years. Hargett Report at 13. Although Glendale and Peat Marwick took the position that the accounting for the Merger was permitted under GAAP, it was foreseeable that this "accounting gimmick" (as the Supreme Court referred it in the *Winstar* opinion) would be modified or taken away. By having its regulators guarantee the regulatory accounting treatment

---

[14] *Winstar*, 518 U.S. at 853, 856. Mr. Hargett also calls them "paper profits." *See* Hargett Report at 13.

[15] The matching principle was explained in paragraphs 84 through 86 of Statement of Financial Accounting Concepts No. 3, which the Financial Accounting Standards Board ("FASB") issued in 1980. Statement of Financial Accounting Concepts No. 3, Financial Accounting Standards Board (December 1980).

for the Merger, Glendale could lock in the benefits of this mismatch and assure itself that a change

in GAAP or RAP accounting rules would not obliterate its regulatory capital.

On September 30, 1982, less than a year after the Merger, FASB published SFAS No. 72,

"Accounting for Certain Acquisitions of Banking or Thrift Institutions" in proposed form.  In

SFAS No. 72, FASB explicitly stated that goodwill could not be amortized over a period greater

than the estimated remaining life of the acquired loans, explaining:

> The Board believes that the use of a 40-year maximum amortization period in the face
> of existing economic and competitive uncertainties confronting the banking and
> thrift industries is inappropriate.  **That accounting for such combinations
> produces results that lack economic substance, that destroy both consistency
> of reporting by the enterprise and comparability among similar enterprises,
> and that have the capacity to mislead users and damage the credibility of
> financial reporting.**  Accordingly, the Board concluded that more explicit
> guidance was needed to improve the relevance and reliability of financial reporting.

SFAS No. 72, ¶30 (emphasis added).[16]

**B.     Valuation of the Intangible Assets**

This Court noted during the summary judgment phase that the tax laws look at the

transaction as a whole.  *Citigroup*, 140 Fed. Cl. at 289.  This Court also noted that "[h]ad all of the

intangible assets from the merger been rendered worthless, the case would be an easier one because

no apportionment would be necessary for Glendale to prove its basis."  *Id.* at  288, n.7.  Plaintiff

will prove Glendale's basis in all intangible assets acquired in the Merger and demonstrate that

they were all either sold as part of the sale of the Florida operations and/or worthless by 2005.

---

[16] Although SFAS No. 72 was promulgated in final form in February 1983, it applied retroactively
to business combinations "initiated after September 30, 1982 with earlier application encouraged."
SFAS No. 72, ¶15.

### 1.    The Value of the RAP Right

In accordance with this Court's 2018 Opinion and the *Washington Mutual* decisions, Plaintiffs will offer expert opinions valuing the RAP Right as both ***insurance*** and a ***guarantee***.[17]

### a.    Dr. Froot Correctly Valued the RAP Right as Insurance

Plaintiff will present testimony from Dr. Kenneth A. Froot as to the value of the RAP Right. Dr. Froot is the André R. Jakurski Professor of Business Administration, Emeritus, at Harvard Business School, with extensive expertise in the valuation of insurance contracts.  He received a B.A. in Economics from Stanford University, and an Economics Ph.D. from the University of California at Berkeley.  He has taught numerous courses in economics and finance, and his research has been published in many journals and books.  Dr. Froot has worked with companies and countries on international and financial policy, and risk and investment management issues. He is also the founding partner of companies that provide investment services and health data services.

Specifically, Dr. Froot values the RAP Right as insurance by answering the question, "what would be the premium charged by a hypothetical insurer, at arm's-length, for a policy promising to replace Glendale's supervisory goodwill with cash when and if the RAP Right is revoked?"  The standard contingent-claim insurance contract premium is a single premium contract that covers two distinct types of costs to the insurer, i.e., the expected loss and the cost of risk bearing.[18]  The

---

[17] The Government's expert, Mr. Kimball, appears to use the terms interchangeably in this case. Kimball Report at 29-30.  In general, all insurance is a guarantee, but not all guarantees are insurance.  In this case, the two valuations are consistent, although Plaintiff's experts took two different approaches.

[18] Given Glendale's insistence that the RAP Right guarantee be a transactional precondition, it would necessarily want full protection against adverse changes in supervisory goodwill associated with the RAP Right, and this protection is most straightforwardly codified as a full transfer of risk. To achieve full risk transfer, the insurance would have to be in force for the full-40 year period on day one.  Thus, the RAP Right is a 40-year long commitment, not a sequence of guarantees over

Government disputes neither this valuation framework nor the pricing factors to be discussed below.

Expected Loss

The expected loss is the present value of the insurance claim the insurer expects to pay, by multiplying the probability of a loss-causing event by the amount of loss. It has three moving parts: (a) the expected future cash claim to be paid; (b) the probability that a claim is made; and (c) the discount rate required to express future period cash flows in present-value (i.e., 1981) dollars.

First, Dr. Froot will testify about his estimate of the expected future cash claim. Because the supervisory goodwill was amortized over 18 years (for the core deposits) and 40 years (for the remaining goodwill) according to a known schedule, Dr. Froot assumes that the hypothetical insurance contract would provide for immediate cash replacement upon its withdrawal. The Government argued in its motion in limine that this was not a reasonable assumption, but Dr. Froot will testify that when the insurer has no access to an identical object (e.g., supervisory goodwill), the typical way for an insurer to compensate an insured entity for loss would be to provide cash. Indeed, immediate cash replacement would be the most expeditious way for the insurance to protect against reductions or shutdowns in Glendale's operations. Therefore, the expected future cash claim to be paid in any year is the goodwill amortization balance (after taking into account the 2.5% annual decrease).[19]

_____

time. In addition, the value of the RAP Right will not change no matter if it is expressed as a single premium on day one, or the sum of 40 annual premiums discounted to day one.

[19] As discussed above, the insurer would first consider expected loss, and then add a mark up to arrive at a final premium. In calculating the annual expected loss, Dr. Froot multiplies the median probabilities of loss of the RAP Right (as discussed in the following paragraph) by the annual amount at risk (i.e., the unamortized annual balance of supervisory goodwill). He then discounts the resulting annual loss estimates to arrive at the present value of the expected loss. Thus, the

Second, Dr. Froot will testify about his probability estimate.  He develops estimates of the annual probabilities of loss of the RAP Right from independent academic articles, which describe the length of time various laws, regulations, or Federal agencies have "survived" in the United States before being full repealed or terminated.  The estimates derived from this literature are fairly low – approximately 2% in the first few years, rising to about 3% in year 7, and then declining over time.  Froot Rebuttal Report at 14, Figure 1; Froot Reply Report at 10, Figure 1.  The Government's experts, Dr. Eckles, Mr. Hargett, and Mr. Kimball all quibble with Dr. Froot's probability estimates, but as explained in Plaintiff's Motion in Limine and Response to Defendant's Motions in Limine, Dr. Froot's estimates are probative and instructive, and more relevant than the estimates plucked from "thin air" by the Government's experts.  Even the Supreme Court noted:  "[I]n light of the frequency with which federal capital requirements had changed in the past ..., it would have been unreasonable for Glendale, FSLIC, or the Bank Board to expect or rely upon the fact that those requirements would remain unchanged."  *Winstar,* 518 U.S. at 863 (quoting the United States' brief).

Third, Dr. Froot will demonstrate that the risk of RAP Right revocation was not driven by Glendale, by Glendale's market value, or by the stock market, thus, a risk-free discount rate is appropriate.  Dr. Froot arrived at a present value of the expected loss of $116 million.

