No. 15-953 T
(Senior Judge Eric G. Bruggink)

---

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

CITIGROUP INC.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

_____

**DEFENDANT'S MEMORANDUM OF CONTENTIONS
OF FACT AND LAW**

_____

DAVID A. HUBBERT
Deputy Assistant Attorney General

DAVID I. PINCUS
G. ROBSON STEWART
BENJAMIN C. KING, JR.
JASON S. SELMONT
STEFAN R. WOLFE

Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C.  20044
(202) 307-6506
(202) 514-9440 (facsimile)
Benjamin.C.King@usdoj.gov

# TABLE OF CONTENTS

Page(s)

Defendant's Memorandum of Contentions of Fact and Law...........................................................1

Introduction...........................................................................................................................................1

    I.   Overview of the case..........................................................................................................1

    II.  Overview of the burden of proof in a tax refund suit. ...........................................6

    III. The claims at issue. ..............................................................................................................7

Factual Background: ..........................................................................................................................10

    I.   The economic conditions affecting the thrift industry in 1981...........................10

    II.  The government's response to the thrift crisis. ......................................................11

    III. Prevailing Accounting Rules. ........................................................................................12

         A.  Accounting for Business Combinations...........................................................12

         B.  Accounting for Goodwill  ......................................................................................14

    IV. The Glendale-Broward Transaction.............................................................................15

         A.  The events leading up to the merger ................................................................15

         B.  The merger takes place .........................................................................................17

         C.  Events following the merger. ...............................................................................19

    V.  The passage of FIRREA. ..................................................................................................20

Contentions of Law: ...........................................................................................................................21

    I.   Issues related to subject matter jurisdiction. ..........................................................21

         A.  Plaintiff has failed to sufficiently allege that this Court has subject matter jurisdiction over its complaint ..........................................................................21

         B.  Even if this Court has jurisdiction over plaintiff's complaint, there is no jurisdiction over any claim beyond a deduction for the RAP right guarantee. ...................................................................................................22

# TABLE OF CONTENTS
## (CONTINUATION)

**Page(s)**

II. A deduction for the RAP right guarantee is the only claim before court .......................24

    A.  Tax deduction for losses under § 165 ........................................................................26

    B.  Plaintiff cannot show that the RAP right guarantee or branching right
        became "worthless" or were otherwise abandoned. ...................................................26

III. To prove its cost basis in the Rights at issue, plaintiff must proffer
    sufficiently reliable evidence for the Court to ascertain value to a
    reasonable degree of certainty. ........................................................................................28

IV. Plaintiff will be unable to meet its burden of proof to demonstrate that it
    is entitled to a deduction for the RAP right guarantee......................................................30

    A.  Dr. McDonald's model of the value of the RAP right guarantee is
        unreliable....................................................................................................................31

    B.  The other assets Harms valued were not affected by FIRREA, and a
        deduction cannot be taken in the 2005 tax year.........................................................38

    C.  Professor Mann's analysis is unreliable and incomplete. ...........................................38

        1.  Professor Mann's estimate of the branching rights is not reliable..........................38

        2.  Professor Mann did not measure all tax benefits from the merger. ........................40

    D.  Mr. Plastino's analysis is of limited utility, and his reliance on other
        experts is misplaced. ..................................................................................................42

    E.  The opinions rendered by Martin Lowy are incorrect. ...............................................43

V.  The government's witnesses will demonstrate the correct GAAP and RAP
    treatment of the transaction and will offer a valuation of the RAP right
    guarantee based on the correct understanding of what was guaranteed ...........................45

    A.  Brent Beesley, the former Director of the FSLIC, will testify regarding
        regulatory issues and the FSLIC's role in the Glendale-Broward merger..................45

## TABLE OF CONTENTS
## (CONTINUATION)

**Page(s)**

B.  Mr. Joe A. Hargett will explain the accounting and regulatory issues
    involved in the Glendale-Broward transaction. ..........................................47

    1.  Mr. Hargett's analysis of the RAP right guarantee...............................47

    2.  Mr. Hargett's analysis of the financial reality of the transaction...........................48

    3.  The probability of regulatory change.......................................................48

    4.  Mr. Hargett will rebut the testimony of plaintiff's expert,
        Dr. McDonald. ..................................................................................48

    5.  Plaintiff's anticipated rebuttal testimony from Marc Oken, to
        the extent it is relevant, will support Mr. Hargett's testimony. ..............49

C.  Mr. Kimball will rebut plaintiff's experts' opinions and provide a
    valuation of the RAP right guarantee.........................................................51

    1.  Mr. Kimball will testify about the flaws in plaintiff's experts'
        reports and on the value of the RAP right guarantee. ............................51

    2.  Plaintiff's experts' critiques of Mr. Kimball's opinions do not
        withstand scrutiny. .............................................................................55

D.  Professor Froot's rebuttal valuation of the RAP right guarantee
    is not reliable.............................................................................................57

    1.  Professor Froot's estimation of $116 million in expected loss is
        unreliable...........................................................................................58

    2.  Professor Froot's estimate of $232 million to $464 million in
        markups is unreliable. ........................................................................59

Conclusion ...........................................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.J. Indus., Inc. v. United States*,
  503 F.2d 660 (9th Cir. 1974) ............................................................................28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................................7

*Beus v. Commissioner*, 261 F.2d 176, 180 (9th Cir. 1958) ....................................28

*Cent. Pines Land Co., LLC v. United States*,
  697 F.3d 1360 (Fed. Cir. 2012) .......................................................................22

*Cencast Servs., L.P. v. United States*,
  94 Fed. Cl. 425 (2010) .....................................................................................22

*Charron v. United States*,
  200 F.3d 785 (Fed. Cir. 1999) ...........................................................................6

*Computervision v. United States*,
  445 F.3d 1355 (Fed. Cir. 2006) .......................................................................23

*Commissioner v. Nat. Alfalfa Dehydrating and Milling Co.*,
  417 U.S. 134 (1974) ...........................................................................................5

*Cook v. United States*,
  46 Fed. Cl. 110 (2000) .......................................................................................6

*Danville Plywood Corp. v. United States*,
  899 F.2d 3 (Fed. Cir. 1990) ...............................................................................6

*Dorrance v. United States*,
  809 F.3d 479 (9th Cir. 2015) ...........................................................................29

*Dresser v. United States*,
  74 Ct. Cl. 55 (1932) .........................................................................................26

*Franchise Tax Bd. v. Constr. Laborers Vacation Trust*,
  463 U.S. 1 (1983) ...............................................................................................7

*Glendale Fed. Bank, F.S.B. v. United States*,
  239 F.3d 1374 (Fed. Cir. 2001), (1999) ..........................................................32

*Glendale Fed. Bank, F.S.B. v. United States*,
  43 Fed. Cl. 390 (1999) .....................................................................................32

# TABLE OF AUTHORITIES
## (Continuation)

**Page(s)**

**Cases (Continuation):**

*Glendale Fed. Bank v. United States*,
   378 F.3d 1308 (Fed. Cir. 2004),..................................................................27

*Glendale Federal v. United States*,
   Fed. Cl. No. 90-772C ..............................................................................7

*Harris v. United States*,
   No. 99-228T, 2000 WL 141272 (Fed. Cl. Jan. 6, 2000)....................................23

*Holley v. United States*,
   124 F.3d 1462 (Fed. Cir. 1997)..................................................................7

*Home Sav. of Am. v United States*,
   57 Fed. Cl. 694 (2003) ............................................................................56

*Int'l Paper Co. v. United States*,
   36 Fed. Cl. 313 (1996)..........................................................................6, 30

*Keiner-Williams Stamping Co. v. United States*,
   30 F. Supp. 807 (Ct. Cl. 1940) (per curiam) ............................................ 28-29

*Kiselis v. United States*,
   131 Fed. Cl. 54 (2017) ............................................................................21

*Kraft, Inc. v. United States*,
   30 Fed. Cl. 739 (1994) ............................................................................30

*Langley v. United States*,
   No. 16-206 T, 2017 U.S. Claims LEXIS 60 (Fed. Cl. Feb. 3, 2017) ...............23

*Lapin v. Commissioner*,
   956 F.2d 1167 (9th Cir. 1992) ...................................................................28

*Lasalle Talman Bank, F.S.B. v. United States*,
   317 F.3d 1363 (Fed. Cir. 2003)..................................................................56

*Lutheran Mut. Life Ins. Co. v. United States*,
   816 F.2d 376 (8th Cir. 1987) ....................................................................29

v

# TABLE OF AUTHORITIES
## (Continuation)

**Page(s)**

**Cases (Continuation):**

*Mo. Pac. R.R. Co. v. United States*,
338 F.2d 668 (Ct. Cl. 1964) ........................................................................6

*R. J. Reynolds Tobacco Co. v. United States*,
149 F. Supp. 889 (Ct. Cl. 1957) ...............................................................30

*Redhead Mgmt., Inc. v. U.S. Virgin Islands*,
Civil No. 2010-55, 2011 WL 1506040 (D.V.I. March 31, 2011) ......................................23

*Reynolds v. Army & Air Force Exch. Svcs.*,
846 F.2d 746 (Fed. Cir. 1988) ...................................................................21

*Sara Lee Corp. & Subs. v. United States*,
29 Fed. Cl. 330 (1993) ..............................................................................6

*Taylor v. Comm'r*,
70 F.2d 619 (2d Cir. 1934) (L. Hand, J.), *aff'd*, 293 U.S. 507 (1935) .........................7, 28

*Trigon Ins. Co. v. United States*,
215 F. Supp. 2d 687 (E.D. Va. 2002) .........................................................29

*Union Pac. R.R. Co. v. United States*,
208 Ct. Cl. 1 (1975) .................................................................................29

*United States v. Clintwood Elkhorn Mining Co.*,
553 U.S. 1 (2008) ....................................................................................21

*United States v. Janis*,
428 U.S. 433 (1976) .............................................................................6, 30

*Wash. Mut., Inc. v. United States*,
130 Fed. Cl. 653 (2017) ...............................................................28, 29, 30

*Wash. Mut., Inc. v. United States*,
856 F.3d 711 (9th Cir. 2017.) .....................................................................4

*Wash. Mut., Inc. v. United States*,
996 F. Supp. 2d 1095 (W.D. Wash. 2014) .................................................28

*Washington Mutual, Inc. v. United States*,
1:08-cv-321 (Fed. Cl. Apr. 30, 2008) ........................................................51

# TABLE OF AUTHORITIES
## (Continuation)

**Page(s)**

**Cases (Continuation):**

*WMI Holdings, Inc. v. United States*,
891 F.3d 1016 (Fed. Cir. 2018)................................................................. *passim*

**Statutes:**

Financial Institutions Reform, Recovery, and Enforcement
Act ("FIRREA"), 1989 ........................................................................... *passim*

Internal Revenue Service Codes of 1986 (26 U.S.C.):

§ 165.......................................................................................................26, 27

§ 1221..........................................................................................................6

§ 1060..........................................................................................................2

§ 6532(a)(1) ...........................................................................................22, 24

§ 7422(a) ....................................................................................................23

**Other Authorities:**

Gordon E. Goodman, *How to Value Guarantees*, Global Association of Risk
Professionals, Issue 40 Jan/Feb 08, at 38..........................................................55

Rules of the United States Court of Federal Claims:

Rule 8 .........................................................................................................9

Rule 9 ......................................................................................................7, 25

Rule 11 .......................................................................................................8

Rule 12 .......................................................................................................8

Rule 15 ......................................................................................................23

Rule 26 ......................................................................................................41

Rule 37 ......................................................................................................41

**TABLE OF AUTHORITIES**
**(Continuation)**

**Page(s)**

**Other Authoritities(Continuation):**

Treasurey Regulations (26 C.F.R.):

§ 1.61-6 .................................................................................................................................2

§ 1.165-1 ..............................................................................................................................26

§ 1.165-2 ..........................................................................................................................4, 6, 9

§ 1.1060-1 ..............................................................................................................................2

IN THE UNITED STATES COURT FOR FEDERAL CLAIMS

_____

No. 15-953 T
(Senior Judge Eric G. Bruggink)

CITIGROUP INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant

_____

## DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

_____

Pursuant to paragraph 14(b) of Appendix A to the Rules of the United States Court of Federal Claims ("Rules" or "RCFC"), defendant, the United States, submits its memorandum of contentions of facts and law.

## INTRODUCTION

### I.      Overview of the case.

On November 20, 1981, Glendale Federal Savings and Loan ("Glendale") acquired First Federal Savings and Loan of Broward ("Broward") in a merger assisted by the Federal Savings and Loan Insurance Corporation ("FSLIC").  In the transaction, Glendale acquired a group of intangible assets from Broward and various rights from the FSLIC by means of the Supervisory Action Agreement ("SAA") executed by Glendale and the FSLIC.  One of the rights provided in the SAA was a Regulatory Accounting Principle ("RAP") right guarantee, which was defined by the Court in this case as "a guarantee against loss should the regulatory/statutory treatment of supervisory goodwill change."  (Dkt. 73 at 2); *see also WMI Holdings, Inc. v. United States*, 891

1

F.3d 1016, 1019-20 (Fed. Cir. 2018).  In its pretrial brief, plaintiff uses the term RAP right interchangeably to refer both to the goodwill asset and to the guarantee against future loss should the accounting treatment of supervisory goodwill change.  Since this Court has already held that the latter is the correct definition of the RAP right, to eliminate any confusion defendant will use the term "RAP right guarantee" throughout this brief.

The other rights provided by the SAA included an interest rate protection provision, the right to operate in Florida ("branching right"), a regulatory forbearance provision, an indemnity provision, and a FHLBB advance financing provision.  Glendale also received various intangible assets from Broward in the transaction.  Those assets included a core deposit intangible, a tax benefit, assemblage value, and the going concern value of Outlook Development Corp.

The claimed purchase price for this bundle of assets was the excess of Broward's liabilities over its assets, which was $798,000,000 ("Purchase Price").  When a group of assets is acquired for a single purchase price, the acquirer of the assets is required to allocate the purchase price to each of the assets acquired, in accordance with the fair market value of each asset.  Treas. Reg. § 1.61-6; *see also* § 1060[1]; Treas. Reg. § 1.1060-1.  The purchase price allocated to a particular asset becomes the acquirers' tax basis in that asset.  At the time of the transaction, Glendale did not allocate the Purchase Price to each of the intangible assets and rights it acquired in the Broward transaction.