Cost of Risk Bearing

The cost of risk bearing is the cost that the actual loss may be different from the expected loss.  A hypothetical insurance premium would necessarily be priced above its expected loss (the difference is called a markup)—an insurer must cover its underwriting and operational costs, but

---

annual expected loss decreases over time by taking into account the annual decrease in the goodwill balance, but the final premium (i.e., the value of the RAP Right ) does not.

most importantly, requires compensation for bearing the risk that the claims could come in far above expected loss. This is a point on which the Government's expert, Dr. Eckles, agrees. *See* Eckles Report at 11. For purposes of understanding the premium that one would pay for an insurance contract, the important thing to remember is that the insurer would first consider expected loss, and then mark it up to arrive at a premium.

Dr. Froot will testify about the insurance truisms usually involved in estimating an insurance markup (e.g., the size of the contract, the maximum possible loss, the nature of the insured risk, the duration of the contract), including in certain insurance lines where the underlying risk events are infrequent and/or unfamiliar.

Cognizant of the sheer magnitude of the maximum possible loss under the hypothetical RAP Right insurance contract, the insurers' unfamiliarity with the risk of regulatory reversal, the little opportunity of diversification across many small RAP Right reversal contracts, and the long duration of the contract, Dr. Froot estimates the cost of risk bearing to underwrite the RAP Right to be equivalent to two (2) to four (4) times the expected loss. This cost of risk bearing must be added to the expected loss. The overall arm's-length insurance premium for this hypothetical insurance contract, therefore, would be between $348 million [$116 million + (2 x $116 million)] and $580 million [$116 million + (4 x $116 million)], with an average (and the value of the RAP Right) of $464 million [$116 million + 3 x 116 million)].

The Government's expert, Dr. Eckles, who has no experience in valuation, valuation of insurance contracts, or valuation of guarantees, contends that the cost of risk bearing would be lower if Dr. Froot were to assume the insurance contract is issued by a government entity. Professor Froot will rebut this contention, noting that government insurance is not necessarily

issued at a lower cost and that in all events his valuation correctly assumes a hypothetical insurer, which could be, but would not necessarily be, a government entity.

Corroborating Analysis

Additionally, Dr. Froot will testify about his corroborating analysis of the markup, which is based on quantitative data available in insurance markets.  He calculates an aggregate markup on the expected loss by estimating and summing up two key components of a markup: (1) underwriting expenses (using insurance-linked securities as a proxy because the market is standardized for the other major factors affecting a risk premium); and (2) contract size (using the 1996 reinsurance contract between National Indemnity and California Earthquake Authority as a comparable, which is the most-documented reinsurance contract with notable size).  Under this corroborating analysis Dr. Froot estimates the markup over the expected loss to arrive at an estimated one-time premium of approximately $512 million.[20]  This empirically-based number is within the range of premiums described above, thus, corroborating Dr. Froot's $464 million valuation of the RAP Right.

### b.   Dr. Froot Will Rebut Mr. Kimball's RAP Right Valuation

Dr. Froot will testify about Mr. Curtis Kimball's erroneous application of the contingent claims method in valuing the RAP Right.  As an initial matter, Mr. Kimball does not value the RAP Right as an insurance contract and it is not a valuation of a contingent claim contract.  It is instead a poorly-executed valuation of what more properly would be called a contingent financing strategy:  a contingent "fund-as-you-go" strategy by which Glendale would, upon revocation of

---

[20] Dr. Froot originally calculated a one-time premium of approximately $544 million under his corroborative analysis.  Froot Rebuttal Report at 6-7.  In preparing for his deposition, Dr. Froot discovered an error in the size markup (using $x$ instead of $x^2$ in a formula) and timely submitted an errata to his original rebuttal report, which reduced his premium estimate from $544 million to $512 million.

the RAP Right, immediately try to sell its equity to investors to raise the requisite replacement capital.

Dr. Froot will explain how Mr. Kimball's model erroneously reduces the benefits offered by the RAP Right insurance by future income earned on the newly raised funds, and ignores the possibility that Glendale's contingent financing is unsuccessful.  Combined with numerous basic corporate finance valuation errors, Mr. Kimball's model has resulted in an unduly low valuation of the RAP Right.

### c.      Dr. McDonald Correctly Valued the RAP Right as a Guarantee

Dr. Robert L. McDonald is the Gaylord Freeman Distinguished Chair in Banking at the Kellogg School of Management at Northwestern University, where he has been a member of the faculty since 1984.  He received a PhD in economics from the Massachusetts Institute of Technology in 1982 and a BA in economics from the University of North Carolina at Chapel Hill in 1975.  Dr. McDonald is the author of Derivatives Markets (3rd Edition), a  textbook published in 2013, and Fundamentals of Derivatives Markets, published in 2008.  He has studied, written, and taught extensively on economic and financial matters, including specifically the value of a government guarantee.

Overview of Dr. McDonald's Valuation Model

The RAP right guaranteed that Glendale could continue to account for the supervisory goodwill as an asset for purposes of complying with regulatory capital requirements, as it had immediately after the acquisition, and to amortize the bulk of the goodwill over 40 years, even if the rules governing the treatment of supervisory goodwill changed.  Dr. McDonald's model builds off of the simple and undisputed fact that, but for Glendale's right to count goodwill as regulatory capital, it would have immediately been insolvent by approximately $460 million.  Professor McDonald will explain the importance of the regulatory forbearance to Glendale – "The combined

entity risked losing ***all of its assets*** should the regulatory treatment of supervisory goodwill change and the risk was immediate." In this specific context, what did the RAP Right do? It bought the bank time. The regulators promised that they would not shut the bank down the day after the merger. Professor McDonald's insight was that the value of that additional time to a thrift institution in November 1981 depended on a critical fact – the movement of interest rates – which can be predicted.

Accordingly, Professor McDonald looked at the pool of assets and liabilities Glendale acquired from Broward. That portfolio of mortgages and deposits still existed after the acquisition. Even after Broward's assets and liabilities were marked to market, the terms of the mortgages did not change, and continued to provide, for example, that the borrowers would pay a certain interest rate. And the depositors were still entitled to receive a certain interest rate.

Professor McDonald also recognized that the RAP right provided protection for Glendale's existing assets as well. If interest rates did not come down sufficiently, not only Broward, but Glendale could fail too – an outcome that Dr. McDonald predicted could occur nearly 20% of the time. As a result, Dr. McDonald valued the RAP Right as the present value of the cash flows that Glendale was expected to be able to achieve after its merger with Broward, subject to the following important constraints:

1. The combined portfolios of assets and liabilities that each held at the time of the Merger was held constant and would not grow, except to the extent that the combined entity would retain earnings generated by its existing business at the time of the Merger; and

2. The combined entity's net worth—as calculated by its regulators and taking into account any unamortized goodwill— would remain above zero.

**Constraint 1:**   The economic value of the RAP Right and the associated regulatory forbearance is intrinsically connected to the assets and liabilities of the combined entity immediately after the Merger was consummated.  Without the RAP Right, the burden of Broward's excess liabilities would have rendered the combined entity unable to meet regulatory capital requirements.  Had the combined entity failed its regulatory capital requirements, the legacy assets of Broward *and* Glendale would have been subject to regulatory action, up to and including liquidation.  Accordingly, as a matter of economics, the value of the RAP right is based on the combined portfolios held at the time of the Merger.