For book accounting purposes, Generally Accepted Accounting Principles ("GAAP"), required that the Purchase Price be recorded on Glendale's books as goodwill.  For regulatory accounting purposes, Glendale was required to establish that the acquisition was accounted for in

---

[1] Unless specified otherwise, references to "section" or "§" are to the Internal Revenue Code of 1986, as amended, 26 U.S.C.

accordance with GAAP, pursuant to FHLBB Memorandum R-31-b, and if so, that treatment would control for RAP purposes.  FHLBB Resolution No. 81-710, dated November 19, 1981, approved the merger with the condition that Glendale provide an opinion from its independent accountant that the accounting for the transaction complied with GAAP, and that Glendale provide a stipulation that the transaction would be accounted for in accordance with Memorandum R-31b.  On November 10, 1981, and March 15, 1982, Peat Marwick provided its opinion that the accounting for the Broward transaction complied with GAAP.

In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA").  FIRREA required thrifts to write off the goodwill in their regulatory accounts over 5 years, ending in 1994.  In 1994, Glendale sold its Florida operations, which included Broward.  Plaintiff contends that it is entitled to recover all of the Purchase Price for the Broward transaction, $798,000,000, by means of a worthless asset deduction in 2005.  Plaintiff claims that all the intangible assets and rights that Glendale received from Broward and the FSLIC in the transaction were all either sold as part of the sale of the Florida operations and/or became worthless by 2005.  (Pl. Br. at 26.)  In essence, plaintiff claims that when the balance of the goodwill recorded on Glendale's books was written off in 1994 in accordance with FIRREA, it was entitled to a tax deduction for all the identifiable intangible assets acquired from Broward or the FSLIC.  However, FIRREA only affected the right of Glendale to include goodwill as a regulatory asset for purposes of RAP accounting.  Stated differently, after FIRREA, the goodwill at issue remained on Glendale's books for all purposes *other than* meeting regulatory capital requirements.  Therefore, the only asset that Glendale acquired that could have been impacted by FIRREA was the RAP right guarantee.

As set forth in greater detail below, the RAP right guarantee did not become worthless when FIRREA was enacted; rather, it became operational.  The intangible assets Glendale acquired from Broward (the tax benefit, core deposit intangible, assemblage value, and Outlook Development) had been fully recovered by Glendale before 1994, so they could not have become worthless in that year.  Similarly, most of the rights that Glendale received from the FSLIC had also been fully recovered well before 1994 and also could not have become worthless in that year.  The interest rate protection provision ended in 1986.  The indemnity, regulatory forbearance, and FHLBB advances ended in 1991.  The branching right was neither abandoned nor did it become worthless in 1994, when Glendale sold its Florida operations.[2]

Finally, as noted by the Federal Circuit, there could be unallocated Purchase Price remaining after allocation to each of the assets and rights Glendale acquired in the Broward transaction.  *WMI Holdings Corp.*, 891 F.3d at 1027.  That unallocated residual goodwill would have become part of Glendale's basis in Broward and should have been recovered when Glendale sold its Florida operations in 1994.  Glendale's decision not to include that basis in calculating the gain or loss in the sale of its Florida operations does not mean that the basis became worthless.

Plaintiff's claim that it is entitled to recover all the basis related to the Broward transaction as a worthless asset deduction, regardless of the circumstances regarding the disposition of each asset and right involved, is clearly incorrect.  Basis allocated to a particular asset can be recovered only if that asset is lost or disposed of in a taxable transaction. Most of the

---

[2] Treas. Reg. § 1.165-2(a) provides that to claim an abandonment loss the taxpayer must prove that it "permanently discarded" the asset with no intention of ever using the asset again.  *Wash. Mut., Inc. v. United States*, 856 F.3d 711, 727 (9th Cir. 2017.)  No evidence of such a permanent disposal is present in this case.

intangible assets and rights Glendale received from Broward and the FSLIC (tax benefit, core deposit intangible, assemblage value, Outlook Development, interest rate protection, indemnity, regulatory forbearance, FHLBB advances, and the branching right) were not lost or disposed of in a taxable transaction, and the basis properly allocated to those assets and rights cannot be recovered.

To recover the basis of an asset through a deduction, a taxpayer must establish entitlement to that deduction under a code provision or a regulation. This was made clear by the Supreme Court made in *Commissioner v. Nat. Alfalfa Dehydrating and Milling Co.*, 417 U.S. 134, 148-49 (1974), when the court stated (citations omitted):

> The propriety of a deduction does not turn upon general equitable considerations, such as a demonstration of effective economic and practical equivalence. Rather, it depends upon legislative grace, and only as there is a clear provision therefor can any particular deduction be allowed. This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not.

If a taxpayer fails to claim the correct deduction allowing for recovery of its basis in a particular asset, the basis allocated to that asset cannot be recovered. In this case, plaintiff elected to claim only a worthless asset deduction. To the extent that is not the proper deduction for each of the assets and rights Glendale acquired, plaintiff cannot recover the basis allocated to those assets.

Plaintiff sought a refund for 2005, based solely on its contention that the goodwill related to the Broward transaction had become worthless in 1994. Plaintiff alleges that the proper year to claim its deduction is in 2005, because that is the year in which any reasonable right of recovery of whatever became worthless as a result of FIRREA would have ended. While a worthless asset deduction cannot be claimed while there is a reasonable chance of recovery, that is not true with the other deductions that could have been claimed with respect to the other assets

Glendale acquired from Broward or the FSLIC.  An abandonment loss deduction, or a deduction of a loss on the sale of a business, must be claimed in the year in which the loss occurred, which in this case would have been 1994.  *See* Treas. Reg. § 1.165-2(a); *see also* § 1221.  As noted above, plaintiff is bound by the tax consequence it chose, which in this case is its decision not to allocate the Purchase Price to each of the assets and rights it received and seek proper deductions for each asset.

## II.    Overview of the burden of proof in a tax refund suit.

A tax refund suit is a *de novo* proceeding in which the IRS's determination is presumed correct.  *Danville Plywood Corp. v. United States*, 899 F.2d 3, 7 (Fed. Cir. 1990).  In a refund suit, the taxpayer bears the burden to prove by a preponderance of the evidence both that the IRS's determination is incorrect *and* the correct amount of the refund due.  *United States v. Janis*, 428 U.S. 433, 440 (1976) (taxpayer bears burden to prove erroneous nature of assessment as well as amount he is entitled to recover); *Charron v. United States*, 200 F.3d 785, 792 (Fed. Cir. 1999) (in tax refund suit, taxpayers were required to prove not only excludability of items from taxable income, but also the amount); *Danville*, 899 F.2d at 7–8 (after taxpayer overcomes presumption of correctness, it must still carry the ultimate burden of proof); *Cook v. United States*, 46 Fed. Cl. 110, 114–17 (2000) (same).

In a refund suit, it is not enough for the taxpayer to prove that the IRS erred; rather, the taxpayer must also prove the "precise dollar amount of the refund to which it is entitled."  *Int'l Paper Co. v. United States*, 36 Fed. Cl. 313, 322 (1996) (citing, *inter alia*, *Janis*, 428 U.S. at 440); *Sara Lee Corp. & Subs. v. United States*, 29 Fed. Cl. 330, 334 (1993); *Mo. Pac. R.R. Co. v. United States*, 338 F.2d 668, 671 (Ct. Cl. 1964).  As a result, even if the taxpayer establishes that the IRS's determination is wrong, the taxpayer will still not recover anything if it does not prove

the amount of the refund due.  *See Taylor v. Commissioner*, 70 F.2d 619, 620 (2d Cir. 1934) (L. Hand, J.), *aff'd*, 293 U.S. 507 (1935) (explaining that, in a refund suit, if taxpayer fails to prove the amount due, taxpayer may not recover everything owed to him "even though we know that the tax is too high").  Thus, in this refund suit, plaintiff will not recover anything unless it proves the amount of its cost basis in the rights at issue.

## III.   The claims at issue.

There is some confusion in plaintiff's pretrial brief regarding exactly which deductions are at issue.  The complaint seeks the recovery of a refund for tax year 2005, based on two claims for refund filed by plaintiff, the first one in 2010 and second one in 2014.  Those are the only claims for refund that plaintiff discusses in its complaint and for which the requirements set forth in RCFC 9(m) have been met in this case.  Plaintiff's first refund claim in issue in this case, the one filed in 2010, seeks a refund for tax year 2005 based on a worthless asset deduction in the amount of $798 million.  Plaintiff's second claim for refund, filed in 2014, also seeks a refund for tax year 2005, based on the exclusion from income of the damage award that plaintiff received that year in connection with the case of *Glendale Federal v. United States*, Fed. Cl. No. 90-772C.  Those are the only two refund claims attached to plaintiff's complaint and the only ones referenced in the complaint.  Therefore, those are the only claims that this Court can consider.  *See Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (*citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1 (1983)) ("Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed"), *reh'g denied* (Fed. Cir. 1997); *cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A] complaint must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' '[D]etailed factual

7

allegations' are not required, but the Rule does call for sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'.") Thus, the absence of *any allegations* regarding plaintiff's 2018 claim for refund signifies that plaintiff has failed to properly bring those claims before the Court.

At the January 27, 2022, hearing on the parties' motions *in limine*, plaintiff's counsel referred to another amended return it filed in 2018, which sought a refund for 2005 based on an abandonment loss deduction with respect to the branching right, and a reduction of the amount of gain it reported in 1994 on the sale of its Florida operations, in addition to the previously claimed worthless asset deduction. Plaintiff's counsel never provided a copy of that claim to defendant's counsel, never amended its complaint to assert these new claims, and the statement at the January 27 hearing was the first-time plaintiff raised this third claim in this action. Plaintiff's counsel did not mention this new claim during the hearing on plaintiff's motions for summary judgment in July 2018, even when the question of whether the branching rights and the loss on the sale of the Florida operations could be deducted as a worthless asset was discussed at that hearing.

Although plaintiff filed this claim in June 2018, it has not sought to file suit regarding that claim. As will be explained later in this brief, this Court has no jurisdiction to consider that claim. Further, asserting an unpleaded claim violates Rule 8(a)(1) (requiring a pleading to contain a "plain statement of the claim showing that the pleader is entitled to relief"); Rule 9(m) (in tax cases, requiring a copy of the refund claim and the date and place the claim for refund was filed); and Rule 11(b) (pleadings contain representations to the Court). An unpleaded claim is axiomatically subject to dismissal under Rule 12(b)(6) because an unpleaded claim cannot

state a claim on which relief can be granted.  Therefore, the claim filed in 2018 is not part of this litigation.[3]

The issues raised in the first claim attached to the complaint, filed in 2010, is that Glendale had basis in the goodwill it received in connection with the Broward transaction in the amount of $798 million, and it was entitled to deduct that amount in 2005, because all that basis became worthless in 1994 as a result of FIRREA, and any reasonable right of recovery ended in 2005.  The second claim attached to plaintiff's complaint was the claim it filed in 2014, which reiterated the earlier claim for a refund based on a worthless asset deduction and added a claim for refund based on excluding from income the $381 million damage award plaintiff received in 2005 in connection with its breach of contract suit.

Plaintiff now acknowledges that all but $24,235,000 of the damage award had been previously deducted and cannot be excluded from income.  Plaintiff asserts that the $24,235,000, referred to in the damage award as recapitalization expense incurred in 1993, was not deducted, but rather was capitalized.  (Pl. Br. 60-61.)  However, merely because an expense is capitalized does not mean it cannot reduce a taxpayer's income in later years through depreciation, or to reduce gain on the disposition of the asset in question.  Depending on the evidence presented at trial, plaintiff might be able to exclude some of that portion of the damage award from its 2005 income.

---

[3] In any event, a deduction for an abandonment loss, and any loss on the sale of a business, must be claimed in the year in which the abandonment, or the sale, occurred, which was 1994.  Treas. Reg. § 1.165-2(a); § 1211.  While the provision governing a deduction of a worthless asset defers the deduction until there is no longer any reasonable right of recovery, no such deferral exists with respect to an abandonment loss or a loss on the sale of an asset, which makes sense as if there was any right or recovery there could be no abandonment.  Therefore, even if this Court had jurisdiction to consider plaintiff's third claim for 2005, it has no merit since the deductions claimed therein had to be deducted in 1994, not 2005.

Separately, in its pretrial brief, plaintiff claims for the first time that it overpaid its 1993 tax, because it should not have reported $48,713,003 as discharge of indebtedness income. (Pl. Br. at 61.) It asserts that it is entitled to use this alleged 1993 overpayment to offset the income it reported in 2005 related to the damage award. (Pl. Br. at 61.) Plaintiff agrees that item is not part of the damage award Glendale received in its breach of contract suit. (Pl. Br. 59.) However, the reversal of the 1993 discharge of indebtedness income is not claimed in either of plaintiff's refund claims at issue. It is not even set forth in plaintiff's impermissible third claim for refund for 2005. This Court cannot consider plaintiff's claim for a reduction of its taxable income for 2005, based on an alleged overpayment in 1993.

Plaintiff's complaint set the boundaries of this lawsuit. Plaintiff did not event attempt to amend the complaint to include its 2018 claim. At this point, on the eve of trial, any attempt to amend the complaint would be unfairly prejudicial to defendant. Accordingly, the Court should not consider plaintiff's untimely incorporation of its 2018 claim.

## FACTUAL BACKGROUND

### I.    The economic conditions affecting the thrift industry in 1981.

At the time of the Broward transaction, the savings and loan industry ("thrifts") had two primary functions. First, thrifts collected consumer deposits and, second, they originated and serviced mortgage loans funded by the consumer deposits. A thrift's income is the spread between the interest rates on mortgages and the interest rates paid to depositors. During the late 1970s and early 1980s, interest rates reached historic highs due to an attempt by the Federal Reserve to control inflation. The high interest rates had a devasting effect on thrifts. Most thrifts held primarily 30-year fixed-rate loans that had been originated when interest rates were low. However, the rising interest rates required thrifts to raise the rates paid to depositors.