The first constraint is intended isolate the assets and liabilities that existed at the time of the Merger from speculative assumptions about the potential growth or expansion of the combined entity following the Merger.  Put differently, the RAP Right and the associated regulatory forbearance only apply to the legacy business of the combined entity.  Dr. McDonald's valuation does not reflect how the legacy business might have grown, nor does it require assumptions about what new business decisions could be made in the future by the managers of the combined entity to change the nature and composition of its legacy business.  Thus, contrary to the assertions of the Government's experts, Dr. McDonald's RAP Right model is not a business enterprise valuation; it values the cash flows that Glendale was expected to be able to achieve after its merger with Broward using only the assets and liabilities that existed on the date of the Merger.

**Constraint 2:**   Although the RAP Right and the associated regulatory forbearance protected the combined entity's regulatory capital position from the excess liabilities assumed in the Glendale-Broward transaction, it did not protect the combined entity from the regulatory impact of each dollar of loss incurred after November 21, 1981.  The second constraint reflects the reality that following the transaction, there was no guarantee that the combined entity would avoid

regulatory insolvency and be subject to regulatory action, up to and including liquidation.  As described below, the fate of the combined entity was determined primarily by future interest rates, the movement of which could not have been known with certainty at the time of the Glendale-Broward Merger, but can be predicted.  Had interest rates not declined in a timely manner, the combined entity would have continued to generate losses and depleted its regulatory capital resulting in regulatory insolvency (an outcome that occurred in approximately 17.53% of Dr. McDonald's 10,000 simulations).  As described in more detail below, in each simulation where the combined entity reached insolvency in terms of regulatory net worth, the cash generated by such simulation was $0.  Combined, the two constraints described above ensured that Dr. McDonald's valuation of the RAP Right: (1) was not artificially inflated by speculative assumptions of future business decisions; and (2) reflected the reality that the combined entity still faced significant risk of liquidation if it reached regulatory insolvency.

<u>Mechanics of Dr. McDonald's Model</u>

Although the RAP Right bought the combined entity time, it did not ensure the combined entity's survival.  Dr. McDonald's model simulates the movement of interest rates and the effect such movement would have on the combined entity.  Specifically, Dr. McDonald's model estimates the value of the RAP Right by performing the following three steps:

<u>Step 1:  Determining Future Interest Rates</u>

At the date of the Merger, the future movements of interest rates would determine the survival of the combined entity.  Because future interest rates were unknown on the date of the Merger, Dr. McDonald employs the widely-accepted Hull-White interest rate model to compute different possible evolutions of interest rates and yield curves.  The Hull-White model is a term

structure model that describes the evolution of the short term interest rate or short rate,[21] which corresponds to the interest rate between two adjacent periods in the model. Specifically, the Hull-White model is "designed to be exactly consistent with today's term structure of interest rates," in which today's term structure of interest rates is used as an input to the model to generate possible evolution of future short rates as output.  One way to visualize the output from the Hull-White interest rate model is the interest rate lattice as shown below:[22]



In the simple textbook example above, the lattice depicts future possible one-period interest rates, with a period being a year.  From any rate associated with a node in the lattice, there are three possible values for the interest rate in the next period.  The model determines the probabilities associated with moving from one interest rate to one of the three possible values for the next period's interest rate.

---

[21] Hull, John, *Options, Futures, and Other Derivatives*, 706 (Pearson 9th ed. 2015)

[22] The interest rates shown on this lattice are illustrative examples from Dr. McDonald's textbook and not from his RAP Right valuation model.  Source: McDonald, Robert L., *Derivatives Markets*, 777 (Pearson, 2013).

The Hull-White interest rate model portion of Dr. McDonald's RAP Right valuation model uses the yield curve from November 19, 1981, as the input, and produces a set of possible future interest rate paths and the associated probabilities of such paths consistent with the market's beliefs about future interest rates at the time.  This is a critical component of any correct valuation of the RAP right:  the correct interest rates to use in the model must be consistent with expectations of market participants at the time of the merger.

Step 2:  Computing the Cash Flow

Glendale and Broward primarily generated income through mortgage lending financed by deposits, earning a profit by lending at a higher rate than was paid to the depositors.  The amount of profit earned by Glendale therefore depends on the interest rates at which it lends to mortgage borrowers and the rates it pays to depositors.  The second portion of Dr. McDonald's RAP Right valuation model uses the output from the Hull-White interest rate model portion to simulate how the combined Glendale-Broward portfolio would fare along each path of possible future interest rates.  This simulation, which is often referred to as a Monte Carlo simulation, is conducted 10,000 times (i.e., 10,000 trials) to obtain a reliable estimate.  The Monte Carlo simulation—just as in the Hull-White model—uses one year as the length of the period.

Dr. McDonald's RAP Right valuation takes into account myriad possible paths of interest rates, but in each simulation trial (as in reality) only one path occurs.  In each trial, interest rates follow a specific path (mimicking reality).  The model calculates the amount of cash that Glendale would make or lose during each period (year) of each trial using the one-year interest rate for such period. Glendale's future cash flows from operations depend on mortgage income, income earned from other assets, cost of deposits, costs from other liabilities, and income earned from net reinvested earnings.  Dr. McDonald's RAP Right Report provides the formulas that are used to

calculate the mortgage income, income earned from other assets, cost of deposits, costs from other liabilities, and income earned from net reinvested earnings. As discussed above, the model simulates the performance of the combined entity based on the balance sheet that would have existed immediately after the Merger and makes no assumptions about how the merged entity would have grown or proactively changed the composition of its balance sheet. The initial balance sheet that serves as a basis for Dr. McDonald's model is depicted below.

| Initial Balance Sheet Immediately After Merger | | | |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Mortgages | $5,713,368,000 | Deposits | $5,883,887,000 |
| Goodwill | $734,666,000 | Other liabilities | $1,621,668,000 |
| Other assets | $1,355,051,000 | **Net Worth** | $297,530,000 |
| **Total Assets** | $7,803,085,000 | **Total Liabilities and Net Worth** | $7,803,085,000 |
| Sources: [A] CITI0003043-073 (Glendale Consolidated Financial Statements as of June 30, 1981). [B] CITI0000283-285 (Peat, Marwick, Mitchell & Co. Opinion on Purchase Method and Accounting, March 15, 1982). | | | |

Step 3:  Discounting Future cash Flows

The cash flows generated along the interest rate paths in each simulation are discounted back to present values as of November 1981 using the after-tax Hull-White one-year rates. For example, to discount a simulation's cash flow from year 20 to year 0, one would just need to see which specific path of interest rates was realized for that simulation, and use year 20's after-tax interest rate to discount the year 20 cash flow to year 19, year 19's after-tax interest rate to discount the cash flow further to year 18, and so on. This process was repeated for all 10,000 simulations, subject to Constraint 2 described above.

In all periods the regulatory net worth of the combined entity evolves based on the effects of the purchase method of accounting—goodwill amortization and accretion of loan discount—in addition to the cash flow from operations. If interest rates stay high in any particular simulation, Glendale may fail. Dr. McDonald's model assumes that if Glendale becomes insolvent at any

point in time in a simulation—that is, if its regulatory net worth is zero or falls below zero—the bank would fail and the value of that simulation is zero.

Using the process described above, Dr. McDonald determined that the value of the RAP Right and the associated regulatory forbearance from an economic perspective is $513 million. This value accounts for the fact that 17.53% of the 10,000 Monte Carlo simulations represent a scenario in which Glendale stops operating due to insolvency.   A graphical depiction of the distribution of simulated values across 10,000 simulations can be seen below.