10

As interest rates continued to climb in the early 1980s, thrifts began experiencing negative spreads.  The spread is the difference between the rate the thrift had to pay its depositors and the rate they received from the loans.  The spread is the major portion of a thrift's revenue.  The negative spread led to nearly all thrifts, including Glendale, to begin to lose money.  The negative spread problem was made worse by disintermediation.  Because thrifts were limited in the types of deposits it could offer, primarily only passbook accounts and CDs, they had difficulty matching the much higher rates investors were receiving in the market.  This led to depositors leaving thrifts in favor of alternative investments.  So even if a thrift paid higher rates than before the crisis, it still did not ensure that it would have sufficient funds to generate new loans.

A third result of the high interest rates was a substantial contraction in the housing market.  As a result, loan originations declined significantly, making it harder for a thrift to earn income.  Thrifts, including Glendale, were losing money in the early 1980s.  Brent Beesley, director of the FSLIC, the regulatory of the thrift industry, will testify that if interest rates did not begin declining in 1982, the entire thrift industry would be out of business in two years.

## II.      The government's response to the thrift crisis.

As a result of the triple whammy of negative spreads, disintermediation, and the housing contraction, many thrifts became insolvent during this period.  As the number of troubled thrifts began to rise exponentially, the FSLIC determined it did not have sufficient funds to liquidate even a small portion of those troubled thrifts, so it would have to come up with alternative means of taking care of the problem.  One of the alternatives the FSLIC settled on was merging failing thrifts with more healthy thrifts by offering assistance, such as cash or income capital certificates, to the acquiring thrift.  However, as the number of thrifts in trouble began

increasing, the FSLIC decided it needed to offer incentives to induce a healthier thrift to take

over a less healthy thrift.  It considered offering cash but realized it would exhaust its cash

reserves long before resolving the crisis.  The FSLIC settled on offering the acquiring thrift the

right to operate branches in a state other than its home base—a branching right.

At this time, thrifts, like banks, could only operate in a limited geographic area.  In most

instances the limitation extended to only a part of a state, such as a county or a region in the

state.  Prior to the 1970s, California only allowed thrifts to operate in the region where its home

base was located.  In the 1970s, California began to allow thrifts to operate beyond their home

base, allowing a Los Angeles thrift to operate in San Francisco.  Many other states still restricted

thrifts to their home region.  However, it was the FSLIC and the FHLBB that prohibited a

California thrift from operating in another state.  The FSLIC decided that allowing a thrift to

operate interstate would be a major inducement to facilitate mergers of more healthy thrifts with

less healthy thrifts.

### III.        Prevailing Accounting Rules.

In the early 1970s, the primary GAAP accounting standard-setting body in the United

States was the Accounting Principles Board ("APB"). APB Opinion ("APBO") No. 16,

"Business Combinations" and APBO No. 17, "Intangible Assets," both of which were issued in

1970, provided the framework for purchase accounting as it was used for decades—from the

1970s into the 21st century.  APBO 16 set forth the requirements for using either the purchase

method or pooling method in accounting for business combinations.  APBO 17 likewise

provided guidance on the proper amortization period for intangible assets.

### A.        Accounting for Business Combinations.

In 1981, GAAP, based on the accounting requirements outlined in APBO No. 16,

allowed for an acquisition to be accounted for *either* as a pooling of interests *or* under the

purchase method depending on the facts and circumstances related to the acquisition. It was not a choice that the acquirer could make.  Rather, specific tests based on the actual facts and circumstances surrounding a given acquisition determined whether the pooling method or the purchase method was required.

Ordinarily, assets and liabilities were reflected on a thrift institution's books (for regulatory accounting purposes) at historical cost values.  The pooling method simply combined the balance sheets of the two entities using their historical cost basis of their assets and liabilities. Under the purchase method of accounting, however, an acquired thrift's assets and liabilities had to be "marked to market" before being combined with the acquiring thrift's balance sheet.

That GAAP required the purchase method of accounting be used was first determined and documented by Glendale's management in a letter *before* the transaction was consummated. As was typical with accounting opinions issued by external auditors, the external auditors would opine on what management of the company first determined was the proper accounting treatment.  Peat Marwick did just that in a November 10, 1981, opinion letter on the accounting required for the then-pending Broward acquisition.  That opinion letter signed by Peat Marwick states:

> "We [Peat Marwick] have reviewed the proposed accounting for the acquisition of . . .Broward . . .as set forth in the 'Proposed Accounting Procedures' section (copy attached) to be included in the filing . . . The acquisition of Broward by GFS [Glendale] is a purchase transaction under generally accepted accounting principles."

In the "Proposed Accounting Procedures" attached to the Peat Marwick opinion, the accounting opinion of Glendale management specifically stated:

> "Pursuant to the provisions of the Agreement of Merger, upon the effective date, [Glendale] will account for the acquisition using the 'Purchase Method' of accounting in accordance with Accounting Principles Board Opinion No. 16. Assets and liabilities will be recorded at their respective fair values as of the

effective date of acquisition. Any excess of fair value of liabilities over the fair value of assets will be recorded as goodwill."

The facts underlying the transaction support the use of the purchase method of accounting. For example, to use the pooling method, the acquiring corporation was required to retain the net assets of the acquired company. However, Glendale's plan was to sell Broward's loan portfolio subsequent to the merger. Thus, Glendale would have failed one of the tests permitting the use of the pooling method and would be required to use the purchase method.

**B.      Accounting for Goodwill.**

From 1974 through August 1981, it had been FHLBB policy to permit goodwill to be amortized over a maximum period of ten years. During the summer of 1981, with the industry desperate to preserve remaining net worth balances, the FHLBB, through its Office of Examinations and Supervision, changed its goodwill accounting policy to conform with generally accepted accounting principles ("GAAP") pertaining to accounting for intangible assets. From September 1, 1981, through the closing date of the Glendale-Broward transaction, and beyond, RAP followed GAAP.

Pursuant to GAAP standard APB 17, the amortization period for an intangible asset, such as goodwill, was not to exceed forty years. APB 17 required that the proposed goodwill amortization period make economic sense and had to be justified by referring to various factors listed in the standard.

The change in *regulatory* accounting policy by the FHLBB (as memorialized in Office of Examinations and Supervision Memorandum R-31b), entailed accepting a thrift's proposed amortization plan if it complied with GAAP—*i.e.*, if it met the requirements of APB 17. Since GAAP permitted the amortization of an intangible for up to 40 years, provided the long period

14

could be justified under APB 17, so too, going forward, did RAP accounting under the FHLBB's new policy.[4]

A thrift was not required to "purchase" or negotiate for FHLBB approval to amortize goodwill over 40 years. Rather, the FHLBB employed a routine approval process whereby the accounting treatment was afforded to every thrift that could substantiate the plan for amortizing goodwill. Thus, the only question posed by the FHLBB in reviewing an amortization plan was whether an institution's plan conformed with GAAP—something that the institution and its outside accountant, and not the FHLBB, controlled.

## IV.    The Glendale-Broward Transaction.

### A.    The events leading up to the merger.

In early September 1981, Broward management conducted a review of the financial status of the thrift. They concluded that the thrift had capital of approximately $57 million and expected losses for fiscal year 1981 in the amount of about $34.3 million. In a memorandum to Broward's board dated September 15, 1981, Broward's CEO noted that, with those financial results, continuing to operate Broward in that manner would "basically be planning the demise of the company." By September 23, 1981, Broward was placed on the FSLIC's list of "problem institutions." In early September 1981, Broward's CEO, Frank DePaul called Glendale's CEO, Gordon Klett, to discuss a merger of their two companies. On September 23, 1981, Mr. Klett sent a memo to Glendale's Board confirming the discussions with Mr. DePaul regarding a possible merger and indicating that work toward the merger should be accelerated.

---

[4] Moreover, nothing suggests that anyone, in December 1981, contemplated a zero-year amortization. As noted above, even before September 1981, FHLBB policy permitted goodwill amortization for up to ten years.

On October 2, 1981, Mr. Klett attended a meeting in San Francisco with the FSLIC and most of the large California thrifts.  At that meeting, Mr. Beesley discussed the fact that the FSLIC would facilitate mergers between larger California thrifts and problem thrifts in Florida, among other states.  At that meeting, Mr. Beesley indicated that the FHLBB had no problem with the use of purchase accounting and recording the resulting goodwill over 40 years.  Mr. Klett indicated that he felt that merger proposal between Glendale and Broward was one the FSLIC would approve.  At this point, negotiations between Glendale and Broward accelerated.

Every person involved in the transaction proceeded with the understanding that the merger would be accounted for as a purchase, and the resulting goodwill recorded on Glendale's books and amortized over 40 years.  That was discussed in the earliest memoranda setting forth the discussions between the parties in September 1981, almost two months before the SAA was finalized.  On November 10, 1981, Peat Marwick issued an opinion that the merger would be accounted for using the purchase method of accounting pursuant to the provisions in APB Opinion No. 16.  On November 17, 1981, Mr. Hansen, Glendale's CFO, sent a letter to the FHLBB justifying the use of purchase accounting by noting that Glendale was the dominant and continuing entity and would have effective control over the entity going forward.  Under the merger agreement, Glendale would have 75% of the board of directors, giving it complete control over the entity going forward.  In its final opinion approving the accounting for the merger, dated March 15, 1982, Peat Marwick stated that purchase accounting was appropriate under APB Opinion No. 16 because Broward was the subject of remedial supervisory action by the FSLIC.  Peat Marwick clearly stated that the right to use purchase accounting was pursuant to APBO No. 16.  Peat Marwick did not make any reference to the SAA when discussing the use of purchase accounting.

### B.      The merger takes place.

The FHLBB approved the merger on November 19, 1981, by issuing FHLBB Resolution

No. 81-710.  That resolution stated that Glendale was to furnish an opinion from its independent

accountant, Peat Marwick, indicating the justification under GAAP for the use of the purchase

method of accounting for the merger.  The FHLBB resolution also stated that Glendale shall

submit a stipulation that any goodwill arising from the merger shall be determined in accordance

with FHLBB Memorandum R-31b, which states that RAP will follow GAAP.  This is contrary to

plaintiff's contention that Glendale's right to use purchase accounting to record the Broward

transaction arose solely from the terms of the SAA, not from GAAP.

On November 19, 1981, Glendale and the FSLIC executed the SAA.  There is no

provision in the SAA related to the accounting for the transaction.  Incorporated by reference

into the SAA were the FHLBB resolution (Exhibit A), a letter from the FHLBB discussing

various forbearances that would be provided by FHLBB and FSLIC related to Broward assets

and liabilities (Exhibit B), a letter from the FHLBB authorizing Glendale to operate in Florida as

if it were a Florida thrift (Exhibit C), and a letter that absent the merger Broward would become

insolvent in the near future absent the merger (Exhibit D.)  Also incorporated into the agreement

by reference was Peat Marwick's opinion letters dated November 10, 1981, and March 15, 1982.

Glendale had to use purchase accounting with respect to the Broward transaction because

the circumstances of the transaction precluded the use of the pooling method.  APBO No. 16 set

forth several criteria that must be met before the pooling method can be used to account for an

acquisition. The following items establish that the Broward transaction had to be accounted for

as a purchase: (1) the FSLIC certified that Broward in the near future would become insolvent;

(2) Broward was failing the applicable regulatory capital requirements and its capital position

was deteriorating; (3) Broward was on the FSLIC's problem institution list; (4) Glendale's pre-acquisition Board of Directors and management would have dominant control of the combined entity going forward; (5) Glendale was approximately twice the size of Broward; (6) Glendale's reported capital was over five times Broward's capital before the transaction.

In addition, Glendale management intended to dispose of a significant portion of Broward's loans, its principal asset, within two years after the transaction. The acquiring company's intention to dispose of significant assets of the acquired company will normally preclude use of the pooling method. Mr. Hansen, Glendale's CFO at the time of the transaction, indicated that Glendale intended to sell most of Broward's loans. This precluded Glendale from using the pooling method to account for the Broward acquisition.

Peat Marwick's March 15, 1982, letter included its valuation of the Broward assets. Peat Marwick valued each of Broward's tangible assets and valued Broward's loan portfolio on a mark to market basis. Because of the high interest rates at the time, the market value of Broward's loans was substantially less, over 30% less, than the book value of those loans. This difference accounts for almost all of the negative net worth of Broward that Glendale assumed in the transaction. Peat Marwick determined that on a mark to market basis that Broward's net worth, the difference between its liabilities and assets, was a negative $734,666,000. On a book basis, however, Broward had positive net worth of about $57 million at the time of the merger and was not insolvent as plaintiff repeatedly asserts.[5] In accordance with APBO No. 16, Glendale recorded the $734,666,000 as goodwill on its books. In accordance with APBO No.

---

[5] Plaintiff repeatedly states in its brief that Broward was insolvent at the time of the merger. That is incorrect. Comparing apples to apples, both Glendale and Broward had positive book values at the time of the merger. On a mark to market basis, both Glendale and Broward had negative net worth. But it is improper for plaintiff to compare Glendale's book value to Broward's mark to market value.

17, Glendale amortized that goodwill over a 40-year period.  Pursuant to FHLBB Memorandum R-31b, and in accordance with GAAP, the goodwill asset was included as a regulatory asset amortizable over 40 years.

     **C.**    **Events following the merger.**

     For several years after the merger Glendale continued to account for the Broward operations on a separate ledger and systems of account.  The accounting was not consolidated until sometime after Glendale went public in the fall of 1983.  Therefore, the assets of Broward were not intertwined with the assets of Glendale until well after the merger, if even then.  Even after the accounts were consolidated, Glendale continued to account for its Florida operation as a separate division.  In 1982, Glendale acquired two other thrifts, one in California and one in Florida.  Neither acquisition was assisted by the FSLIC.

     On February 6, 1982, Glendale acquired Alameda Federal Savings and Loan Association ("Alameda").  The Alameda transaction was accounted for as a purchase and the resulting goodwill of approximately $15 million was recorded as goodwill on Glendale's books.  On December 31, 1982, Glendale acquired Tampa Savings and Loan ("Tampa").  That transaction was also accounted for as a purchase and Glendale recorded approximately $49 million of goodwill on its books related to that transaction.  In both instances Glendale amortized the resulting goodwill over 40 years.  This shows that use of purchase accounting, recording the excess of liabilities over assets as goodwill, and amortizing that goodwill over 40 years were not dependent on an agreement with the FSLIC.  Glendale acknowledged that use of purchase accounting in a thrift acquisition was authorized by GAAP, and not the SAA, when it stated in its offering circular dated October 5, 1983, that the Broward, Alameda, and Tampa acquisitions were accounted for in accordance with GAAP, under the purchase method of accounting.