### Dr. McDonald's Rebuttal to Critiques

Dr. McDonald will respond to Mr. Hargett and Mr. Kimball's criticisms of his RAP Right valuation.   Based on their critiques and deposition testimony, it appears that neither expert understood Dr. McDonald's model.

Both Government experts alleged that Dr. McDonald's model is fundamentally flawed because it is based on a definition of the RAP Right that is different from the RAP Right definition that was provided to them by counsel.   As explained in the preceding sections, Dr. McDonald's

definition of the RAP Right is wholly consistent with the Supreme Court and this Court's description of the RAP Right. Similarly, both Government experts mischaracterize Dr. McDonald's Model as a business enterprise valuation. As described above, it is not, and so any critiques based on this interpretation of Dr. McDonald's model are irrelevant and wrong.

**d.** **Plaintiff Will Prove the Major Flaws and Technical Errors in Mr. Kimball's Purported Valuation of the RAP Right**

As described above, the Kimball Report makes numerous criticisms of Plaintiff's experts, many with little or no supporting analysis. Mr. Kimball also values the RAP Right, stating that its value ranges from $7.3 million to $20.0 million, with a concluded value of $14.1 million, but values no other assets acquired by Glendale in the Transaction. Kimball Report at 10.

Mr. Kimball notes his understanding is that the "RAP Right should be valued as a guarantee" and outlines three different approaches to valuing guarantees. Kimball Report at 50. In support, the Mr. Kimball cites to an article by Gordon Goodman (the "Goodman article").[23] The methods presented by the Kimball Report are the market value method, the credit spread method, and the contingent claims method. The Kimball Report selects and purports to apply a contingent claims method to value the RAP Right. Kimball Report at 51.

Under Mr. Kimball's contingent claims method, the RAP Right is valued by estimating: (1) the likelihood of a "triggering event" (the loss of supervisory goodwill asset); and (2) the cost to replace the regulatory capital over the 40-year amortization period. He assumes that, if the supervisory goodwill asset were lost, "preferred capital would be the most cost-effective source of additional capital…" Kimball Report at 53.

---

[23] Goodman, Gordon E., *Risk Tutorial: Financial Reporting - How to Value Guarantees*, 38-45 (Global Association of Risk Professionals, January/February 2008).

<u>Likelihood of a Triggering Event</u>

Mr. Kimball's valuation using the contingent claims method relies heavily on the likelihood of triggering events (regulatory changes) at future dates.  Mr. Kimball "considered" the testimony of Mr. Hargett in constructing scenarios that assign probabilities of regulatory change. Kimball Report at 55-56.  These probabilities range from 0% to 10% and are applied to various future dates.

<u>Cost of Replacement Capital</u>

The cost of replacement capital is estimated based on:  (1) the cost of raising capital; and (2) after-tax costs of paying dividends on capital.  To determine the cost of raising capital Mr. Kimball analyzed monthly issuances of preferred capital over the five-year period leading up to the Merger.  He calculates that the average fee for raising capital as a percentage of total principal of preferred capital raised of 2.3 %.  Kimball Report at 53.

Mr. Kimball derives the cost of maintaining the replacement capital from the issuance of preferred dividends.  He analyzed yields on straight and convertible preferred stock issued by financial services firms and outstanding as of October 31, 1981 and selected 16.0% as the dividend yield on preferred capital.

Finally Mr. Kimball assumes that, in a scenario where the hypothetical buyer would be required to raise additional capital, that buyer would be able to partially offset its costs by investing in income-producing assets.  Therefore, the cost of replacement capital analysis is net of after-tax investment income.  He analyzes mortgage interest yields and determines an after-tax yield on mortgage assets of approximately 11.8%.

### i. Mr. Plastino Will Describe the Flaws and Errors in Mr. Kimball's RAP Right Valuation

Plaintiff's expert David Plastino will describe the following flaws in Mr. Kimball's RAP Right valuation.

<u>Mr. Kimball does not value the RAP Right from the buyer's perspective</u>

The methods described in the Goodman article value the RAP Right from a guarantor's perspective (FSLIC) rather than from the perspective of the guaranteed party (in this case, Glendale).  Consider, for example, the following from the Goodman article:

> A guarantee reduces the risk to the guaranteed party and creates a contingent liability for the guarantor.  The guarantee's value from the guaranteed party's standpoint is usually higher than the value (actual cost) from the guarantor's standpoint … In the valuation procedures described a bit later in this article, the guarantor's perspective is the one being considered.[24]

The Goodman article's general observation that the value of a guarantee is worth more to the guaranteed party than to the guarantor is important.  The value of the guarantee to Glendale was likely substantially higher than the expected value of the contingent liability assumed by the FSLIC.  This is because the value that Glendale, or a similarly situated buyer, would derive from the guarantee included the regulatory forbearance allowing its continued operation.  Had this forbearance not been granted, Glendale would have been unable to continue as a going concern following the Merger.

Thus, the value of the RAP Right to Glendale or a similarly situated buyer is more relevant to an analysis of the Merger than the probability-weighted expected loss (i.e., the contingent claim) that FSLIC might bear due to the issuance of this guarantee.

---

[24] Goodman, *Risk Tutorial: Financial Reporting - How to Value Guarantees* at 38.

<u>Mr. Kimball improperly uses preferred equity as replacement capital</u>

Mr. Plastino will explain why Mr. Kimball's assumption that "…preferred capital would be the most cost-effective source of additional capital…" is erroneous for a number of reasons.

First, as mutual associations, it would have been difficult for Broward, Glendale, and most other thrifts to raise preferred equity.  Mr. Kimball's own report concedes as much:

> The structure of S&Ls made it difficult to increase liquidity through an equity issuance as most S&Ls were structured as mutual corporations, rather than stock companies.  One disadvantage for mutual companies is the lack of access to capital markets via equity issuances.

Second, even if Glendale could have been structurally able to issue preferred equity, it would not have been able to issue a sufficient quantity to restore the loss of hundreds of millions of dollars of regulatory capital.  Mr. Plastino will show that the aggregate proceeds from preferred equity issuances by banking and investment services companies from 1977 to 1981 was approximately $321.6 million and the largest issuance was $125.0 million.   Comparing the issuances that actually occurred to Mr. Kimball's initial supervisory goodwill value of $716.7 million illustrates that using preferred equity as a source of alternative financing is unrealistic as there would have been insufficient investor demand for such an issuance.   Furthermore, Mr. Kimball's sample of non-convertible preferred stock includes issuances from just three institutions:  Chase Manhattan Corporation, Republic National Bank, and Bankers Trust New York Corporation.  All three institutions were not thrifts and were significantly more creditworthy than Glendale as of the Merger date.

<u>Mr. Kimball's estimated cost of preferred equity financing is flawed and unreliable</u>

Even had Glendale been able to issue the preferred equity assumed in Mr. Kimball's model, the dividend rate assumed by Mr. Kimball is far too low.  The hypothetical preferred equity in Mr. Kimball's model represents capital that would be used to recapitalize an insolvent institution (as

Glendale would have been immediately following the Merger absent supervisory goodwill).  It would be, therefore,  the most junior tranche in the capital structure and bear risk typically born by common equity.  It goes without saying that insolvent companies are typically unable to raise preferred equity, however, Mr. Kimball's model is based on the premise that an insolvent thrift could raise sufficient capital to plug the hundred million dollar hole in its balance sheet on the same economic terms as a well-capitalized AAA rated bank.  One does not need to look at each variable in his model to appreciate the absurdity of this premise.