V.      **The passage of FIRREA.**

FIRREA immediately overhauled the thrift industry in dramatic ways.  The new

regulatory capital standards were far more stringent than prior standards, including the

implementation of a FIRREA-mandated three-part test that either deducted supervisory goodwill

from capital immediately, or phased it out over five years.  Goodwill that was qualifying

supervisory goodwill was allowed to be phased out of five years.  The impact on thrifts was

immediate and devasting from a regulatory capital compliance standpoint.  In addition, FIRREA

provided the applicable regulatory agency with tens of billions of dollars to permanently close

insolvent/undercapitalized thrifts.  Ultimately hundreds of thrifts did close.

Beginning in 1992, Glendale fell out of regulatory capital compliance.  Although it was

still solvent, its capital ratio fell below the new capital requirement of 5% set by the Office of

Thrift Supervision ("OTS"), which replaced the FHLBB.[6]

In order to get back into regulatory compliance, Glendale had to either raise capital or sell

assets.  Glendale had many non-preforming assets related to its unsuccessful commercial real

estate ventures.  During 1993, Glendale sold most of those assets.  It raised capital by converting

debt to preferred stock and selling new preferred stock.  By the end of 1993, Glendale's

recapitalization had succeeded in getting it back into capital compliance.  In 1994, Glendale

decided to sell its Florida and Washington operations, both to focus on its operations in

California, and to provide a substantial capital cushion going forward.  Around this time other

California thrifts, including Home Savings and Cal Fed, also began to sell their out of state

operations because of the strong California real estate market.

---

[6] At the time of the Broward merger the capital requirement was 3%.  Before FIRREA, the
requirement had increased to 4%.  When it fell out of regulatory compliance in 1992, Glendale
had roughly 2-3% capital.

## CONTENTIONS OF LAW

**II.     Issues related to subject matter jurisdiction.**

> **A.     Plaintiff has failed to sufficiently allege that this Court has subject matter jurisdiction over its complaint.**

Plaintiff has failed to allege sufficient facts to demonstrate that this Court has subject matter jurisdiction over its complaint.  For this court to exercise jurisdiction over a federal tax refund claim, a plaintiff must first satisfy the tax refund scheme detailed in the Internal Revenue Code.  Section 6511 requires that a claim for refund must be filed with the IRS before filing suit in federal court and establishes strict deadlines for filing such claims—"within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later."  § 6511(a); *see United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 4 (2008); *Kiselis v. United States*, 131 Fed. Cl. 54, 60 (2017) ("To establish jurisdiction, Plaintiff must establish that he filed an administrative refund claim with the IRS prior to filing suit in this Court.").

In its complaint, plaintiff alleged that it filed its corporate income tax return for tax year 2005 "on or about August 24, 2006."  (Compl. ¶ 62.)  Plaintiff subsequently alleges that it filed its claim for refund "on or about December 7, 2010."  (*Id.* at ¶ 64.)  Plaintiff's claim for refund was filed more than four years after it filed its income tax return.  Plaintiff's alleged timeline falls outside the strictures of § 6511, and plaintiff has failed to allege any facts to otherwise demonstrate that this Court has subject matter jurisdiction over its complaint.  *See Reynolds v. Army & Air Force Exch. Svcs.*, 846 F.2d 746, 748 (Fed. Cir. 1988) (Plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.")

**B.      Even if this Court has jurisdiction over plaintiff's complaint, there is no jurisdiction over any claim beyond a deduction for the RAP right guarantee.**

Plaintiff's 2018 refund claim was filed while this suit was already pending; there is no basis for jurisdiction.  Section 6532(a)(1) of the Internal Revenue Code provides that "no suit shall be begun" until after the earlier of: (a) the IRS denies the claim; or (b) six months has elapsed since the refund claim was filed.  It is axiomatic that a suit that began *before* the refund claim was filed, cannot "be begun" *after* the refund claim was decided or six months had elapsed.  Because jurisdiction must exist at the time the complaint is filed, a refund claim filed with the IRS after the complaint is filed in court fails to confer jurisdiction.  *Cent. Pines Land Co., LLC v. United States*, 697 F.3d 1360, 1365-66 (Fed. Cir. 2012).

In *Cent. Pines Land Co.*, the Federal Circuit stated, "we have held that certain circumstances may exist in which a supplemental complaint can cure a defect in subject matter jurisdiction . . . [But], if a statute contains an express prohibition against filing suit, then a supplemental complaint cannot cure the lack of jurisdiction existing at the onset."  *Id.*  The Court then held that as §6532(a)(1) contains such a provision, "subject matter jurisdiction depends on the state of things at the time of the . . . action that was brought."  *Id.*  Accordingly, jurisdiction for this case is limited to the refund claims that were filed *before* the suit was filed.

In *Cencast Servs., L.P. v. United States*, plaintiffs raised a new basis for recovery six years into the litigation, and well after the deadline to amend the complaint had passed.  94 Fed. Cl. 425, 448 (2010).  The government then asserted that the new claim was a "variance" from the refund claim filed with the IRS.  *Id.*  Plaintiffs responded that the variance had been cured by a new refund claim, but a refund claim filed *after* the lawsuit had already commenced. The court rejected that argument, stating:

> The administrative refund claim submitted in 2009 does not cure the jurisdictional defect created by plaintiffs' failure to raise the independent contractor issue in

their 2001 administrative refund claims. This court is only vested with jurisdiction over a refund claim when specific processes laid out in the Internal Revenue Code and its implementing regulations are followed. Permitting plaintiffs to cure a jurisdictional defect by filing a second and overlapping refund claim would contravene these jurisdictional requirements by allowing taxpayers to alter the grounds for their refund claim after a suit has been filed in court, even outside the limitations period. *See Computervision*, 445 F.3d at 1372.

*Id.* at 450. Nor was the court was persuaded by plaintiffs' argument that other cases had permitted considering such claims:

Plaintiffs argue that parties have previously amended their pleadings to incorporate later-filed administrative refund claims. But in none of the cited cases did plaintiff add a theory different from those set forth in the pre-litigation administrative claim for refund. Allowing an amendment at this point would permit plaintiffs to raise a claim not appearing in their initial administrative refund claims, which would contravene the variance statute.

Allowing plaintiffs in this case to raise new and different administrative claims after the case has been brought to court to "cure" the jurisdictional defect created by the variance doctrine would contravene the fundamental goal of that doctrine and thus effectively would read [I.R.C. § 7422(a)] out of the statute.

*Id.* (cleaned up).

Similarly, in *Langley v. United States*, the court rejected adding to the case a refund claim that had been filed after the lawsuit had commenced. *Langley v. United States*, No. 16-206 T, 2017 U.S. Claims LEXIS 60 (Fed. Cl. Feb. 3, 2017). *See also Harris v. United States*, No. 99-228T, 2000 WL 141272, at *2 (Fed. Cl. Jan. 6, 2000) ("Although RCFC 15(d) does allow for the cure of jurisdictional pleading defects by a supplemental pleading, the rule does not apply to cases in which a claimant has violated a specific statutory prohibition against filing a complaint before the expiration of a waiting period."); *Redhead Mgmt., Inc. v. U.S. Virgin Islands*, Civil No. 2010-55, 2011 WL 1506040, at *4 n.4 (D.V.I. March 31, 2011) ("the Court does not find that amendment of a complaint would cure the defect that a suit or proceeding under 7422, 'began before the expiration of 6 months.'").

The requirement to exhaust administrative remedies is a fundamental part of administrative law, and in tax refund suits, is baked into statute. When plaintiff filed suit in this case, administrative responsibility for resolving issues for this tax year was transferred from the IRS to the Department of Justice. The IRS cannot (and did not) address plaintiff's 2018 refund claim because the case had already been transferred to the Justice Department. Allowing plaintiff to introduce a refund claim into this suit that the IRS never addressed (and could not have addressed) makes this Court decide the issue as a matter of first impression, without allowing the administrative agency the first bite at the apple.

However, even if §6532(a)(1) was not a jurisdictional bar, (which it is), plaintiff would face the additional, and likewise insurmountable hurdle that it never amended the complaint to include its 2018 refund claim, never complied with Rule 9(m), and never provided notice of this new claim to defendant or the Court. Plaintiff is attempting to go to trial on a claim that is not properly before the Court.

III.    **A deduction for the RAP right guarantee is the only claim before court.**

The central issue is whether plaintiff can establish the portion of the Purchase Price to be allocated to each constituent asset and right so the Court can determine Glendale's cost basis in each asset. Because Glendale paid a lump sum Purchase Price for all the intangible assets and FSLIC provided rights, it was required to allocate "the purchase price among the assets according to each asset's relative fair market value at the time of the acquisition." *WMI Holdings*, 891 F.3d at 1022 (citations omitted). Plaintiff has the burden of proving the fair market value of each of the intangible assets it received from Broward and each of the rights provided by the FSLIC.

One of the rights Glendale received from the FSLIC was a RAP right guarantee. Plaintiff originally asserted that the RAP right guarantee was the right to use purchase accounting, and to

record the resulting goodwill as a regulatory asset and amortize it for 40 years.  However, the

Court rejected plaintiff's proffered definition of the RAP right, concluding that the RAP right

"was a guarantee against loss should the regulatory/statutory treatment of goodwill change."

(Dkt. 73 at 2.)  Plaintiff continues to confuse this issue in its pretrial brief.  As noted above, the

GAAP and RAP accounting rules required that Glendale use the purchase method to account for

the Broward transaction.  The Federal Circuit in *WMI Holdings*, 891 F.3d at 1025, found that

FHLBB Memorandum R-31b "mandated that acquiring thrifts account for the goodwill created

by the merger in accordance with GAAP, which in turn, required thrifts to use the purchase

method of accounting to account for supervisory mergers."  "The memorandum provides that

accounting for the goodwill in accordance with GAAP is acceptable for regulatory purposes."

*Id.*

This Court has already examined the nature of the RAP right guarantee and concluded

that the Federal Circuit's holding in *WMI Holdings* "mandated the result in this case."  (Dkt. 53

at 11.)  This Court held:

> The Federal Circuit ultimately agreed on each point, including the holding that the RAP
> right was not a contractual promise that WAMU's predecessor be allowed to treat the
> excess of liabilities as goodwill.  Instead, the court stated, as did this court below, that the
> nature of the RAP right was a regulatory guarantee that the purchaser be allowed to
> continue to account for that asset as it had and to amortize it for 40 years should the
> financial regulations change in the future.  This was, in essence, an insurance against loss
> if the law changed.  The purchase method of valuation that required the treatment of
> goodwill as an asset was already in place prior to the SAA.  The import of the holding
> was that WAMU's valuation was premised on the flawed assumption of a contractual
> right to treat the goodwill as an asset.

(*Id.* at 10 (citations removed).)  Thus, the primary legal issue has already been decided and the

Court has no need to revisit the matter.

A.      **Tax deduction for losses under § 165.**

Section 165 of the Internal Revenue Code allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." § 165(a).  The Regulations permit a deduction where a loss is "evidenced by closed and completed transactions, fixed by identifiable events, and . . . actually sustained during the taxable year."  Treas. Reg. § 1.165-1(b).  Furthermore, the amount of loss allowable as a deduction may not exceed the property's adjusted basis, and an adjustment must be made "for any insurance or other compensation received."  *Id.* at § 1.165-1(c)(1), (4).  Moreover, § 165 is not a catchall provision. *See Dresser v. United States*, 74 Ct. Cl. 55, 77 (1932) ("A loss, in order to be deductible under the statute, must be an unintentional parting with something of value.")

B.      **Plaintiff cannot show that the RAP right guarantee or branching right became "worthless" or were otherwise abandoned.**

To prove its case, plaintiff must demonstrate *both* its cost basis in the intangible assets it acquired during the Broward merger to a reasonable degree of certainty, *and* that those assets later became worthless or were abandoned.  Most of the pretrial litigation, (and nearly all of plaintiff's pretrial brief), has focused on the parties' views establishing the cost basis of those assets—especially the value of the RAP right guarantee.  Equally important however, is plaintiff's obligation to prove that the intangible assets became worthless or were abandoned.  If plaintiff cannot prove worthlessness, (or abandonment), plaintiff cannot prove its case.

Given this Court's definition of the RAP right guarantee, plaintiff cannot prove that the RAP right guarantee became worthless as a result of FIRREA as they allege in their pretrial brief.  (Pl. Br. at 14).  As the Federal Circuit and this Court have repeatedly made clear, the RAP Right was "in the nature of a 'guarantee' – i.e. the right to continue to amortize the goodwill created by these mergers over a period of forty years if the regulations governing the

26

amortization period for goodwill changed in the future." *WMI Holdings Corp. v. United States*, 891 F.3d 1016, 1025 (Fed. Cir. 2018) (quotations omitted).  Viewed as a guarantee, the passage of FIRREA did not make the RAP right guarantee worthless.

Indeed, after FIRREA was passed, it was the RAP Right guarantee that allowed plaintiff to seek redress in the courts and receive a judgment of several hundreds of millions of dollars. *See Glendale Fed. Bank v. United States*, 378 F.3d 1308, 1312 (Fed. Cir. 2004), *aff'g* 54 Fed. Cl. 8 (2002) (awarding Glendale damages of $380,787,000 in its *Winstar* case).  To now claim that the RAP right guarantee is worthless—after successfully arguing that the guarantee entitled plaintiff to millions of dollars—is impermissibly inconsistent.

When a house burns to the ground, the owners do not look at their fire insurance policy as being worthless.  Rather, it is the policy that entitles them to a recovery, and if the recovery is not paid, the policy gives the owners the legal remedy of suing the insurer for their losses.  Similarly, a guarantee that promises there will be no change to regulations of supervisory goodwill does not lose its value when the promise is broken.  The promise remained enforceable—and it was enforced.  The RAP right guarantee did not become worthless upon the passage of FIRREA.