### ii.    Mr. Harms Will Proffer His Expert Report Valuing the RAP Right to Preserve His Testimony

Mr. Travis Harms defines the RAP Right with reference to the Supreme Court's description, in the *Winstar* decision, of the contractual rights that Glendale received in the Broward acquisition:  "the government had an express contractual obligation to permit Glendale to count the supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes."  Harms Report at 2 (citing *Winstar*, 518 U.S. at 864).  Furthermore, the *Winstar* decision states that "the Bank Board and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the agreements between the parties."  *Winstar*, 518 U.S. at 868.  With leave of the Court, Mr. Harms will proffer a separate report valuing the RAP Right solely for purposes of preserving Plaintiff's arguments on appeal.

### 2.    Dr. Mann Correctly Valued the Branching Right and the Tax Benefit.

Dr. Steven C. Mann is Chair of the Finance Department and an Associate Doctor of Finance and Beasley Faculty Fellow at the M.J. Neeley School of Business, Texas Christian University ("TCU"), which he joined in 1994.  He received a Financial Economics Ph.D. from the University of Utah and has published articles in various journals.  Dr. Mann served as an expert on behalf of

the Government in the *Washington Mutual* case.  Dr. Mann performed a market analysis in calculating the value of a Florida Branching Right acquired by Home Savings of America ("Home") in its December 1981 acquisition of Southern FS&LA of Pompano Beach, also located in Broward County, Florida, which the Western District Court of Washington found very persuasive.  *See Wash. Mut.*, 130 Fed. Cl. at 719.  As discussed below, Dr. Mann also valued the tax benefits in *Washington Mutual*.  Professor Mann applied the same methodologies to value the Branching Right and tax benefit in this case.

### a.        The Value of the Branching Right

Glendale's Branching Right represents an approval by the regulators given to an out-of-state thrift to operate acquired branches in a specific new state not previously part of the buyer's operations, as well as to be able to expand in that state, subject to the FHLBB's approval.  Dr. Mann will explain that market evidence from other thrift acquisitions provides the most reliable evidence on the value of the Florida Branching Right that Glendale acquired.  He examined numerous thrift acquisitions in both Florida and across the nation during the 1981 to 1983 period. The best evidence for the market price of a Florida Branching Right is the difference between the median price paid in excess of acquired assets (scaled by acquired liabilities) in acquisitions with a Florida Branching Right and the price paid in acquisitions without one.  Dr. Mann calculated that:

- The median price paid for the five acquisitions in 1981 and 1982 that included a Florida Branching Right was approximately 29% of acquired liabilities;

- The median prices paid for thrifts without a Branching Right from June 1981 through June 1983 ranged from 17% to 26% of acquired liabilities, depending on the sample; and

- The median prices paid for intrastate thrifts acquisitions without a Branching Right from July 1981 to June 1983 ranged from 21% to 24%, depending on the sample.

Accordingly, Dr. Mann determined that the median price paid in thrift acquisitions with a Florida Branching Right was 5% to 8% more than the median price paid in large samples of comparable thrift acquisitions without one.

Using the method described above, and applying the 5%-8% range to Glendale's $2,559 million in liabilities it acquired from Broward, Dr. Mann concluded that the value of Glendale's Florida Branching Right ranged from approximately $125 million to approximately $200 million.

The Government's expert, Mr. Kimball, questions whether the market transactions Dr. Mann used were comparable and whether he had adjusted for "other factors that may have influenced the price paid," such as "changes in the economy, industry conditions, and financial markets, or factors specific to each transaction." Kimball Report at 71. Dr. Mann will demonstrate that while factors specific to each transaction may have generated some variation in transaction prices, thrift asset composition was substantially homogenous during the 1981-1983 time period. He will also show that his methodology in estimating the value of Florida Branching Right has no logical overlap with the RAP Right valuations. Plaintiff also notes that in questioning Dr. Mann's market approach analysis, none of the Government's experts has offered an alternative valuation approach, any new or contradictory data, or an overall value estimate for the Branching Right.

### b.     The Value of the Tax Benefit

In *Washington Mutual*, Dr. Mann calculated tax benefits under the assumption that Home would be able to carry back 100% of the potential tax losses, as Home's retained earnings were more than twice as large as the discount on the acquired loans, and testimony indicated that Home, in fact, intended to sell the acquired loans and carry back losses. *Wash. Mut.*, 996 F. Supp. 2d at 1116-1117.

In contrast to Home, Glendale had no ability to carry back potential tax losses from selling acquired loans. Financial projections at the time of Glendale's acquisition indicated that Glendale would have operating losses through 1983 independent of any loan sales, and in great enough amounts to eliminate any taxable income from 1971-1980. Therefore, Glendale would have maximized the value of the tax benefit by using the potential tax losses from loan sales to offset anticipated future income.

At the time of the Merger, Glendale had fully utilized its capacity to carry back net operating losses. Furthermore, financial projections prior to the merger showed that Glendale would have no available taxable income to utilize the potential NOL carryforwards from the loan sales until 1987. If Glendale's objective was maximization of tax benefits, it would have been anticipated to delay loan sales so as to maximize expected tax gains. Dr. Mann will demonstrate to the Court that assuming: (1) maximization of tax benefits would be the only motivation for loan sales; and (2) loan values would remain unchanged other than amortization, Glendale would have expected to maximize the potential tax benefits by selling the loans in 1985 allowing the tax losses to be carried forward through 1990. Dr. Mann then discounts the future tax benefits back to November 19, 1981, and determines that Glendale's potential tax benefits from the Broward acquisition were worth approximately $45 to $50 million.

Dr. Mann will also respond to Mr. Kimball's criticisms. Dr. Mann will show that his calculation of the tax benefits to Glendale is a reasonable, non-speculative measure of the value of the tax benefits to the potential buyers of Broward as of 1981. Additionally, Dr. Mann will testify about a Glendale May 1982 internal memorandum presented by the government during his deposition. The memorandum states that Glendale received tax refunds arising from Broward's

pre-merger losses. Dr. Mann will demonstrate that the foregoing refund amounts were already accounted for in the Merger and should not be included in his tax benefits analysis.

### 3. Mr. Harms Correctly Valued the Other Items of FSLIC Assistance

Mr. Harms received an MBA degree from St. Louis University. He is a CFA, a CPA, and is accredited in business valuation. As the leader of Mercer Capital's Family Business Advisory Services Group, Mr. Harms practice focuses on providing financial education, valuation, and other strategic financial consulting to multi-generation family businesses. He has performed valuation used for tax compliance, ESOP compliance, and other purposes for clients in a wide range of industries and is a frequent speaker on valuation and related topics. Mr. Harms determined the fair market value of the following FSLIC assistance items:

| FSLIC Assistance Item | Amount |
|---|---|
| Interest Rate Protection Agreement ("IRPA") | $12,700,000 |
| Indemnification Provision | $4,400,000 |
| FHLB Advance Refinancing Provision | $4,600,000 |

### a. The Interest Rate Protection Agreement

Section 5 of the SAA provides that if interest rates rose above threshold levels, the FSLIC would make payments to Glendale; if interest rates fell below threshold levels, Glendale would make payments to the FSLIC. Mr. Harms will explain why it is appropriate to measure the fair market value of the IRPA using valuation techniques applicable to interest rate derivative securities. The IRPA can be modeled most simply as a portfolio of interest rate calls and puts. Mr. Harms will describe the two models he used to calculate the value of the portfolio of interest rate options, the sum of which provides an indication of value for the IRPA.