Even though an abandonment deduction for the branching right is not properly before the Court, plaintiff nevertheless will not be able to prove that it abandoned the Florida branching rights.[7]  Section 165 of the Internal Revenue Code allows a taxpayer to deduct" any loss sustained during the taxable year," so long as the loss is not compensated by insurance or otherwise. § 165(a). "An abandonment loss is deductible if evidenced by a closed and completed transaction that is fixed by an identifiable event occurring in the year of the claimed loss, but

---

[7] In its brief, plaintiff states that it will prove that all intangible assets were "either sold. . . and/or worthless by 2005."  The branching rights were not transferable and could not be "sold."

only if the taxpayer shows both an intention to abandon the asset in question and an affirmative act of abandonment." *Lapin v. Commissioner*, 956 F.2d 1167 (9th Cir. 1992) (citing *A.J. Indus., Inc. v. United States*, 503 F.2d 660, 670-71 (9th Cir. 1974)).  Thus, plaintiff must show through the surrounding facts and circumstances (1) that Glendale intended to abandon the Florida Branching Right and (2) that Glendale performed an overt act of abandonment.  Neither the non-use of an asset nor the mere intention to abandon is sufficient by itself to accomplish abandonment.  *A.J. Indus.*, 503 F.2d at 670 (*quoting Beus v. Commissioner*, 261 F.2d 176, 180 (9th Cir. 1958)).

To establish abandonment, it is not enough for plaintiff to show that they sold their Florida operations, but that Glendale left Florida for good, with the intent never to return.  In *Wash. Mut., Inc. v. United States*, 996 F. Supp. 2d 1095, 1118 (W.D. Wash. 2014), for example, the plaintiff was unable to prove abandonment of the branching rights merely because they sold operations in a state.  Even when the sale of operations included a covenant not to compete in the state for a number of years, the court did not find an "abandonment" of the branching right, as Home Savings still had some ability to return to the State.  *Id.*  Plaintiff will not be able to meet its burden of proof to show that the Florida branching right was abandoned.[8]

## IV.   To prove its cost basis in the rights at issue, plaintiff must proffer sufficiently reliable evidence for the Court to ascertain value to a reasonable degree of certainty.

In this refund suit, plaintiff must prove the amount of its cost basis in the Rights at issue to a "reasonable degree of certainty."  *See Wash. Mut., Inc. v. United States*, 130 Fed. Cl. 653, 687 (2017); *Taylor*, 70 F.2d at 620; *see also Keiner-Williams Stamping Co. v. United States*, 30

---

[8] Plaintiff has provided no evidence that Glendale, for example, wrote a formal letter to the FHLBB rescinding the branching rights it had been granted.  Why Glendale would not choose to take such a step is obvious, as it would unnecessarily limit their ability to reenter the Florida market in the future.

F. Supp. 807, 808 (Ct. Cl. 1940) (per curiam) (upholding denial of taxpayer's refund claim for depreciation deductions where plaintiff failed to put forward sufficient evidence "for the court to determine with any certainty what the value [of the depreciable assets] really was").  To do so, plaintiff must put forward sufficiently reliable evidence for the Court to determine "a 'reasonable or rational approximation' of the value of these assets."  *Wash. Mut., Inc.*, 130 Fed. Cl. at 687 (citing *Union Pac. R.R. Co. v. United States*, 208 Ct. Cl. 1 (1975) ("Asset appraisal, therefore, requires a reasonable or rational approximation . . . to adduce a reasonably accurate value . . . .")).  *See, e.g.*, *Trigon Ins. Co. v. United States*, 215 F. Supp. 2d 687, 738 (E.D. Va. 2002).  As the case law makes clear, where, in a refund suit, the taxpayer fails to put forward sufficient evidence to support a reasonable estimate of value, the taxpayer recovers zero.  *See, e.g.*, *Wash. Mut., Inc.*, 130 Fed. Cl. at 704 (dismissing complaint where plaintiffs did not show that their fair market value determinations for the RAP Rights, Branching Rights and the other intangible assets acquired through the Supervisory Mergers are reliable and therefore could not establish their cost basis to a reasonable degree of certainty); *Keiner-Williams Stamping*, 30 F. Supp. at 808; *Dorrance v. United States*, 809 F.3d 479, 484 (9th Cir. 2015) (district court erred in calculating taxpayers' stock basis where taxpayers failed to provide sufficient evidence to support their basis in the stock; court should have adopted the basis put forth by the IRS, "— even where, as here, that figure is zero"); *Lutheran Mut. Life Ins. Co. v. United States*, 816 F.2d 376, 379 (8th Cir. 1987) (upholding trial court's denial of any deduction where trial court found empirical inadequacies inherent in survey taxpayer used to derive amount of deduction).  Simply put, the Court is under no duty to estimate value when the plaintiff's proof is lacking.  *WMI Holding, Inc. v. United States*, 891 F.3d 1016, 1022-23 (Fed. Cir. 2018) ("[A] trial court is not required to undertake an independent analysis when, as here, the taxpayer's own evidence is

insufficient to allow the court to do so."), *aff'g Wash. Mut., Inc. v. United States*, 130 Fed. Cl. 653 (2017); *see Kraft, Inc. v. United States*, 30 Fed. Cl. 739, 765 (1994) ("If the court is not satisfied that taxpayer has properly allocated a value to an identified severable intangible asset, it is not *a fortiori* the duty of the court to determine that value, but the court *may* do so if the presumption of correctness . . . has been overcome by substantial evidence. . . *and if the value can be determined from a review of the record in its entirety*") (emphasis added) (citing cases); *see also R. J. Reynolds Tobacco Co. v. United States*, 149 F. Supp. 889, 896–97 (Ct. Cl. 1957) (refusing to determine how much of the taxpayer's payments represented deductible reasonable compensation because plaintiff did not sufficiently prove the amount that was reasonable, notwithstanding that the government offered no contradictory evidence).

Not only is the Court under no obligation to estimate plaintiff's cost basis from unreliable evidence, but it is also under no obligation to relax plaintiff's burden of proof simply because this is a valuation case.  To the contrary, such a rule would effectively eliminate the burden of proof requirement in valuation cases, and it would be particularly inappropriate in a tax refund suit where, such as here, the taxpayer must establish the "precise dollar amount of the refund to which it is entitled." *Int'l Paper Co.*, 36 Fed. Cl. at 322 (citing, *inter alia*, *Janis*, 428 U.S. at 440).

## V.     Plaintiff will be unable to meet its burden of proof to demonstrate that it is entitled to a deduction for the RAP right guarantee.

As discussed above, plaintiff bears the burden to demonstrate that it is entitled to a loss deduction for the RAP right guarantee.  Plaintiff will be unable to meet its burden because the valuation it will proffer at trial is unreliable.

30

### A.    Dr. McDonald's model of the value of the RAP right guarantee is unreliable.

Plaintiff retained Dr. Robert McDonald to determine the value from an economic perspective of the RAP right guarantee associated with the Broward transaction.  However, at his deposition, Dr. McDonald was unaware of the definition of fair market value in the Internal Revenue Code—that is, the price at which an asset will change hands in a transaction between a hypothetical willing buyer and seller.  As a result, Dr. McDonald made no attempt to determine the fair market value of the RAP right guarantee.  The economic value of an item of property may be very different than the fair market value of that property, a concept not considered in Dr. McDonald's analysis.

Separately, Dr. McDonald utilized a software program that he developed for his model.  However, Dr. McDonald, who allegedly wrote the code, provided to defendant only one component of his program—the Hull-White portion, which included approximately 100 lines of computer code.  Dr. McDonald maintained that the remainder of his code for his program "consists of approximately 500 lines of computer code and is proprietary and has not been made available to defendant or anyone else."  Therefore, defendant's experts have no way of reviewing the assumptions made, formulae applied, and the resulting cash flow calculated in the program because they were not provided any access or documentation to enable them to do so.

The opacity of Dr. McDonald's program is illustrated by his inability to answer whether his model ascribes different business values, *i.e.* higher or lower net worth, to simulations with higher interest rates or lower interest rates.  In 1981, however, the record shows that higher interest rates resulted in substantially lower net worth of savings and loans.  But Dr. McDonald could not explain if his program reflected this reality.  It is unclear whether Dr. McDonald even understood the mechanics of his program.  Given Dr. McDonald's inability to explain whether his program would reflect real world economic conditions, it lacks reliability

Significantly, Dr. McDonald does not value the RAP right as a guarantee against loss should the treatment of goodwill change.  Nor does he attempt to value the RAP right as a contractual right to count the goodwill created by the use of purchase accounting as an asset for regulatory purposes.  Rather, Dr. McDonald defines the RAP right as a government guarantee of Glendale's continued operations.  (McDonald Report at 3.)  The initial problem with such an analysis is that it is Glendale-specific and does not contemplate a hypothetical willing buyer and seller.  His value of this "guarantee" is based solely on Glendale's expected future profits. (McDonald Report at 3.)

Dr. McDonald states that the RAP right was equal to "the present value of the cash flows that Glendale was expected to be able to achieve after its merger with Broward."  (McDonald Rep. at 9.)  Dr. McDonald's expected future cash flow model is very similar to Glendale's expectancy damage claim in its breach of contract case.  That claim was also based on Glendale's loss of expected future profits.  *See Glendale Fed. Bank, F.S.B. v. United States*, 43 Fed. Cl. 390, 401 (1999).  The Federal Circuit rejected Glendale's loss of future profits claim as too speculative.  *Glendale Fed. Bank, F.S.B. v. United States*, 239 F.3d 1374, 1382 (Fed. Cir. 2001), *rev'g in part* 43 Fed. Cl. 390 (1999).  Dr. McDonald's model is also based on a loss of future profits of Glendale, which is speculative and should be rejected.

Dr. McDonald's assumption of the guarantee of continued business operations is made of up of two components.  The first is the RAP right guarantee, which Dr. McDonald defines as "an express contractual obligation to permit Glendale to count supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes."  (McDonald Report at 1.)  Dr. McDonald's definition of the RAP right is based on his conclusion that the SAA granted Glendale particular supervisory authority to count goodwill as an asset for

regulatory purposes over 40 years   However, this Court has rejected that definition of the RAP right.  (Dkt. 53, 73.)  This Court made it clear that the RAP right was only a guarantee against loss should the treatment of supervisory goodwill change, not a contractual right to count goodwill as an asset.  (Dkt. 73 at 2.)

That Dr. McDonald considered the RAP right guarantee to be the goodwill asset is evident from his assertion that, without the RAP right, Glendale would have been insolvent immediately after the transaction.  (McDonald Report at 2-3.)  In reality, Glendale was not insolvent after the transaction because of the goodwill asset's treatment for RAP purposes—not because of the RAP right guarantee against a future change in the treatment of goodwill.  Dr. McDonald conflates the "insurance" with the "insured asset."

Moreover, this confusion is carried over into his ultimate opinion.  To arrive at his estimation of future lost profits, Dr. McDonald appears to assume that there would be a complete breach of the SAA on day one of the contact, resulting in a total loss of goodwill.  Otherwise, he could not establish that the RAP right guarantee allowed Glendale to continue business.

However, Dr. McDonald does not provide any support for his assumption about the possibility of such a total breach happening in 1981 or 1982.  The evidence at trial will establish that the likelihood of such a total breach in the first two years after merger was negligible. Therefore, Dr. McDonald's model, predicated on an assumption of a total breach immediately after the merger, is unreliable.  Moreover, there is limited discussion of the facts related to the transaction in Dr. McDonald's reports, and nothing to support his most significant assumptions. As further discussed below, Dr. McDonald's failure to consider actual conditions at the time of the transaction is a fatal flaw in his analysis.

The second component of Dr. McDonald's purported guarantee of continued business is the regulatory forbearance provided in the SAA.  Dr. McDonald argued that the forbearance provision allowed Glendale to "continue operating following its supervisory merger with Broward even though, while solvent, it otherwise would have immediately failed the net worth and statutory reserve requirements."  (McDonald Report at 2.)  Dr. McDonald claimed that the regulatory forbearance allowed Glendale to continue operating as long as its new worth remained above zero.  (McDonald Report at 3.)  Those claims are not supported by the plain language of the forbearance provision.

Dr. McDonald identified the contract provision providing the regulatory forbearance as the letter from the FHLBB to Glendale, attached as Exhibit B to the SAA.  Dr. McDonald agreed that the regulatory provision he is referring to was in paragraph 1 of Exhibit B.  That paragraph reads:

> 1.  Following the effective date of the merger, OES will forbear from exercising its authority under Sec. 563.13(d) and Sec. 563.14(b) of the Rules and Regulations for the Federal Savings and Loan Insurance Corporation because of the failure of Glendale to comply with the statutory reserve and net worth requirements of Sec. 563.13 to the extent that such failure results from (a) scheduled items attributable to the assets of Broward existing at the effective date of the merger, or (b) any reduction in net worth resulting from losses on assets acquired in connection with the merger ("losses of Broward").

This provision by its express terms is limited to scheduled items and losses related to Broward assets at the time of the merger.  There is no reference to Glendale in this provision.  Therefore, the provision in Exhibit B to the SAA, cannot be construed as a guarantee that Glendale could continue business for 20 years after the merger as long as its net worth did not fall below zero.

Dr. McDonald did not conduct any analysis to determine what the Broward scheduled assets were at the time of the merger or what the likelihood was of any losses related to Broward.  Nor is there any discussion of the possible impact of those items on Glendale's post-merger

balance sheet.  Dr. McDonald argued that the forbearance provision allowed Glendale to "continue operating following its supervisory merger with Broward even though, while solvent, it otherwise would have immediately failed the net worth and statutory reserve requirements." (McDonald Report at 2.)  Yet he does not explain the basis for that assumption.  A review of the facts at the time of the transaction establish that Dr. McDonald was wrong.

Glendale was twice the size of Broward.  Glendale management noted before the merger that Broward was a well-run company with very few problem assets.  Dr. McDonald sets forth no fact to support his assumption that without the forbearance Glendale would not be able to continue operating.  At the time of the transaction, a thrift was required to file with the FHLBB Thrift Financial Reports ("TFRs").  The TFR reported, among other things, a thrift's net worth, reserve, and scheduled items.[9]  The forbearance (received from the FSLIC) excluded from the calculation of Glendale's net worth and reserve requirements after the merger Broward's scheduled items and losses on Broward assets existing at the time of the merger.   At the time of the merger, the amount of Broward's scheduled items was not significant, and, given the size of Glendale, those scheduled items would not have had a material impact on Glendale's net worth or reserve requirements if they were considered.  Similarly, there were very few potential losses related to Broward's assets at the time of the merger.  Therefore, the forbearance had little or no impact on Glendale's continued operations.  Dr. McDonald's assumption to the contrary makes his model completely unreliable.

Also, it is unclear what supports Dr. McDonald's notion that the forbearance allowed Glendale, after the merger, to continue operation as long as its net worth remained above zero.