First, Mr. Harms values the portfolio of interest rate options underlying the IRPA using the Black Model.  The indicated value of the IRPA is $13.4 million.  Because the standard Black Model cannot accommodate certain features of the IRPA, Mr. Harms also develops a second estimate of the value using the Binomial Model.  The indicated value of the IRPA using the Binomial Model is $12.0 million.  Mr. Harms assigns equal weight to the two indications in reaching his conclusion of value for the IRPA of $12.7 million.

### b.      The Indemnification Provision

Mr. Harms will also testify about his valuation of the Indemnification Provision.  Section 6 of the SAA states that the FSLIC agreed to indemnify Glendale against damages associated with litigation arising from the Broward acquisition or from amounts paid in respect of any unknown liabilities of Broward existing at the acquisition date.   Mr. Harms will explain why the Indemnification Provision is essentially a form of representations and warranties ("R&W") insurance.  Under an R&W policy, the insurance carrier agrees to compensate the policyholder in the event of loss precipitated by the breach of a representation or warranty made by the counterparty in an M&A transaction.  The insured parties under most R&W policies are the buyers in the underlying M&A transaction.  Because the Indemnification Provision functions similarly to R&W insurance, Mr. Harms values the Indemnity Provision by reference to the market for R&W insurance in corporate transactions.

R&W policies generally include the following principal terms:  coverage limit (most commonly set at 10% of the total purchase price), retention (i.e., the deductible), exclusion (generally exclude breaches of seller covenants, purchase price adjustments, tax-related issues, certain labor or environmental exposures, and forward-looking representations), policy term (often extend from three to six years), and premium (typically have a single premium quoted as a percentage of the coverage limit, 2%-3.5%).

49

Applying the general R&W policies to the Indemnification Provision, Mr. Harms concludes that the value for the Indemnification Provision is $4.4 million. The value of the Indemnification Provision is appropriate given that it provided modest risk mitigation benefits to Glendale.

### c.  The FHLB Advance Refinancing Provision

Finally, Mr. Harms will testify about his valuation of the FHLB Advance Refinancing Provision. Section 8 of the SAA includes a provision allowing Glendale to extend, restructure, or refinance outstanding advances from the FHLB to Broward during a 90-day period following the Merger. Mr. Harms measures the value of the provision with reference to the terms of outstanding FHLB Advances of Broward and terms available on new FHLB advances at the Merger date. The benefit of refinancing to a borrower is the present value of the interest cost savings realized through the refinancing over the remaining life of the outstanding borrowings. Mr. Harms will explain to the Court the reasonableness of the various assumptions and adjustments he made in order to calculate the potential interest savings.

In order to calculate the potential interest savings with precision, one would need to know the weighted average interest rate on Broward's near-term borrowings at the valuation date, and the balance of near term maturities at that date. As of the drafting of his report, Mr. Harms did not know either. As a result, Mr. Harms makes various assumptions and adjustments regarding the relevant interest rate, the terms of maturities, and the applicable spread to treasuries.

The indications of value range from $2.3 million to $6.9 million. Mr. Harms assigns equal weight to each indication, deriving an overall conclusion of $4.6 million. Glendale did not perceive any benefit in using the FHLB Advance Refinancing Provision to fundamentally alter the term structure of Broward's FHLB advances.

The Government's only criticism of Mr. Harms' above valuations is that R&W policies were not widely available as of the valuation date. Mr. Harms will demonstrate the reasonableness of using R&W policies as a proxy. Essentially, the underlying risk exposures existed at the valuation date even if an active R&W insurance market did not yet exist. Thus, observing how insurance markets price the types of risks that existed at the valuation date does not violate the proscription against the use of subsequent events in fair market value determinations.

### 4. Mr. Plastino Correctly Identified and Valued Broward's Intangible Assets

Mr. Plastino is a principal at The Brattle Group and leads bankruptcy, tax controversy, complex litigation, and corporate merger and acquisition engagements.[25] He earned a Master in Business Administration degree and a Master of Science in Information Systems degree from Boston University Questrom School of Business. He is a CPA and is accredited in business valuation by the AICPA. With over 20 years of finance and consulting experience, Mr. Plastino specializes in corporate valuation, securities analysis, and complex financial modeling and is an expert in financial economics. In addition, Mr. Plastino is a Lecturer at the Boston University Questrom School of Business and has published numerous articles and regularly presents to attorneys, corporate managers, law students, and academics.

Plaintiff will show that intangible assets owned by Broward had a fair market value of approximately $28.3 million at the time of the Merger as follows:

| Intangible Asset | Description | Value |
|---|---|---|
| Core Deposits Intangible ("CDI") | CDI assets represent the value a financial institution obtains from its retail deposit base – typically the largest intangible asset acquired in an unassisted bank merger. | $18.0 million |

---

[25] At the time his first report was written, Mr. Plastino was a Senior Manager in Ernst & Young's National Tax Transaction Economics Group.

| Intangible Asset | Description | Value |
|---|---|---|
| Assembled Workforce Intangible | This intangible asset represents the value of a financial institution's investments in recruiting and training its employees. | $3.9 million |
| Outlook Development Corporation ("Outlook") | This intangible consists of the going concern value of Broward's real estate development subsidiary. | $6.1 million |
| Florida Real Estate Appraisers ("FREA") | This intangible consists of the going concern value of Broward's real estate appraisal subsidiary. | $0.3 million |
|  |  | **$28.3 million** |

The Core Deposit Intangible represents the value in a financial institution's retail accounts which generally offer a stable, low-cost source of funds when compared to other alternatives such as debt issuances and wholesale funding sources such as jumbo CDs. Broward had a large retail deposit base at the time of the Merger. This retail base was changing rapidly, as products such as Passbook Savings accounts, whose rates were fixed by law and FHLBB at 5.5% at the time of the Merger, were experiencing high net outflows while higher-rate options were experiencing net inflows. Peat Marwick valued the Core Deposit intangible at $18 million near the time of the merger. Mr. Plastino confirmed this valuation. The Government does not dispute it.

Assembled workforce intangible assets relieve a buyer of the expense and effort required to hire and integrate replacement workers. In other words, there is inherent value in having an already assembled workforce that may be relied upon to appear at work on time and work efficiently. The value in Broward's assembled workforce intangible asset primarily related to its loan operations, which required branches to attract depositors and loan officers to lend funds out. In the course of the Merger, Glendale management noted the high value it placed upon the rights it obtained to operate branches in Florida. Trained staff was required for Glendale to realize the value from these branch operations post-Merger, and Broward's management largely remained in

place to oversee these activities.  The evidence will show that Broward's assembled workforce intangible asset value as of the date of the Merger was $3.9 million.

The going concern value for Outlook, Broward's residential real estate development operations, represents the value of these profitable operations over and above the value of the tangible assets.  The value of Outlook's real estate assets is reflected in the Purchase Price Allocation prepared by Peat Marwick for the Merger.  Mr. Plastino analyzed whether the fair market value of Outlook as an operating business exceeded this adjusted book value of Outlook's tangible assets.  The evidence will show that the going concern value for Outlook as of the date of the Merger was $6.1 million.

Similarly, the going concern value of FREA, Broward's real estate appraisal operations, represents the value beyond the adjusted book value of the tangible assets.  Mr. Plastino determined that the going concern value for FREA, was $0.3 million at the time of the Merger.