---

[9] Scheduled items are a specific term in the thrift industry, and refers to loans that are seriously in distress, not just delinquent loans.

There is no mention of this in the forbearance provision.  It only says that scheduled items and losses related to Broward assets at the time of the merger will not be included in calculating Glendale's net worth and reserve requirement.  Dr. McDonald has not pointed to anything to support his assumption that the FSLIC or the FHLBB had agreed to exempt Glendale from the normal net worth and reserve requirements that applied to all thrifts.

Most glaringly, Dr. McDonald assumed that the forbearance provision applied to the combined assets of Glendale and Broward, disregarding the express language in the forbearance provision that it was limited to losses related to Broward assets at the time of the merger.  Dr. McDonald fails to explain how a contract provision expressly limited to assets of Broward at the time of the merger can be construed to apply to the assets of both Broward and Glendale after the merger.

Notably, at least through 1983, Glendale and Broward maintained separate ledgers and books of account, indicating that the assets were not as integrated as Dr. McDonald claims.  Dr. McDonald's incorrect assumption regarding the forbearance provision renders his model unreliable.

Lastly, Dr. McDonald assumes under his model that the forbearance provisions would last indefinitely, notwithstanding that under the terms of the SAA the forbearance provision had a specific end date.  The SAA terminated 10 years after it was executed, which would be November 19, 1991, year 10 of Dr. McDonald's model.  However, the vast majority (about 70%) of the cash flow Dr. McDonald projects in his model occurs in years 11-20, after the forbearance provision ceased to exist and the goodwill asset had been reduced by over 25% through amortization.  Dr. McDonald has no explanation for this anomaly.

Dr. McDonald throughout his report and testimony refers to the "RAP right and associated regulatory forbearance" when discussing his guarantee. However, he never quantifies the contribution each component had on Glendale's future cash flow. In other words, in his model there is no way to determine how much of the cash flow was due to the RAP right as Dr. McDonald defined it—and not the RAP right guarantee as defined by the Court—and how much was due to his incorrect interpretation of the forbearance provision. As a result, if either component is wrong or unreliable, the entire model falls.

Dr. McDonald's model is also based on an unrealistic assumption regarding Glendale's passbook savings accounts going forward 20 years after the merger. Dr. McDonald assumes that Glendale's level of passbook savings account would remain constant over his 20-year projection period. This is inconsistent with the fact that passbook accounts vary with interest rates. When interest rates are high, depositors have greater incentive to move their money from relatively low-yielding passbook accounts to alternative investments, including CDs, money market accounts or mutual funds, where the rate of return is much higher. Therefore, Dr. McDonald's assumption that Glendale's deposits mix would remain constant is inconsistent with the increased interest rates predicted by the Hull-White model he used.

As noted above, there was a significant decline in thrifts deposits during the early 1980s. In creating a model that fixes the composition of the Glendale deposit portfolio regardless of the extreme interest rate environment disregards the relationship between interest rates and deposit mix. Glendale's actual portfolio of passbook accounts was declining on both a dollar basis and as a percentage of total deposits at the time of the merger. Dr. McDonald's report ignores that Glendale's proportion of passbook savings to total deposits was declining for years before the merger. There is nothing in Dr. McDonald' report to indicate that this decline would not

continue after the merger.  This is another aspect that renders Dr. McDonald's value conclusion

unreliable.

### B.     The other assets Harms valued were not affected by FIRREA, and a deduction cannot be taken in the 2005 tax year.

Plaintiff intends to proffer the expert testimony of Travis Harms regarding the fair market

value of the following FSLIC assistance items: Interest Rate Protection Agreement;

Indemnification Provision; and FHLB Advance Refinancing Provision.  Ultimately, plaintiff is

not entitled to a deduction for these assets because they were not affected by FIRREA and

expired by their own terms in tax years other than the one at issue.  (*See supra* Contentions of

Law I.B.)  Thus, to the extent Mr. Harms' valuations are accurate, they cannot serve as the basis

for a tax deduction.

### C.     Professor Mann's analysis is unreliable and incomplete.

Professor Mann attempts to estimate the value of two assets acquired during the

Glendale-Broward merger: (a) the Florida branching rights; and (b) tax benefits.  In neither case

does plaintiff meet their burden of calculating the value to a reasonable degree of certainty.

#### 1.     Professor Mann's estimate of the branching rights is not reliable.

To determine the value of the Florida branching rights, Professor Mann conducted a

market analysis of the "price"[10] paid by an acquiring firm in mergers around the same time as the

Glendale-Broward merger.  Plaintiff asserts that he then compared the price paid by intrastate

mergers (without a branching right) to interstate Florida mergers (with branching rights) to

estimate firms were willing to pay for the branching rights.  (Pl. Br. at 45-46).

---

[10] By "price" Professor Mann means the amount of liabilities acquired in excess of the acquired
assets, as a percentage of the acquired liabilities.  Accordingly, the price is expressed as a
percentage.  So, for example, if an acquired thrift had $1.22 million in liabilities, and $1 million
in assets, the "price" would be 22%.

However, plaintiff's summary does not accurately describe what Professor Mann actually studied. Professor Mann compared *unassisted* intrastate mergers with *assisted* interstate Florida mergers. That is, he compared mergers that received no FSLIC incentive package, to mergers that received a FSLIC incentive package that included a Florida branching right. The difference between these two sets is not the value of a Florida branching right—it is the value of *all FSLIC assistance received* (including a Florida branching right). Professor Mann's estimate of $125 million is most accurately described as an estimate of all the intangible assets received from the government as a result of the merger.

Additionally, what is noticeable from Professor Mann's analysis is that the overwhelming majority of the goodwill created by thrift mergers was completely unrelated to FSLIC assistance. Professor Mann's calculations show that dozens of mergers took place without a FSLIC incentive package, all creating goodwill, but none of which was attributable to a RAP right guarantee or a branching right. As plaintiff notes in their brief, the median firm was willing to acquire a firm in which liabilities exceeded assets by 21-24%. Those mergers received no FSLIC assistance, and therefore the goodwill created by those mergers cannot be attributed to assets such as a RAP right guarantee or the branching right. Yet in this case, and contrary to Professor Mann's analysis, plaintiff attributes most of the goodwill created by the Glendale-Broward merger to the FSLIC's RAP right guarantee.

Separately, Professor Mann's methodology is not a reliable method for estimating goodwill. To conduct his analysis, Professor Mann did not rely on the actual merger documents to determine the price paid for the unassisted mergers. Instead, he relied on quarterly financial

statements from which he inferred the facts about the merger from the goodwill that was created. Defendant intends to show that this methodology does not produce reliable results.[11]

### 2.     Professor Mann did not measure all tax benefits from the merger.

Professor Mann estimated one portion of the tax benefit that Glendale received from the merger with Broward – the sale of underwater loans.  However, in order to meet its burden of proof, plaintiff must estimate—to a reasonable degree of certainty—all tax benefits Glendale received.  That would at least include:

- The amount of the 1981 federal tax refund Glendale received attributable to the Broward operations *before* the November 20, 1981, merger.

- The amount of the federal tax refund Glendale received that was attributable to the Broward operations in 1981 *after* the merger.

- The amount of any tax refund that Glendale received on behalf of Broward for years prior to the merger.

- Florida State and local tax refunds attributable to Broward operations in 1981 and earlier.

At his deposition, Professor Mann acknowledged that he did not consider these tax benefits when he prepared his report.  The value of the benefits that Professor Mann did not include in his report have a material effect on the overall valuation of the tax benefits.  As a result, plaintiff will be unable to show the actual value of the tax benefits.

Nonetheless, in its pretrial brief, plaintiff asserts that Professor Mann will testify that some or all of these tax benefits were incorporated into the merger as an asset, and therefore

---

[11] While this is similar to the process Professor Mann used in *Washington Mutual*, there Professor Mann *did not* attempt to use that methodology to provide an expert valuation.

should not be included as part of Professor Mann's tax benefit analysis. (Pl. Br. at 47-48). That expert opinion by Professor Mann is improper as it is an undisclosed opinion under RCFC 26.[12]

Nowhere in Professor Mann's report does he discuss his expert opinion that the tax benefits listed above would have been incorporated into the merger accounting, and plaintiff points to none. Indeed, at his deposition, while Professor Mann said it was possible that those tax benefits were incorporated into the merger, he was then specifically asked if he actually knew whether those tax benefits were incorporated into the merger accounting, and his answer was "I don't know." Lastly, Professor Mann was asked, "If you were to change your mind and you did intend to offer additional opinions or bases for your opinions, would - - do you intent to tell plaintiff's counsel as soon as you were to make that decision." Professor Mann responded. "Certainly." Yet, plaintiff has not provided an updated report to include a complete statement of Professor Mann's new opinions related to the tax benefits and the basis and reasons for these opinions. *See* RCFC 26(a)(2)(B). The Court should not allow Professor Mann to provide expert testimony on this undisclosed opinion, and which he specifically disclaimed knowledge of in his deposition. *See* RCFC 37(c)(1).

---

[12] RCFC governs the mandatory disclosure of expert testimony. Rule 26(a)(2)(A) requires a party to "disclose to the other parties the identity of any witness it may use at trial to present [expert] evidence." For witnesses "retained or specially employed to provide expert testimony in the case," the party must also submit a written expert report that contains, *inter alia*, "a complete statement of all opinions the witness will express and the basis and reasons for them." RCFC 26(a)(2)(B). These disclosures must be made "at the times and in the sequence that the court orders." RCFC 26(a)(2)(D). For purposes of these rules, rebuttal expert reports are those that contain evidence "intended solely to contradict or rebut evidence on the same subject matter identified by another party." RCFC 26(a)(2)(D)(ii).

### D.    Mr. Plastino's analysis is of limited utility, and his reliance on other experts is misplaced.

Plaintiff proffers the expert report of David Plastino.  In his report, Mr. Plastino claims to identify Broward's intangible assets and to value the intangible assets Glendale acquired from Broward.  Mr. Plastino also offers values of Broward's "non-core businesses."  Lastly, Mr. Plastino serves, in effect, as a calculator to summarize all the intangible assets acquired by Glendale in the merger transaction, including Broward's intangible assets and the items of FSLIC assistance.

Mr. Plastino's testimony will be of little utility to the Court.  *First*, Mr. Plastino's identification of Broward's intangible assets is unreliable because it is unclear that Mr. Plastino's review of so-called (and unidentified) transaction documents permitted him to identify each intangible asset.  The basis for much of Mr. Plastino's identification of Broward's intangible assets appears to be whether they were specifically identified in the merger document.  *Second*, even assuming Mr. Plastino correctly identified every intangible asset, his valuation of those assets and Broward's non-core businesses do not form the basis for a tax deduction because these assets did not become worthless or were not abandoned as a result of FIRREA or the *Winstar* litigation.  *Lastly*, Mr. Plastino's Transaction Value Summary, whereby he attempts to separately identify and value the intangible assets included in goodwill, incorporates Dr. McDonald's valuation infirmities.  In his summary, Mr. Plastino relies on Dr. McDonald's valuation claiming, without any support, that Dr. McDonald's valuation "reflects the economic perspective of the most likely buyer of Broward's assets."  However, Dr. McDonald's valuation is based on an incorrect definition of the RAP right guarantee.  Similarly, Mr. Plastino relies on the Professor Mann's valuation of the branching right.  Although Professor Mann valued the branching right in the range of $125-200 million, Mr. Plastino selected the only number in that range, without

explanation, for which the math works.  Mr. Plastino's summary cannot accurately reflect the economics of the transaction.

Moreover, Mr. Plastino's claim that there was "no ordinary goodwill" acquired in the transaction is belied by Mr. Plastino's own calculations and by the anticipated testimony of plaintiff's own expert, Professor Mann.  Plaintiff's expert, Professor Mann, is expected to testify that *unassisted* mergers (*i.e.*, mergers that did not receive a FSLIC assistance package) still generated enormous amounts of goodwill.  Professor Mann's comparison of assisted and unassisted mergers shows that most goodwill created from the mergers was unconnected to FSLIC assistance.  Accordingly, Mr. Plastino's calculator-function is not only unreliable but also of little utility in resolving the issues in this case.

     **E.**     **The opinions rendered by Martin Lowy are incorrect.**

Plaintiff intends to proffer expert testimony from Martin Lowy on the accounting and regulatory environment existing at the time of the merger.  Mr. Lowy has offered five opinions in this case—the first three are accounting opinions, the second two are on regulatory issues.  To the extent Mr. Lowy has expertise in accounting topics, it will become quite clear that his opinions on these topics are erroneous.

In his first opinion, Mr. Lowy seems to believe that Glendale had the choice of whether to use purchase accounting or pooling accounting.  However, the GAAP rules at the time, in APBO No. 16 included a bright-line test to determine which method was appropriate; if any of the conditions were met, as was the case with Glendale, a company was forbidden from using the pooling method and was required to use the purchase method.

Mr. Lowy also opines on two issues related to the amortization of goodwill.  Mr. Lowy suggests that it was not in accordance with GAAP to amortize the goodwill in this transaction over 40 years or to create what he calls "Phantom Income."  However, Mr. Lowy's opinions

43

conflict with the plain language of GAAP literature at the time of the transaction, Glendale's management's certification, and its auditors' attestation.

As to his regulatory opinions, Mr. Lowy's seizes on Supreme Court *dicta* to conclude that there was no regulation that established whether Glendale could or should include the goodwill created by purchase accounting as an asset for purposes of its net worth requirements, and that Glendale would have had to rely on an agreement with the FHLBB or FSLIC in order to rely on goodwill being treated as an asset for regulatory purposes.  Again, Mr. Lowy's opinion makes plain his inexperience with accounting concepts.  Mr. Lowy's opinion appears to be founded in the fact that the "net worth" regulations do not specifically list the term "goodwill."  According to Mr. Lowy, therefore, there was no regulation that established that goodwill was included in the net worth definition contained in the regulations.  However, as Mr. Hargett will discuss in rebuttal, from an accounting perspective, goodwill is encompassed in the concept of "retained earnings," which term is specifically included in the "net worth" regulations.  Thus, basic accounting conventions dictate that goodwill is included in the calculation of retained earnings for regulatory purposes, even if the term "goodwill" is not specifically identified in the regulations.