Mr. Plastino will describe how there is no evidence in Broward's financial results that it owned any other substantial valuable intangible assets.  He will explain why he assigns no value to certain intangible assets (e.g., the credit card intangible, the loan servicing intangible, the trust account operations intangible, etc.) of Broward.

Plaintiff anticipates that the Government, through its experts Messrs. Kimball and Hargett, will claim that a portion of the purchase price should be allocated to ordinary goodwill.  Mr. Plastino will testify that there is no evidence that Broward was worth more than the sum of the assets identified and valued by Plaintiff's experts.  Broward was not able to operate as an ongoing enterprise, or going concern, absent FSLIC and FHLBB assistance as of the Merger date.[26]  To the

---

[26] See, for example, Memorandum from Mr. Brent Beesley, Director of FSLIC, to the FHLBB, dated November 19, 1981, recommending the approval of the Merger and listing Broward's net worth to assets as 1.9%, or below the regulatory minimum.

extent Broward was a going concern as of the Merger date, this condition was due to the forbearance and assistance provided by FSLIC and FHLBB.   Absent FSLIC and FHLBB assistance, Broward's assets would have been liquidated and its obligations retired with the proceeds.  No value is obtained for goodwill in a liquidation.  In other words, there was no residual or "ordinary" goodwill.

### 5.    Mr. Plastino Will Also Opine on the Overall Valuation of the Assets at Issue

Mr. Plastino will testify about his identification and valuation of the various intangible assets included in the $734.7 million supervisory goodwill.  He groups the intangible assets into three categories:  intangible assets received from Broward ($28.3 million), potential tax benefits ($47.5 million), and intangible assets in the form of assistance received from the regulators pursuant to the terms of the SAA ("SAA Assets").

Mr. Plastino will show the Court that Mr. Kimball's and Mr. Hargett's opinions regarding the RAP Right and the Glendale-Broward transaction as a whole are inconsistent with basic economics, core valuation principles, and the facts of this matter.  He will address the government experts' specific criticisms, which are based on a misunderstanding and mischaracterization of their analysis, lack support and analysis, are contradictory, and are inconsistent with the facts of this matter.  Moreover, he will point out the flawed premise upon which Mr. Kimball's valuation of the RAP Right is based, including its numerous basic valuation errors.

As discussed below, through its experts and the evidentiary record, Plaintiff has identified and valued each intangible asset Glendale received from the regulators in the Merger.  And the cumulative intangible assets identified and valued by Plaintiff equal the purchase price of the intangible assets acquired by Glendale.   Conversely, the Government has valued only one intangible asset (the RAP Right).  The Government has not described how to account for the

remaining purchase price, other than speculating that there was ordinary goodwill in the failing thrift or that Glendale simply overpaid for Broward. Both assertions are incorrect, and even if they were somehow correct, Plaintiff's basis in the acquired intangible assets does not simply disappear.

Mr. Plastino will testify about his review of Dr. Mann's calculation of the tax benefits. He will demonstrate his rationale in selecting the midpoint of Dr. Mann's range of values as the fair market value of the tax benefit.

With regard to the SAA Assets, Mr. Plastino will testify about his assessments of Dr. McDonald's RAP Right valuation. Mr. Plastino will also testify about his determination of a reasonable point estimate value for the Florida Branching Right ($124.2 million), including the key premises upon which his analysis relies.

Leveraging the contemporaneous valuation work in Peat Marwick's opinion, together with the valuations performed by Dr. Mann, Mr. Harms, and Dr. McDonald, Mr. Plastino identified and valued all the separately identifiable assets acquired by Glendale. Even in the context of a typical, two-party transaction, such an analysis would minimize the residual goodwill booked by the acquirer. For example, unrealized potential tax benefits would typically not be separately identified and valued in a purchase price allocation because of the uncertainty that they will be realized. Likewise, small non-core subsidiaries that are not material to the business as a whole, such as FREA, typically would not be separately identified and valued. Any value assigned to these items by an acquirer would, in an ordinary transaction, end up in goodwill. Plaintiff's experts have valued all such assets for the purposes of this proceeding.

In sum, Mr. Plastino will describe the methods he used to: (1) value the intangible assets he identified; and (2) confirm the reasonableness of the valuation opinions proffered by Plaintiff's other experts by considering them within the context of the Merger as a whole. Specifically, he

evaluated whether the expected fair market value of the liabilities Glendale assumed was equal to the aggregate fair market value of the assets it received, including intangible assets. When assets and liabilities are equal, the Merger is economically rational for both Glendale and FSLIC, and it is therefore logical that the deal closed.

| Assets Received from FSLIC and FHLBB | |
|---|---|
| RAP Right | 513,000 |
| Interest Rate Protection | 12,700 |
| Indemnification Provision | 4,400 |
| FHLB Advance Refinancing Provision | 4,600 |
| Florida Branching Rights | 124,158 |
| **Subtotal** | **658,858** |
| **Other Assets** | |
| Tax Benefits | 47,500 |
| **Assets Received from Broward (other than tangible assets)** | |
| Core Deposit Intangible Asset | 18,000 |
| Assembled Workforce Intangible Asset | 3,904 |
| Outlook Development Corporation | 6,103 |
| Florida Real Estate Appraisers | 301 |
| **Subtotal** | **28,308** |
| **Total Value of Intangible Assets Acquired by Glendale** | **734,666** |
| **Total Value of Supervisory Goodwill** | **734,666** |

Taken as a whole, therefore, Plaintiff's valuation comports with the economic realities at the time of the Merger. Plaintiff will demonstrate, not only the value of all of the assets at issue, but also how the valuation is consistent with the contract that Glendale negotiated with the government at the time of the Merger. Moreover, unlike the taxpayer in *Washington Mutual*, Plaintiff is not trying to deduct the cost of different assets in different years. The entirety of its $798 million basis is deductible in 2005, when its litigation finally ended.

### 6.   Mr. Carroll Will Describe the Tax Consequences of the Merger and Related Litigation

Plaintiff will present expert testimony from Mr. James V. Carroll as well as documentary evidence at trial. Mr. Carroll is the Director of Federal and State Tax Controversy  at Citigroup

Inc.  He graduated from St. John's University in 1986 with a Bachelor of Science degree in Finance.  Mr. Carroll joined CitiBank, N.A. in 1987 in the finance department where he worked on forecasting and budgeting for the northeast region.  In 1988, he joined the U.S. Consumer Bank Tax Department of CitiBank where he had responsibility for preparing and reviewing federal tax returns and ensuring federal tax return compliance for Citibank's consumer banking affiliates.  He became Group Manager of CitiBank's U.S. Consumer Bank Tax Department in 2000 and remained in that department until 2007, when he joined CitiBank's advisory group for global wealth management/private banking.  In 2014, Mr. Carroll started his current position with CitiBank's tax controversy department.

As part of his duties with the U.S. Consumer Bank Tax Department of CitiBank, Mr. Carroll became familiar with the Merger.  Mr. Carroll will testify that neither Glendale nor any of its successors in interest ever received a tax deduction or other tax benefit for any portion of the its $798 million basis through depreciation or otherwise.  Mr. Carroll can also provide a summary of Glendale's refund claims and the IRS's refusal to pay such claims.

a.   **Mr. Carroll Will Testify that Any Amounts Attributed to the Florida Operations Should Offset the Gain on the Sale of the Florida Business**

Mr. Carroll will describe the tax reporting of Glendale's 1994 sale of its Florida business. Mr. Carroll will explain that neither Glendale nor any of its successors received any deduction or other tax benefit for any amount of the $798 million basis when it sold its Florida business, and that no amount of the $798 million basis was included in the basis of the assets for purposes of calculating gain on the sale of the Florida business.