Moreover, Mr. Lowy's opinions are largely immaterial in this case.  Because plaintiff does not believe that Glendale was required to use the purchase method of accounting to account for the transaction—notwithstanding Glendale's management's and auditor's representations at the time to the contrary—plaintiff intends to utilize Mr. Lowy's opinions to muddy the waters on defined accounting concepts.  In essence, plaintiff contends that because the GAAP and RAP conventions were unclear at the time of the transaction, FSLIC's approval of the merger and issuance of the RAP right guarantee was a valuable clarification.  But, even if there were

44

ambiguity in the accounting principles at issue, which there was not, Mr. Lowy's opinion simply applies hindsight to what happened in the thrift industry and does not square with Glendale's management's actions at the time of the transaction.

Defendant's expert, Joe A. Hargett, will present rebuttal testimony regarding why Mr. Lowy's analysis of the GAAP treatment related to the transaction is incorrect. Mr. Hargett will explain that Mr. Lowy misapplies GAAP to the facts and circumstances of the transaction. Mr. Hargett will explain the "hierarchy of GAAP," which provides a four-level framework to classify guidance on accounting practices and standards by their level of authority, and how Mr. Lowy ignores this hierarchy in forming his opinions. Mr. Hargett will offer rebuttal testimony on the faulty implication from Mr. Lowy's opinions—that the purchase accounting treatment and forty-year goodwill amortization were only available to Glendale via the FSLIC.

## VI.   The government's witnesses will demonstrate the correct GAAP and RAP treatment of the transaction and will offer a valuation of the RAP right guarantee based on the correct understanding of what was guaranteed.

### A.   Brent Beesley, the former Director of the FSLIC, will testify regarding regulatory issues and the FSLIC's role in the Glendale-Broward merger.

Brent Beesley was the Director of the FSLIC in 1981 and 1982. In that position, he had primary responsibility for overseeing the government's response to the thrift crisis in those years. Mr. Beesley was involved in the FSLIC's earlier attempts to liquidate troubled thrifts and concluded in the spring of 1981 that the FSLIC simply did not have the funds to liquidate all the troubled thrifts at that time. Mr. Beesley was involved in the decision to assist with the mergers of troubled thrifts with more healthy thrifts. There was some uncertainty as to whether regulators would allow the 40-year amortization allowed by GAAP. To resolve any uncertainty, the FHLBB issued Memorandum R-31b, replacing the earlier R-31a, which limited the amortization of goodwill to 10 years. Memorandum R-31b stated that the regulatory accounting

for an acquisition would follow GAAP.  If the accounting were in accordance with GAAP, it would be accepted for RAP purposes.  Mr. Beesley will make it clear that at the time of the Broward transaction RAP followed GAAP.  Mr. Beesley will state that the FSLIC did not sell Broward the accounting treatment it used in the Broward transaction because that accounting treatment was already allowed under GAAP.

Furthermore, Mr. Beesley will testify that the FSLIC and FHLBB had no intention of ever removing the goodwill Glendale resulting from the Broward acquisition.  He will explain that in 1981-1983, the FSLIC did not have the funds to liquidate Glendale and other thrifts that engaged in assisted mergers.  Indeed, the mergers were designed to alleviate this problem.  He will support Mr. Hargett's conclusion that there was a 0% chance of any change to the Broward related goodwill occurring in the first two years after the transaction.  Mr. Beesley will testify that Glendale's regulators would never take such action.  It took an Act of Congress for the treatment of the goodwill to be changed.

Plaintiff intends to call Richard Fink, an attorney for Glendale at the time of the transaction, to discuss certain facets of the merger, including the negotiations with the FSLIC/FHLBB.  Defendant expects that Mr. Beesley's testimony will clarify or correct any of Mr. Fink's erroneous assertions about regulatory accounting principles and the FHLBB/FSLIC's role and responsibility in the transaction.

**B.    Mr. Joe A. Hargett will explain the accounting and regulatory issues involved in the Glendale-Broward transaction.**

Plaintiff bases its understanding of accounting and regulatory matters on *dicta* from the Supreme Court's *Winstar* opinion.  Plaintiff's reliance is misplaced.  In *Winstar*, the Supreme Court was not asked to, and did not, interpret matters of GAAP or RAP.  Rather, that case

centered on whether there was a breach of contract.  And, while the opinion's statements on RAP and GAAP matters may be technically accurate, they do not tell the entire story.

Defendant will proffer the expert testimony of Joe A. Hargett, an expert in GAAP and RAP accounting in the savings and loan industry, in financial analysis of savings and loans, and in regulatory matters related to regulatory capital standards applicable to savings and loans in the 1980s and 1990s.  Mr. Hargett has nearly 40 years' experience directly related to accounting and regulatory matters of savings and loans, specifically regarding matters arising in the 1980s and 1990s.[13]

### 1.    Mr. Hargett's analysis of the RAP right guarantee

Mr. Hargett will provide the Court with an overview of the RAP right guarantee from an accounting, financial, and industry perspective.  Mr. Hargett's analysis will begin with a presentation of the applicable accounting standards for thrifts and GAAP and RAP standards for goodwill.  (*See supra* Background III.)  Mr. Hargett will explain the application of GAAP in Glendale's acquisition of Broward and Glendale's RAP accounting procedures.  Mr. Hargett will explain why Glendale was required to use the purchase method of accounting and how why the resulting goodwill was amortizable over 40 years.  Mr. Hargett's testimony will confirm that the accounting policies employed by Glendale, certified by its management, and attested by its auditors was in accordance with GAAP.  Lastly, Mr. Hargett will explain from an accounting

---

[13] Mr. Hargett is a *summa cum laude* graduate of the University of Alabama and a certified public accountant.  Following graduation, worked as an independent external auditor for Peat Marwick, working on many savings and loan audits.  He served as an accounting fellow at the FHLBB and the Office of Thrift Supervision, where he was the only accountant/CPA assigned to the internal OTS working group responsible for the implementation of FIRREA capital regulations, including drafting definitions of terms like "supervisory goodwill."  Since 1991, Mr. Hargett has been a financial consultant working extensively in the savings and loan and banking industries.

perspective how goodwill was incorporated into the capital/net worth accounts for purposes of reporting to the FSLIC.

### 2. Mr. Hargett's analysis of the financial reality of the transaction.

Mr. Hargett will also testify that if the assumption of excess liabilities were considered the measuring device for the cost of an acquisition, Glendale paid the maximum possible purchase price to enter the Florida market. Mr. Hargett will also testify that a substantial amount of the purchase price Glendale paid (in the form of excess liabilities assumed) in the Broward acquisition must remain as goodwill (an unidentified intangible asset) for that acquisition to be consistent with the financial reality at the time of the acquisition.

### 3. The probability of regulatory change.

Mr. Hargett will testify regarding the low probability of Glendale needing the RAP right guarantee in the years following the Glendale-Broward transaction. Specifically, Mr. Hargett will testify on: (1) what accounting changes would have been necessary; and (2) the probability of change within the first two years following the merger and within five years of the merger. Mr. Hargett will explain how the S&L industry's condition at the time, the regulatory landscape, and actions and statements made by Glendale management lead to the conclusion that it is inconceivable that Glendale would have had to modify its accounting treatment regarding the amortization of goodwill over forty years on a RAP basis in the two years immediately following the Broward acquisition.

### 4. Mr. Hargett will rebut the testimony of plaintiff's expert, Dr. McDonald.

Mr. Hargett will also address Dr. McDonald's model. Mr. Hargett will testify that Dr. McDonald's RAP Right Model: (1) is inconsistent with the financial reality of the November 1981 Broward acquisition; (2) does not value the RAP Right as an insurance policy; and (3) has

other material flaws, including a failure to account for operating expenses and a flawed estimate of the cost of deposits.  Mr. Hargett will testify that these issues render Dr. McDonald's valuation conclusion unreliable and overstated.

> **5.    Plaintiff's anticipated rebuttal testimony from Marc Oken, to the extent it is relevant, will support Mr. Hargett's testimony.**

Marc Oken was an accounting fellow with the Securities and Exchange Commission ("SEC") in 1981 and 1982.  In that capacity he was involved the issuance of Staff Accounting Bulletin No. 42 ("SAB 42"), which was issued on December 23, 1981.  The SEC did not regulate Glendale or Broward, because they were mutual thrifts, not publicly traded companies.  Indeed, Mr. Oken acknowledged that the primary regulators of Glendale were the FHLBB and FSLIC, and those regulators determined the regulatory accounting Glendale should use.  So even if the SEC had adopted an accounting rule different than that used by Glendale's regulators, the FHLBB's and FSLIC's RAP rules would control.  The Broward transaction occurred before the issuance of SAB 42, so that bulletin did not apply to that transaction.  Although Glendale became a public company in October 1983, Mr. Oken stated that the SEC would never apply accounting rule changes retroactively.  Therefore, Mr. Oken's testimony is largely irrelevant because nothing he will testify to applies to the Broward transaction.

The issue addressed by SAB 42 was to specify the proper period over which the goodwill resulting from the use of purchase accounting should be amortized.  It was based on the premise that GAAP allowed the use of purchase accounting because otherwise there would be no goodwill created and no corresponding amortization period.  Mr. Oken did not state that the use of purchase accounting was not in accordance with GAAP.

SAB 42 makes it clear that the SEC agreed that purchase accounting to account for a merger between two thrifts was in accordance with GAAP.  Otherwise, the lengthy discussion

49

over whether the amortization period for the goodwill should be 25 or 40 years would have been meaningless.  It is also clear that the only issue addressed in SAB 42 was whether a 40-year amortization period was appropriate or whether the period should be shorter.[14]  SAB 42 provided that when the thrift was entering into a new major market, the use of 40-year amortization was appropriate.  Under this rationale, the SEC would have probably approved Glendale's use of 40-year amortization, if Glendale were subject to its jurisdiction. [15]

Plaintiff has also identified Mr. Oken as a rebuttal witness to rebut Mr. Hargett's testimony regarding the possibility of Glendale's goodwill asset being eliminated.  Mr. Oken never indicated that the SEC considered requiring thrifts to write off any goodwill that resulted from the use of purchase accounting.  In fact, Mr. Oken made it clear that the SEC would never take such action.  Since the probability Mr. Hargett addressed was the likelihood of the elimination of the goodwill resulting from the Broward transaction, Mr. Oken's testimony will not be applicable to Mr. Hargett's analysis.

---

[14] In 1985, the SEC issued SAB 42A, which stated that the amortization of goodwill resulting from purchase accounting could be amortized for a period of no more than 25 years.  However, that bulletin only applied to mergers after September 30, 1982. This bulletin followed the enactment of FASB No. 72, which stated for mergers after September 30, 1982, the amortization period for the goodwill would be limited to 25 years.  Neither SAB 42A nor FASB No. 72 apply to the Broward transaction.

[15] The reference to a thrift moving into a major new market in SAB 42 was to Home Savings acquisition of a Florida thrift on December 12, 1981.  Unlike Glendale, Home was a public company and was subject to SEC jurisdiction.  Home requested that the SEC approve its use of a 40-year amortization period for the goodwill generated by accounting for the Florida acquisition as a purchase.  The SEC approved that request.  Since the circumstances of Glendale's acquisition of Broward were substantially similar to the Home transaction, it is reasonable to assume that had Glendale been required to obtain the approval of the SEC, the SEC would have granted that approval.

C.     **Mr. Kimball will rebut plaintiff's experts' opinions and provide a valuation of the RAP right guarantee.**

Defendant retained the services of Curtis Kimball, of Willamette Management Associates ("Willamette") to provide valuation consulting, review, and expert witness services in connection with this case.  Mr. Kimball provided similar services for defendant in *Washington Mutual, Inc. v. United States*, 1:08-cv-321 (Fed. Cl. Apr. 30, 2008), involving similar circumstances, a FSLIC-assisted merger of thrift in California and a thrift in Florida, and a substantially similar assistance agreement between the thrift and the FSLIC.  Mr. Kimball was accepted by this Court as an expert in valuation in *Washington Mutual* and testified at the trial in that case.[16]

1.     **Mr. Kimball will testify about the flaws in plaintiff's experts' reports and on the value of the RAP right guarantee.**

Mr. Kimball was asked to perform two functions in this case.  The first was to review and critique plaintiff's experts' reports.  Most of Mr. Kimball's pertinent comments on his review of plaintiff's experts have been set forth in the defendant's discussion of each expert above.  The second function Mr. Kimball was asked to perform was to determine the value of RAP right guarantee.[17]  Mr. Kimball was not asked to value any of the other rights or intangible assets

---

[16] Mr. Kimball is a managing director of Willamette.  He holds a BA degree from Duke University and an MBA from Emory University.  In addition to his work on *Washington Mutual*, Mr. Kimball has performed economic damages analyses, valuation analyses, remaining useful life analyses, and/or transfer price analyses on numerous types of intangible assets and intellectual property.  Mr. Kimball is an Accredited Senior Appraiser of the American Society of Appraisers in business valuation and holds the Chartered Financial Analyst ("CFA") of the CFA Institute.  He has valued business entities and business interests, analyzed public and private securities in investment portfolios, valued intangible assets, options and derivative interests, examined claims and damages, valued fractional interests, and intellectual property.  Mr. Kimball has submitted testimony in over 70 court and binding arbitration proceedings.

[17] Mr. Kimball's valuation of the RAP right guarantee is only relevant in the event that plaintiff can demonstrate, as a legal matter, that the RAP right guarantee became worthless.

Glendale received in the Broward transaction, because the only right or asset that could have been affected by the enactment of FIRREA was the RAP right guarantee, and that is the only asset that could be recovered by a deduction.

To determine the value of the RAP right guarantee, Mr. Kimball considered three generally accepted methods to value a guarantee. The first was the Market Value method. Under this method the value of the guarantee is estimated as (a) the fee received for the guarantee or (b) the difference between the market value of guaranteed debt and the market value of the nonguaranteed debt. The Market Value method was not applicable here because the requisite market data do not exist.

The second method for valuing the RAP right guarantee is the Credit Spread Method.

<u>Value of Supervisory Goodwill with Guaranteed 40-year amortization</u>
<u>-Value of Supervisory Goodwill without Guarantee</u>
=Value of the RAP right guarantee

There is no comparable data for determining a spread (*i.e.*, a difference in risk) related to the likelihood of a change in regulatory accounting treatment of goodwill so the credit spread method is inappropriate to the valuation of the RAP right.