As described above, Plaintiff has identified and valued certain intangible assets that were acquired by Glendale in the Merger, were components of the supervisory goodwill asset listed on Glendale's balance sheet, and were not rendered worthless by the government's breach.  These

assets included the intangible assets acquired from Broward, the Florida Branching Right, and the Other Items of FSLIC Assistance detailed above (the "Florida Intangible Assets"). As described below, Plaintiff's basis in the Florida Intangible Assets is $174.2 million.

On December 15, 1994, Glendale sold its entire Florida business (including the former Broward business) to Barnett Banks, Inc. for the approximately $297.4 million. Neither Glendale nor any of its successors received any deduction or other tax benefit for any amount of the supervisory goodwill when it sold the Florida business. For tax purposes, no amount of the supervisory goodwill was included in the basis of the assets for purposes of calculating gain on the sale of the Florida business. Glendale reported gain for tax purposes in the amount of $200,874,684 on Glendale's 1994 tax return. The IRS audited Glendale's 1994 tax return and did not adjust the reported gain from the sale of the Florida business.

When Glendale sold the Florida business, it could not include in the calculation of the gain any basis allocated to the Florida Intangible Assets because it was seeking compensation for the supervisory goodwill asset. This Court has asked Plaintiff to separately identify and value the intangible assets that comprised the supervisory goodwill asset. As a result, Plaintiff has identified and valued all of the intangible assets that were part of its Florida business and should have been included in its basis for purposes of determining its gain on the sale of the Florida business. If the Court accepts the valuations described above, Glendale's basis in the Florida business should have also included the $28.3 million allocable to the intangible assets acquired from Broward, the $124.2 million (or up to $200 million) allocable to the Florida Branching Right, and the $21.7 million allocable to the Other Items of FSLIC Assistance. Glendale's gain on the sale of the Florida business would have been $174.2 million less (or up to $250 million less) than it declared and paid tax on in 1994. Accordingly, Plaintiff is entitled to a $174.2 million (or $250 million)

reduction of the gain it reported on the sale of the Florida business attributed it its basis in the Florida Intangible Assets.[27]

Mr. Carroll will also testify regarding the tax treatment of the components of the damage award.  A taxpayer who recovers an item deducted in an earlier year is ordinarily taxed on the recovery unless the deduction did not reduce the taxpayer's tax liability and thus provided no tax benefit.  The Court awarded reliance damages in the amount of approximately $380,787,000.  These damages can be broken down into the following post-breach costs:

| Category | Amount |
|---|---|
| Wounded Bank Damages | **$335,400,000** |
| Increased Deposit Insurance Premiums | **$11,480,000** |
| Increased OTS Assessments | **$4,675,000** |
| Transaction Costs from the sale of University Savings | **$4,472,000** |
| Transaction Costs from the 1993 Recapitalization | **$24,235,000** |
| Custodial Fees Paid to FHLB | **$525,000** |
| Total Non-Overlapping Reliance Damages | **$380,787,000** |

See *Glendale Fed. Bank*, 43 Fed. Cl. at 408-09.

Plaintiff concedes that the following reliance damages were deducted on its 1992-1996 tax returns and yielded a tax benefit:  Increased Deposit Insurance Premiums, Increased OTS

---

[27] Section 165(a) permits the deduction of losses "sustained during the taxable year and not compensated for by insurance or otherwise."  Treas. Reg. §1.165-1(b) provides that, to be deductible, a loss must be:  (a) evidenced by a closed and completed transaction; (b) fixed by an identifiable event; and (c) with certain exceptions, sustained in the year claimed.  Accordingly, Plaintiff should be allowed a deduction equal to the amount of its basis in 2005, the year in which the claim was finally adjudicated.

Assessments, Transaction Costs from the sale of University Savings, and Custodial Fees Paid to FHLB.

> **b.    Mr. Carroll Will Testify that Glendale Did Not Obtain a Tax Benefit From the Transaction Costs From the 1993 Recapitalization**

The Court awarded Glendale $24,235,000 in transactional costs from the 1993 recapitalization based on Glendale showing that such costs were incurred as a result of the breach and would not have been incurred had it not fallen out of capital compliance.  *Id.*  These transaction costs were the excess of:  (1) actual amounts paid by Glendale to service providers in connection with the recapitalization in 1993; over (2) the amount of estimated transaction costs that Glendale would have paid in connection with capital-raising transactions if the government had not breached.

Glendale paid approximately $3.7 million in cash and $240,270 in stock to legal, accounting, and financial service providers for their work on the 1993 debt recapitalization.  These costs consist of payments for services to various service providers that participated in the March 1993 debt restructuring transaction.  Glendale also paid $31,779,808 in fees to service providers in connection with the recapitalization in August and September of 1993.  The total amount of recapitalization costs paid by Glendale was $35,734,573. Glendale estimated that it would have paid approximately $10.75 million to $12.25 million in transaction costs for capital raising transactions.

The difference between the actual transaction costs and the estimated transaction costs was approximately $24.235 million.

Plaintiff will show that the transaction costs associated with the restructuring were booked to "additional paid-in capital" attributed to preferred stock issued in connection with the restructuring transaction.  *See* Glendale 1993 Federal Tax Return Workpapers.  Such costs did not

yield a deduction or credit on Glendale's tax returns and should not be subject to tax upon their recovery.

> ### c.   Mr. Carroll Will Testify that Glendale Recognized Cancellation of Indebtedness Income as a Result of the Breach and Subsequent Restructuring

In addition to the costs incurred in connection with the 1993 recapitalization, Plaintiff will demonstrate that the Government's breach of the SAA caused Glendale to recognize $48,713,003 of cancellation of indebtedness ("COD") income on its 1993 tax return.  I.R.C. § 61(a)(12).  As previously discussed, Glendale undertook the 1993 recapitalization because, as a result of the breach, it had fallen out of capital compliance.  *Glendale Fed. Bank*, 43 Fed. Cl. at 407-09.  In order to come into regulatory capital compliance, it had to retire approximately $132 million of outstanding debt in exchange for preferred stock of Glendale.  Due to its regulatory capital issues, the value of Glendale's preferred stock was substantially lower than the value of the outstanding debt, resulting in $48,713,003 of cancellation of COD income.  This COD income offsets $48,713,003 of wounded bank damages as it represents tax incurred as a result of the Government's breach.

## IV.   <u>CONCLUSION</u>

For the reasons described above, Plaintiff respectfully requests the Court find that:

(1)    Plaintiff is entitled to recover the full $798,291,000 cost basis in the assets acquired in the Merger;

(2)    Approximately seventy three million dollars ($72,948,0003) of the $381,538,696 damages award received by Plaintiff in 2005 should be excluded from income as it represents the return of lost capital and not recovery of expenses that generated a tax benefit; and

(3)    Plaintiff is entitled to recover taxes paid in accordance with the findings above, together with interest thereon.

Respectfully submitted,

February 4, 2022                    */s/ Jean A. Pawlow*
                                   JEAN A. PAWLOW
                                   Attorney of Record
                                   Latham & Watkins LLP
                                   555 11th St. NW, Suite 1000
                                   Washington, D.C. 20004
                                   Telephone: (202) 637-3331
                                   Fax: (202) 637-2201
                                   jean.pawlow@lw.com

                                   Counsel for Plaintiff