The final method is the Contingent Claims method. Guarantee contracts can represent contingent claims to be settled in the future. The Contingent Claims method can be applied to value virtually any type of guarantee. The value of a guarantee under the Contingent Claims method is estimated as the present value of the probability-weighted expected cash flow. Mr. Kimball determined that the Contingent Claims method is the more reliable and reasonable method to value the RAP right guarantee. To value the RAP right guarantee, an estimate is made of the probability of a retroactive change in the treatment of supervisory goodwill (*i.e.*, the likelihood of a "triggering event") and the cost to replace the regulatory asset over the 40-year

amortization period.  Typically, the contingent claims method involves the identification of all payout scenarios and the likelihood of the occurrence of each scenario.

The starting point for the valuation of a guarantee is the valuation of the guaranteed asset, in this case the supervisory goodwill.  Mr. Kimball chose the cost of replacement capital model to determine the value of the goodwill asset.  The cost of replacement capital is estimated based on (a) the cost of raising capital and (b) after-tax costs of paying dividends on capital.  Since goodwill, a non-cash asset, is being replaced with tangible capital, the hypothetical buyer would be able to partially offset its cost of replacing the goodwill by investing tangible replacement capital in income producing assets.  Therefore, the cost of replacement capital is net of after-tax investment income.

Mr. Kimball determined that preferred capital would be the most cost-effective source of additional capital for a hypothetical willing buyer.  To determine the cost of raising replacement capital, Mr. Kimball calculated weighted average fees (based on the number of issuances of preferred stock) for raising capital as a percentage of total principal of preferred capital raised. Mr. Kimball concluded that the appropriate percentage was 2.3%.

The cost or replacement capital is derived from the issuance of dividends.  To estimate dividend yield, Mr. Kimball analyzed yields on straight and convertible preferred stock.  The dividend yield range for the examined convertible preferred stock issuances was between 7.1% and 15.9%.  Mr. Kimball opines that the dividend yield for a thrift institution, given the extreme economic conditions at the time of the merger, would be towards the high end of the rates.  Mr. Kimball selected 16% as the dividend yield on preferred capital.  To reflect dividend payments occurring during the year, Mr. Kimball multiplied his dividend yield of 16% by the average balance of supervisory goodwill.  To account for investment income throughout the year, Mr.

Kimball calculated an after-tax yield on mortgage assets of approximately 11.8% and applied that after-tax yield to the average annual balance of supervisory goodwill.  The total after-tax cost of preferred capital is equal to (a) the initial cost of raising preferred capital, plus (b) the after-tax cost of dividends on preferred capital, net of investment income.

To calculate the present value of the RAP right guarantee using the contingent claims method, Mr. Kimball used the modified capital asset pricing model ("CAPM") to estimate the cost of equity as of the transaction date.  After examining each of the components used in the CAPM model, Mr. Kimball concluded that the appropriate discount rate to use is 21.5%.  Mr. Kimball concluded that the value of the supervisory goodwill (*i.e.*, the cost of replacing capital immediately) was $153.3 million.

To determine the value of the RAP right guarantee, Mr. Kimball had to determine the likelihood of the triggering event occurring.  Mr. Kimball examined four possible scenarios using different possibilities of the triggering event occurring.  In Scenario 1, Mr. Kimball estimated that the likelihood of the trigging event occurring in the first two years after the transaction was 0%, through year three to five, the likelihood was 2% and was 2.5% thereafter.  In Scenario 2, Mr. Kimball estimated the likelihood of the triggering event occurring in the first two years, 2% percent in years 3-5, and 5% thereafter.   In Scenario 3, Mr. Kimball used the same likelihoods in years 1-5, as in Scenarios and 2, but used 10% beginning in year 6.  Finally, in Scenario 4, Mr. Kimball used 2.5% for every year.  Applying the likelihood scenarios to the present value of the cost of replacing the supervisory goodwill, generated a present value for the RAP right guarantee in the four scenarios of between $7.3 million and $20 million.

### 2.  Plaintiff's experts' critiques of Mr. Kimball's opinions do not withstand scrutiny.

Plaintiff's experts have raised varied criticisms of Mr. Kimball's analysis, but they often contradict each other.  Professor Froot takes the position that Mr. Kimball's valuation is "a contingent 'fund-as-you-go' strategy, by which Glendale would, upon revocation of the RAP right, immediately try to sell its equity to investors to raise the requisite replacement capital." (Froot Report at 31.)  By contrast, Mr. Plastino takes the contrary position that the Willamette valuation is from the perspective of the guarantor (the Government) rather from the perspective of the guaranteed party.  Neither Professor Froot nor Mr. Plastino is correct.  The Kimball valuation model is a cost savings model developed to answer the following two questions:

1. What expected cost savings did the RAP right guarantee provide to the guaranteed party (Glendale)?
2. What costs would the FSLIC expect to incur by entering into the RAP right guarantee.

Mr. Kimball's valuation model appropriately captures the fair market value standard-the perspective of a hypothetical willing buyer *and* a hypothetical willing seller.

Neither Professor Froot's nor Dr. McDonald's RAP right guarantee valuations were consistent with the fair market value standard.  Professor Froot failed to determine whether any thrift would have paid $464 million for the alleged insurance policy.  Dr. McDonald was unfamiliar with the term "fair market value."

Mr. Plastino's critique of Mr. Kimball's analysis is that his valuation is from the perspective of a guarantor.  This critique is based on an excerpt from Gordon Goodman's article, *How to Value Guarantees*.  However, Mr. Plastino omits the sentence in that article that states, "This difference in values, however, diminishes as the creditworthiness of the guarantor increases."  Gordon E. Goodman, *How to Value Guarantees*, Global Association of Risk Professionals, Issue 40 Jan/Feb 08, at 38.  The RAP right guarantee was a contract between

Glendale and the government, through the FSLIC.  The government's creditworthiness was not in question, and there is no alternative guarantor of the RAP right guarantee.  Therefore, the difference in values from the perspective of the guaranteed and guarantor would be diminished, and Mr. Plastino's critique is misplaced.

Professor Froot criticizes Mr. Kimball for reducing the value of the RAP right guarantee by the future income earned on the replacement capital.  One of the major flaws with Professor Froot's analysis is the assumption that the balance of the supervisory goodwill is replaced with cash. This assumption fails to address the issue that a dollar of cash is worth significantly more than a dollar of goodwill on the balance sheet.  In *Home Sav. of Am. v United States*, 57 Fed. Cl. 694, 723 (2003), this Court distinguished between the value of tangible capital and supervisory goodwill, stating, "tangible capital, like supervisory goodwill, may be used to meet regulatory capital requirements, but unlike supervisory goodwill, it is tangible and liquid and thus has the additional character of being able to produce a return of its own."  Further, in *Lasalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1375 (Fed. Cir. 2003), the Federal Circuit noted that "the benefits of . . . capital must be credited, as mitigation due to the replacement of goodwill with cash."  Therefore, Mr. Kimball's model appropriately values the supervisory goodwill using a cost of replacement capital that is net of the after-tax interest income that capital would generate.

Professor Froot and Mr. Plastino criticize Mr. Kimball's use of preferred capital to replace the supervisory goodwill.  Both argue that it would be difficult for a thrift to raise preferred capital.  Mr. Kimball model's use of preferred capital is well founded.  The Kimball model was designed based on the breach of contract cases, in which thrifts sought damages based on the cost of replacing their supervisory goodwill with preferred capital.  This was the case with

Home Savings.  Further, if preferred capital was not used as a substitute, income capital certificates were one potential alternative to supervisory goodwill at the time of the transaction. Plaintiff's experts do not consider any alternatives to replacing supervisory goodwill other than cash.

### D.    Professor Froot's rebuttal valuation of the RAP right guarantee is not reliable.

Defendant expects that plaintiff will call Professor Froot in rebuttal.  Professor Froot was hired by plaintiff to review and assess the reliability of defendant's expert report by Mr. Kimball. In preparing his rebuttal report, Professor Froot determined that in order to "rebut" the Kimball report, he found it necessary to state what a guarantee for an insurance contract would look like in this case.  Thus, as part of his rebuttal, Professor Froot created a valuation of the RAP right guarantee.

In modeling this guarantee, Professor Froot made several decisions, all of which make his result an unreliable estimate of the value of the RAP Right.  Each of these decisions had the effect of both (a) departing from the transaction as it happened; and (b) increasing the cost of the insurance policy.

As a threshold issue, in modeling the RAP right guarantee, Professor Froot assumed that the "guarantee" was, in fact, a full-on insurance contract.  While an insurance contract is *one type* of a guarantee, the RAP right guarantee was not a formal insurance contract.  Guarantees are common in business, and there is a deep reservoir of literature in valuing guarantees.[18]  As

---

[18] Put another way, to establish the cost basis, plaintiff must prove the value of the intangible assets *it received*.  Modeling the RAP right guarantee as an insurance contract increases the cost and no longer measures what Glendale actually got from the FSLIC (a government issued guarantee).  Plaintiff's burden is to prove to the Court the cost basis of a government promise. By deviating from valuing that promise, plaintiff sacrifices accuracy, and cannot meet their burden.

explained below, this initial assumption drew Professor Froot astray as he then included in his model costs associated with formal insurance policies (such as underwriting) that were not present in the actual transaction at bar.

After Professor Froot testifies, defendant intends to call Professor David Eckles. Professor Eckles holds the P. George Benson Professorship at the University of Georgia where is a professor of risk and insurance. The insurance program at the University of Georgia is currently ranked first in the country by U.S. News and World Report. Professor Eckles will explain the insurance industry, to include areas overlooked by Professor Froot, and note areas where Professor Froot's methodology departs from insurance principles and industry practice.[19]

### 1.    Professor Froot's estimation of $116 million in expected loss is unreliable.

Under Professor Froot's model he first determined the expected loss of his hypothetical insurance policy, and then multiplies the expected loss to account for "markups" such as underwriting. The initial determination of the expected loss is deeply flawed.

The first step in calculating the estimated loss is determining the probability of loss. For this case, this requires estimating the likelihood of the government breaching its RAP right guarantee. As discussed in the government's motion *in limine*, Professor Froot estimates the likelihood of a breach by using the results of four papers published decades after the merger. Those studies measured the amount of time that passed between the enactment and termination of federal credit programs, laws, and agencies. As a willing buyer or selling in 1981 would have access to neither the papers nor the majority of the underlying data, they could not have used Professor Froot's methodology or data to estimate the cost basis of the insurance contract he

---

[19] As Professor Froot was a rebuttal witness, Professor Eckles will testify in reply, and did not conduct his own valuation of the RAP right guarantee.

models.  Moreover, had he used the papers available at the time of the merger—*i.e.*, the ones the willing buyer and seller would have used had they tried to use his methodology—he would have come to the opposite result.

Even more importantly, Professor Froot's model does not reliably predict the likelihood of a breach of the RAP right guarantee.  Professor Eckles will explain that Professor Froot's model is not tailored to estimating the likelihood of a breach of the RAP right guarantee.  His estimates apply equally to *all* government programs in general.  His model does not consider or depend on any real-world variables.  So, for example, if one used Professor Froot's model to predict the chance that Congress would end the draft, his answer would depend solely on how much time had passed since the law establishing the draft had been passed.  His answer to the question would be the same if asked in 1941 (World War II) or 1992 (end of Cold War).  Professor Froot will be unable to show that his model accurately predicts the likelihood that the government would breach its RAP right guarantee.

After estimating the probability of loss, Professor Froot's next step is to estimate the expected loss.  Determining the value of the expected loss requires knowing the value of the insured asset.  Here, however, Professor Froot assumes that the insurance policy will replace all goodwill lost with an equal amount of cash.  Professor Eckles will testify that such a policy would leave the insured better off than they were without the breach, thereby violating the "indemnity principle" in insurance.  Again, the assumption that goodwill is replaced by cash has the effect of dramatically increasing the "price" of the policy he models.

### 2.    Professor Froot's estimate of $232 million to $464 million in markups is unreliable.

Professor Froot estimates that a private insurer would add between two times and four times the expected loss to the premium as "markups."  As he estimates the markup to be between

2x and 4x, this addition increases the cost of the policy he modeled by $232 million to $464 million.  Professor Froot's estimate of the proper markup is based on his "expertise in insurance to gauge what would be an appropriate markup to compensate an insurer for the cost of risk bearing." (Froot Report at 6.)  Professor Froot then attempts to explain that estimate through his corroborating analysis.

But it is clear from Professor Froot's report that the "cost of risk bearing" under his methodology includes *profit* for the private insurance company that he assumes will issue the policy.  While the RAP right guarantee was issued by the US government, the model used by Professor Froot assumes a hypothetical private insurer will issue the policy, and that insurer will be compensated for undertaking risk.

Professor Froot's model also assumes that the insurance policy will be written and covered by a single company.  Most large insurance contracts are "shared and layered" so that the risk is distributed between multiple insurers and reinsurers.  Professor Froot assumes that the risk will be carried by a single company.  Having made that assumption, Professor Froot next finds that the loss from such a policy would overwhelm most insurers, and that therefore a large markup is needed to provide a capital buffer in the event of a loss.[20]

Lastly, Professor Eckles will rebut Professor Froot's estimate of the premium of the RAP right guarantee by explaining that it is overstated due to improper theoretical foundations and assumptions that are not rooted in insurance principles, and that Professor Froot's corroborative analysis is disconnected from this theoretical qualitative exercise.

---

[20] Instead of modeling a government guarantee where the government could absorb a large loss, Professor Froot modeled a policy issued by a private insurer which could not.  This then requires the private insurer to boost the premium.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that this Court deny plaintiff's

claims in their entirety and enter judgment in favor of the government.

Respectfully submitted,

February 25, 2022

*/s/ Benjamin C. King, Jr.*
BENJAMIN C. KING JR.
Attorney of Record
JASON S. SELMONT
STEFAN R. WOLFE
Trial Attorneys
U.S. Department of Justice, Tax Division
Court of Federal Claims Section
Post Office Box 26
Washington, D.C. 20044
202-307-6506 (v)
202-514-9440 (f)
Benjamin.C.King@usdoj.gov

DAVID A. HUBBERT
 Deputy Assistant Attorney General
DAVID I. PINCUS
 Chief, Court of Federal Claims Section
G. ROBSON STEWART
 Assistant Chief

*/s/ G. Robson Stewart*
 Of Counsel

*Attorneys for Defendant*